UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LAURENCE MALZBERG,

                     Plaintiff,                            Case No. 19 Civ. 10048 (LJL)

     -against-

NEW YORK UNIVERSITY,

                     Defendant.
--------------------------------------------------------x

**PLAINTIFF'S LOCAL RULE 56.1 OPPOSITION TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS**

       Pursuant to Local Rule 56.1 of the Local Civil Rules of this Court, Plaintiff Laurence Malzberg ("Plaintiff' or "Malzberg") submits his opposition to Defendant's statement of undisputed material facts as to which Defendant contends there is no genuine dispute, along with Plaintiff's Supplemental Statement of Undisputed Facts, in support of his opposition to Defendant's Motion for Summary Judgment.

       1.       On or about October 30, 2019 Plaintiff Laurence Malzberg ("Plaintiff' or "Mr. Malzberg") filed a Complaint in the United States District Court for the Southern District of New York, alleging disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* as amended and the New York City Human Rights Law, N.Y.C. Admin Code § 8-101 *et seq. See* Joint Statement of Material Facts Not in Dispute (hereinafter "Joint Statement"), ¶ 1.

       **Plaintiff's Response**: Admitted.

       2.       Mr. Malzberg began his Physician Assistant ("PA") career at the Hospital for Joint Disease in January 2001. *See* Joint Statement ¶ 2.

       **Plaintiff's Response**: Admitted.

3.      In or around July 2005 Mr. Malzberg accepted a position as a PA in the Interventional Radiology Department ("IR") at NYU Langone. Joint Statement ¶ 3.

**Plaintiff's Response**: Admitted.

4.      In the IR PA position, Mr. Malzberg learned to insert Peripherally Inserted Central Catheters ("PICC lines"), mediport placements and removals, permcath placements, insertion of drainage catheters, and generally assisted the IR doctors with paperwork and patient care.  Joint Statement ¶ 4.

**Plaintiff's Response**: Admitted.

5.      Beginning in or around September 2005, in addition to working in IR, Mr. Malzberg worked at the Hospital for Joint Disease ("HJD") and at NYU's main hospital inserting PICC lines, mediports and permcaths. Joint Statement ¶ 5.

**Plaintiff's Response**: Admitted.

6.      In order to get from the Hospital for Joint Disease to the IR, Mr. Malzberg walked back and forth to each facility. *See* Declaration of Joan M. Gilbride ("Gilbride Decl."), Exhibit ("Ex.") "B," Exhibit "1," Malzberg Deposition Transcript ("Dep. Tr.") at p. 87.

> **Plaintiff's Response**: Denied. Plaintiff testified that he walked back and forth from the Hospital for Joint Disease ("HJD") to "the faculty practice." Def. Ex. B, Malzberg Dep. Tr. at p. 87:4-7.

7.      During his entire career as a PA at NYU, Mr. Malzberg never asked for any kind of accommodation to do his job. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 87-88.

**Plaintiff's Response**: Admitted.

8.      Mr. Malzberg applied for a Family and Medical Leave Act ("FMLA") Leave of Absence in or around February 2008. NYU approved his request and Mr. Malzberg took

intermittent FMLA leave from January 24, 2008 though January 24, 2009. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 41-43.

> **Plaintiffs' Response**: Admitted that Plaintiff took FMLA leave during this time period to care for his father. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 42:17-21.

9.      In or around March 26, 2009 Mr. Malzberg applied for, and was approved to take intermittent FMLA leave. Mr. Malzberg utilized this intermittent FMLA leave between February 6, 2009 and February 6, 2010. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 44-46.

> **Plaintiff's Response**: Admitted that Plaintiff took FMLA leave during this time period to care for his father. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 45:21-25.

10.     Mr. Malzberg was approved for, and took intermittent FMLA Leave a third time, between June 2011 and June 2012. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 47-48.

> **Plaintiff's Response**: Admitted that Plaintiff took FMLA leave during this time period to care for his mother. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 47:11-13.

11.     Mr. Malzberg never applied for FMLA leave to care for his personal medical issues. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 54.

> **Plaintiff's Response**: Admitted.

12.     In or around October 2012 Mr. Malzberg was instructed to report to NYU's Cancer Center, where he performed outpatient CT scans. Joint Statement ¶ 6.

> **Plaintiff's Response**: Admitted.

13.     Mr. Malzberg occupied a dual role in which he assisted with CT Scans at NYU Langone Medical Center Faculty Group Practice ("FGP") and also inserted PICC lines at the HJD. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 63-66.

> **Plaintiff's Response**: Admitted.

14.     Mr. Malzberg always performed CT scans while sitting down. Joint Statement ¶ 7.

**Plaintiff's Response**: Admitted.

15.     Mr. Malzberg resumed his position inserting PICC lines at the Hospital for Joint Disease in or around 2013 while continuing to perform outpatient CT scans.  Joint Statement ¶ 8.

**Plaintiff's Response**: Admitted.

16.     Mr. Malzberg performed his PA job without any accommodations from 2013 through 2019. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 87.

**Plaintiff's Response**: Admitted.

17.     Mr. Malzberg did not request any reasonable accommodations which would enable him to perform the essential functions of his job from 2001 through 2019. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 87.

**Plaintiff's Response**: Admitted.

18.     Mr. Malzberg did not seek medical care for his back at any point from 2001 through 2006. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. pp. at 87, 213-214.

> **Plaintiff's Response**: Denied. Defendant's citations to the record only support that Plaintiff did not have "medical documentation concerning the current state of any issues with [his] back" as of the date of his meeting with Evelyn Taveras. Ex. B, Malzberg Dep. Tr. at pp. 213:17-214:3.

19.     Mr. Malzberg had an X-ray and MRI scans of his back in or around 2006 and 2008, respectively. Joint Statement ¶ 9.

> **Plaintiff's Response**: Admitted that Plaintiff had at least one X-ray in 2006 and at least one MRI scan in 2008. Declaration of Scott Simpson in Opposition to Defendant's Motion for Summary Judgment, Ex. 3, Laurence Malzberg Deposition Transcript ("LM"), 213:17-214:3, 233:15-234:9.[1]

20.     Mr. Malzberg did not provide the MRI scans or X-ray records to NYU. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 213-4, 237-9.

---

[1] Hereafter, all citations to exhibits to the Simpson Declaration will simply be referred to as "Ex." followed by the exhibit number. Similarly, citations to exhibits to the Gilbride Declaration will be referred to as "Ex." followed by the exhibit letter.

7465672

**Plaintiff's Response**: Admitted.

21.     Between 2008 and 2019 Mr. Malzberg did not seek any treatment from a medical doctor related to his back. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 236.

> **Plaintiff's Response**: Denied. Plaintiff's testimony was that, between 2008 and 2019, he "did not *have* any treatment" related to his back. Ex. B, Malzberg Dep. Tr. at 236:6-10 (emphasis added).

22.     Mr. Malzberg received an MRI for his back on March 29, 2019, the last day of his employment with NYU. Joint Statement ¶ 10.

> **Plaintiff's Response**: Admitted.

23.     Mr. Malzberg did not provide medical records from the March 29, 2019 MRI to anyone at NYU. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 238-9.

> **Plaintiff's Response**: Admitted.

24.     Although the doctor who performed the March 29, 2019 MRI recommended that Mr. Malzberg receive physical therapy for his back, Mr. Malzberg did not obtain any such treatment. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 239.

> **Plaintiff's Response**: Denied as to "the doctor who performed the March 29, 2019 MRI …." Plaintiff was recommended physical therapy by the doctor who performed his December 2019 MRI, Dr. Kiril Kiprovski. Ex. 3, LM 239:16-25; Ex. 6, P139. Otherwise admitted with the addition that Plaintiff did seek physical therapy for his back. Ex. B, Malzberg Dep. Tr. p. 262:8-263:23.

25.     For the entirety of his employment with NYU, Mr. Malzberg did not provide NYU with any medical documentation regarding any issues with his back. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 87-88, 120-1, 213-4, 237-9.

> **Plaintiff's Response**: Admitted.

26.     Mr. Malzberg did not request any accommodations related to any back pain at any point during his employment. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 120-1, 213-4, 237-9.

7465672

**Plaintiff's Response**: Admitted.

27.     NYU provided Mr. Malzberg with glasses to protect his eyes from radiation exposure while performing procedures utilizing radiation, as well as a lead vest, collar and glasses. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 256-7, Gilbride Decl., Ex. "A," Complaint ¶¶ 14-15; Gilbride Decl., Ex. "F," Rybak Dep. Tr. at p. 77.

> **Plaintiff's Response**: Admitted that Plaintiff wore radiation glasses "during procedures" and that Plaintiff wore a lead vest and thyroid shield or collar while inserting PICC lines. Ex. B, Malzberg Dep. Tr. at 256:17-257:19; Ex. F, Rybak Dep. Tr. at 77:14-23.

28.     In or around 2018 Mr. Malzberg had four (4) eye surgeries to repair a detached retina and cataracts. Joint Statement ¶ 11.

> **Plaintiff's Response**: Admitted.

29.     Mr. Malzberg took time off from work for his eye surgeries, but returned to work with no medical restrictions. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 109-10, 252-3.

> **Plaintiff's Response**: Admitted that Plaintiff took time off work for his eye surgeries. Ex. 3, LM 252:2-22. Defendant's citations to the record do not establish that "he returned to work with no medical restrictions." Ex. B, Malzberg Dep. Tr. at 109-10, 252-53.

30.     For the entirety of his employment with NYU, Mr. Malzberg did not request any additional accommodations for his job responsibilities related to his eye surgeries or any impairments with his eyes. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 109-10, 117-8, 251-3, 256-7.

> **Plaintiff's Response**: Admitted.

31.     Following his eye surgeries in November 2018, Mr. Malzberg did not experience any further issues with cataracts in his eyes while employed at NYU.  Joint Statement ¶ 12.

> **Plaintiff's Response**: Admitted.

7465672

32.     For the entirety of his employment with NYU, Mr. Malzberg did not provide NYU with any medical documentation regarding any issues with his eyes or any need for accommodations related to his eyes, vision or cataracts. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 252-3.

**Plaintiff's Response**: Admitted.

33.     On February 14, 2019, Mr. Malzberg attended a meeting with Dan Alexa, Dr. Leon Ryback and Dr. Akhilesh Sista during which he was advised that his current position was ending, effective March 1, 2019. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 125, 129-30, 171.

> **Plaintiff's Response**: Denied. On February 14, 2019, Plaintiff attended a meeting with Dan Alexa, Dr. Rybak, and Dr. Sista during which he was advised that his help was needed in IR and that he would be required to report there on a fulltime basis, effective March 1, 2019. Ex.3, LM 125:10-21, 129:7-130:18, 136:13-22, 168:8-16, 171:8-16; Ex. A, Compl. ¶¶ 46-47.

34.     At the February 14, 2019 meeting, NYU offered Mr. Malzberg a position in IR, where he previously worked. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 125-7, 129-30.

> **Plaintiff's Response**: Denied. At the February 14, 2019 meeting, NYU told Mr. Malzberg that he was required to transfer to a position in IR. Ex.3, LM 125:10-21, 136:13-22; Ex. A, Compl. ¶¶ 46-47.

35.     Mr. Malzberg did not ask anyone at the meeting about the specifics about the offered position and did not inquire about non-procedural job duties. Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 133-4.

> **Plaintiff's Response**: Denied. When asked whether he "ask[ed] anybody at the meeting if the position would include anything other than doing procedures," Plaintiff responded, "I don't remember." Ex.3, LM 134:8-12. Moreover, Dr. Rybak testified that Plaintiff "was engaging" and "asking questions like anybody considering a new position would," including questions about the case mix. Ex. 10, Leon Rybak Deposition Transcript ("LR") at 127:11-19, 129:6-14. Daniel Alexa also testified that Plaintiff asked questions.

Ex. 11, Daniel Alexa Deposition Transcript ("DA") at 99:12-23.

36.     At the February 14, 2019 meeting, Dr. Akhilesh Sista told Mr. Malzberg that he was willing to work with him to carve out a position that accommodated his physical needs.  *See* Gilbride Decl., Ex. "E," Sista Dep. Tr. at pp. 124-6.

> **Plaintiff's Response**: Denied. When Plaintiff raised the issue of his disability during the February 14, 2019 meeting, Dr. Sista, Dr. Rybak, and Mr. Alexa were "quiet" and "looked at each other." Ex. 3, LM 136:13-20. No one mentioned the possibility of a reasonable accommodation. Ex. A, Compl. ¶ 49.

37.     Dr. Sista told Mr. Malzberg that there were many different tasks involved in the offered IR position, and NYU would "reduce any sort of difficulty [Mr. Malzberg has] physically with the job."  *See* Gilbride Decl., Ex. "E," Sista Dep. Tr. at pp. 124-5.

> **Plaintiff's Response**: Denied. When Plaintiff raised the issue of his disability during the February 14, 2019 meeting, Dr. Sista, Dr. Rybak, and Mr. Alexa were "quiet" and "looked at each other." Ex. 3, LM 136:13-20. No one mentioned the possibility of a reasonable accommodation. Ex. A, Compl. ¶ 49.

38.     During the February 14, 2019 meeting, Mr. Malzberg did not appear to consider accepting the offered IR position. *See* Gilbride Decl., Ex. "E," Sista Dep. Tr. at pp. 123-4.

> **Plaintiff's Response**: Denied. Dr. Rybak testified that Plaintiff "was engaging" and "asking questions like anybody considering a new position would." Ex. 10, LR 129:6-14. Alexa testified that Plaintiff agreed to move to IR. Ex.11, DA 101:8-102:13. Rybak testified that there was "a sense during and after that meeting … of relief that … this was gonna work out." Ex. 10, LR 127:20-24.

39.     Dr. Sista testified that NYU could provide an accommodation to a PA who could not stand for more than fifteen to twenty minutes without experiencing back pain. *See* Gilbride Decl., Ex. "E," Sista Dep. Tr. at pp. 125-6.

> **Plaintiff's Response**: Admitted.

40.     From January to April 2019, Dr. Sista had no knowledge of Mr. Malzberg's alleged back pain. *See* Gilbride Decl., Ex. "E," Sista Dep. Tr. at p. 163.

**Plaintiff's Response**: Denied. In or around December 2016, Dr. Sista asked Plaintiff if he would return to IR and Plaintiff told him about his back pain. Ex.3, LM at 73:25-74:13, 76:2-19; Ex. A, Compl. ¶ 32.

41.     During the same February 14, 2019 meeting, Mr. Alexa offered to provide Mr. Malzberg with any training needed for the offered position. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 128-9, 136.

**Plaintiff's Response**: Admitted that Plaintiff was offered training during the February 14 meeting. Otherwise denied. Defendant's citation to the record only establishes that Dr. Sista made the offer to train Plaintiff. Ex. 3, LM at 128:20-129:3.

42.     Mr. Malzberg did not request an accommodation at the February 14, 2019 meeting that would allow him to perform the essential functions of the offered IR position. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 135, 141-2, 219-20.

**Plaintiff's Response**: Admitted.

43.     Mr. Malzberg did not accept the offered IR position. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 135, 147-8, 210, 213.

**Plaintiff's Response**: Denied as to the characterization of the IR position as an "offer." Ex.3, LM 136:13-22. Plaintiff told NYU that he could not perform the IR position as it was described to him without experiencing physical pain. Ex.3, LM 137:13-138:20, 141:6-20, 210:24-211:10. In response, NYU told Plaintiff that "that was it." Ex.3, LM at 137:2-138:9, 193:16-195:19 ("I was not saying no to the position.").

44.     Mr. Malzberg stated that he could not perform the job that NYU offered him. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 141.

**Plaintiff's Response**: Denied as to the characterization of the IR position as "offered." Ex. 3, LM 136:13-22. Admitted that Plaintiff stated he could not perform the IR position as it was being described to him without experiencing physical pain, with the addition that Dr. Sista and Dr. Rybak both testified reasonable accommodations would have been possible. Ex. 3, LM 137:13-138:20, 141:6-20; Ex.1, Deposition of Akhilesh Sista ("AS") at 125:6-14, 125:22-126:23; Ex. 10, LR 124:15-21, 157:23-158:4.

45.     Mr. Malzberg did not offer any suggestions of any accommodations that would enable him to perform the offered IR job. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 141-2.

**Plaintiff's Response**: Admitted.

46.     Instead, Mr. Malzberg inquired about a severance package if he refused to accept the IR position. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 140-1, 147-8, 214-5; Gilbride Decl., Ex. "J," Pacina Dep. Tr. at p. 89.

**Plaintiff's Response**: Denied as to "if he refused to accept the IR position." Plaintiff inquired about a severance package because he was "being fired." Ex. 3, LM at 147:8-21.

47.     On February 15, 2019, Mr. Malzberg called Employee Relations and spoke to Michelle Hawkins. Mr. Malzberg then called Ms. Hawkins back and left a voicemail stating that he did not want the offered job and inquired whether he was eligible for unemployment. *See* Gilbride Decl., Ex. "L," NYU003913 – NYU003915; Gilbride Decl., Ex. "M," NYU003978.

**Plaintiff's Response**: Denied as to "stating that he did not want the offered job." Plaintiff states in his voicemail: "If a job is being offered to me that I do not want, and then I have to leave based on that, am I eligible for unemployment?" Ex. M, NYU003978. Otherwise admitted.

48.     Mr. Malzberg applied for a PA position in the Dysautonomia Center to work with Dr. Horacio Kaufmann. Joint Statement ¶ 13.

**Plaintiff's Response**: Admitted.

49.     Mr. Malzberg interviewed with Patricia Gaeta for the position in the Dysautonomia Center on or about March 4, 2019. Joint Statement ¶ 14.

**Plaintiff's Response**: Admitted.

50.     As of March 12, 2019 Mr. Malzberg had no official job offer for a PA position in the Dysautonomia Center. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 178-80.

7465672

**Plaintiff's Response**: Denied. Defendant's citation to the record only establishes that, as of March 12, 2019, Plaintiff "had nothing in writing from anybody at NYU offering [him] a position in Dysautonomia." Ex. 3, LM 179:7-180:20. Plaintiff had a verbal offer from Dr. Kaufmann. LM 158:2-15.

51.     Mr. Malzberg learned that he did not receive a job offer for the position in the

Dysautonomia Center on March 15, 2019. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp.

211-2, 215; Gilbride Decl., Ex. "G," Taveras Dep. Tr. at p. 60.

**Plaintiff's Response**: Denied. Plaintiff learned that the job he had been offered by Dr. Kaufmann and subsequently accepted was no longer being offered to him. Ex. 3, LM at 211:15-212:4; Ex. 27, NYU351. Plaintiff learned this information on March 14, 2019. Ex. 20, NYU344.

52.     After learning that he would not be offered the position with Dr. Kaufmann, Mr.

Malzberg requested a meeting with Employee Relations at NYU and on March 27, 2019 he met

with Evelyn Taveras in in her office. Joint Statement ¶ 15.

**Plaintiff's Response**: Admitted.

53.     Mr. Malzberg told Ms. Taveras that he believed he was being fired and wanted to

know what severance he was entitled to receive. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr.

at pp. 214-5; Gilbride Decl., Ex. "G," Taveras Dep. Tr. at p. 62.

**Plaintiff's Response**: Denied as to "Mr. Malzberg told Ms. Taveras that he believed he was being fired." Plaintiff told Ms. Taveras that he *was* being fired. Ex. 3, LM 214:17-215:5. Otherwise admitted.

54.     Mr. Malzberg also told Ms. Taveras that he would not accept the new job because

he had a "physical disability" and he believed he was being fired because of his age.  *See*

Gilbride Decl., Ex. "B," Malzberg Dep. at pp. 213-20; Gilbride Decl., Ex. "G," Taveras Dep. Tr.

at pp. 62, 67.

**Plaintiff's Response**: Denied. Plaintiff told Ms. Taveras that he was "being fired" and that he "could not do the position due to physical disability and pain." Ex. 3, LM 214:17-215:5. After raising the issue of his disability, when Ms. Taveras responded that he was not being fired for his back problems, Plaintiff said, "sarcastically," "What is it[,] my

7465672

age?" Ex. 3, LM 215:6-23, 217:3-218:9.

55.     However, Mr. Malzberg did not provide Ms. Taveras with any medical documentation regarding any physical impairment or medical issue at any point during his March 27, 2019 meeting with Ms. Taveras. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 211-3.

**Plaintiff's Response**: Admitted.

56.     On March 28, 2019, Ms. Taveras sent an email to Mr. Malzberg. In the fourth paragraph of her email, Ms. Taveras wrote that NYU would provide Mr. Malzberg with appropriate training and "would work with [him] to provide a reasonable accommodation that would allow [him] to support the essential functions of the role." Joint Statement ¶ 16.

**Plaintiff's Response**: Admitted.

57.     Mr. Malzberg did not respond to Ms. Taveras' March 28, 2019 written offer of reasonable accommodation. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 219-20.

**Plaintiff's Response**: Admitted.

58.     Mr. Malzberg did not request reasonable accommodations from anyone at anytime during his employment with NYU. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 219-20.

**Plaintiff's Response**: Admitted.

59.     Mr. Malzberg did not apply to any other jobs within the NYU system prior to the date his position ended on March 29, 2019. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at p. 189.

> **Plaintiff's Response**: Admitted that Plaintiff did not apply to any jobs other than the
> Dysautonomia position with Dr. Kaufmann. *See* Ex. B, Malzberg Dep. Tr. at p. 189:7-6.

7465672

60.      Mr. Malzberg reported to work at HJD on April 1, 2019, to demonstrate that he did not quit his job. Joint Statement ¶ 17

**Plaintiff's Response**: Admitted.

61.      On April 1, 2019 Daniel Alexa gave Mr. Malzberg a letter dated March 26, 2019 advising him that he would be required to return to IR or be "released" from his position. Joint Statement ¶ 18.

**Plaintiff's Response**: Admitted.

62.      The letter also explained that Mr. Malzberg's job responsibilities had changed to meet the operational needs of the department, and while the changes were originally slated to occur on March 5, 2019, when Mr. Malzberg informed Dr. Rybak that he found another position in NYU, NYU extended his current position until he started the new position or the end of March. *See* Gilbride Decl., Ex. "C," Malzberg Dep. Ex. 16; Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 208, 210-1; Gilbride Decl., Ex. "I," Alexa Dep. Tr. at pp. 135-8.

**Plaintiff's Response**: Admitted.

63.      Mr. Alexa also informed Mr. Malzberg that he had to leave HJD, but once again offered Mr. Malzberg the open PA position in IR. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 210-1.

> **Plaintiff's Response**: Denied as to "once again offered Mr. Malzberg the open PA position in IR." Mr. Alexa reiterated NYU's ultimatum that Plaintiff could either move into the IR position or else be forced to leave. Ex. 3, LM at 210:4-211:10. Otherwise admitted.

64.      Mr. Malzberg once again declined the position and instead chose to leave. *See* Gilbride Decl., Ex. "B," Malzberg Dep. Tr. at pp. 210-1.

> **Plaintiff's Response**: Denied. Plaintiff told Mr. Alexa, "[I]t's not that I don't want to, I physically can't [perform the job as described]." Ex.3, LM at 211:3-10.

13

65.     HR documents state that Mr. Malzberg was officially "released" from his position with NYU on April 4, 2019. Joint Statement ¶ 19.

**Plaintiff's Response**: Admitted.

## PLAINTIFF'S SUPPLEMENTAL STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

### I. Plaintiff's Disability

66.     Plaintiff suffers from chronic, severe lower back pain. Ex. A, Compl. ¶¶ 16, 32-34, 39; Ex. 3, LM 87:12-21, 110:3-16, 137:7-25, 210:13-23, 218:13-25, 220:16-19; Ex. 2, Expert Report; Exs. 4-8.

67.     Plaintiff's back pain began in or around 2005 or 2006 while he was a PA in NYU's Interventional Radiology Department ("IR"). Ex. 2, Expert Report at 1; Ex. 3, LM 55:8-12, 213:17-214:3 (noting existence of 2006 medical records pertaining to back).

68.     Dr. Christopher Gharibo, a pain management specialist employed by NYU, ordered an MRI for Plaintiff in connection with his worsening back pain in November 2008. Ex. 3, LM 234:3-17; Ex. 4; Ex. A, Compl. ¶ 33.

69.     The resulting MRI report, dated November 13, 2008, identified the following conditions in Plaintiff's lumbar spine: (1) large Schmorl's nodes, (2) fatty Modic endplate changes, (3) disc desiccation, (4) mild disc bulging, (5) diffuse disc bulging, (6) disc ridging, (7) mild neural foraminal stenosis, and (8) suspected annular fissure. Ex. 4.

70.     The 2008 MRI report summarized these results as "mild multilevel discogenic degenerative changes." Ex. 4.

71.     At some time between November 2008 and March 29, 2019, Malzberg sought treatment for his back from an acupuncturist and a chiropractor. Ex. 3, LM 236:6-237:2.

14

72.     Beginning in or around 2005 or 2006, Plaintiff experienced difficulty standing for more than 15-20 minutes at a time because of his back pain. Ex. 2, Expert Report at 1.

73.     In December 2016, Plaintiff experienced difficulty standing for long periods of time because of his back pain. Ex.3, LM 73:25-74:7, 75:23-76:19, 79:21-25.

74.     In January, February, March, and April 2019, Plaintiff experienced difficulty standing for long periods of time because of his back pain. Ex. 3, LM 110:3-16, 134:13-21, 136:3-7, 183:24-184:13, 186:8-187:12, 210:13-23; Ex. 19, 7; Ex. 27.

75.     In 2019, Plaintiff could not stand for longer than 15-20 minutes at a time without experiencing substantial pain in his back. *See* Comp. ¶ 34; Ex. 2, Expert Report at 2.

76.     In March 2019, Plaintiff's pulmonologist and general practitioner, Dr. Mona Bashar, ordered a second MRI in connection with Plaintiff's back pain. Ex. 2, LM 237:20-238:15; Ex. 5.

77.     The resulting MRI report, dated March 29, 2019, identified the following conditions in Plaintiff's lumbar spine: (1) compression deformity, (2) Schmorl's nodes, (3) multilevel disc desiccation, (4) mild space narrowing, (5) facet arthropathy, (6) disc bulging, (7) possible foraminal disc protrusion, (8) possible annular fissure, (9) mild ligamentous thickening, (10) mild stenosis, and (11) mild degenerative changes of the sacroiliac joints. Ex. 5.

78.     The 2019 MRI report summarized these conditions as "multilevel degenerative changes of the lumbar spine with possible small left foraminal disc protrusions." Ex. 5.

79.     The March 2019 MRI report also noted that its findings had "progressed" as compared to the findings of Plaintiff's MRI in 2008. Ex. 5, P113-14.

80.     The findings in Plaintiff's March 2019 MRI report are consistent with those of someone who suffers from back pain. Ex. 2, Expert Report at 2.

7465672

81.    On November 18, 2019, Plaintiff was examined by Dr. Kiril Kiprovski, a physician in NYU's Clinical Neurophysiology Department. Ex. 6.

82.    Dr. Kiprovski's notes reflect that Plaintiff experiences "intermittently exacerbated lower back pain" that "is worse upon standing". Ex. 6.

83.    Dr. Kiprovski also noted in his examination that Plaintiff "has pain in the gluteal area, which is likely referred somatic spinal pain." Ex. 6.

84.    Dr. Kiprovski recommended physiotherapy for Plaintiff's back pain and noted that, "[i]f the pain exacerbates," he would consider "referring [Plaintiff] for lumbar spinal epidural injection." Ex. 6 at P139; Ex.3, LM 236:19-25, 261:14-19.

85.    Dr. Kiprovski also ordered an MRI of Plaintiff's lumbosacral plexus, which took place on December 26, 2019. Ex. 7, P172-74.

86.    The resulting MRI report, dated December 26, 2019, identified the following conditions in Plaintiff's lumbosacral spine: (1) small disc bulges contacting the descending nerve roots, and (2) mild bilateral facet joint osteoarthritis. Ex. 7, P172-74.

87.    The December 2019 report also referenced "lower back pain for years" and "chronic axial lumbar pain." Ex. 7, P172-74.

88.    On November 21, 2019, Plaintiff was examined by Dr. Robert Meislin, who diagnosed him with degenerative disc disease, chronic bilateral low back pain without sciatica, herniated lumbar disc without myelopathy, and lumbosacral radiculopathy.  Ex. 8.

89.    [Intentionally Left Blank]

90.    On March 10, 2021, Plaintiff was examined by Dr. Jeff Silber, an orthopedic surgeon affiliated with Hofstra Northwell School of Medicine. Ex.2, Expert Report at 1-2.

91.    Dr. Silber noted that Plaintiff "still complains of periodic significant bouts [of] low back pain." Ex. 2, Expert Report at 1.

16

7465672

92.     In his physical exam of Plaintiff, Dr. Silber noted that Plaintiff "has palpatory tenderness in the paraspinal musculature across his lumbosacral joints." Ex. 2, Expert Report at 2.

93.     Dr. Silber also examined Plaintiff's March 2019 MRI results and concluded they "are consistent with someone who suffers from back pain." Ex. 2, Expert Report at 2.

94.     Dr. Silber concluded that Plaintiff suffers from a "lumbar degenerative condition" with "disc bulging and facet arthropathy (arthritis), as well as foraminal narrowing (pinched nerves) at multiple levels." Ex. 2, Expert Report at 2.

95.     Dr. Silber further concluded that Plaintiff "will suffer periodic low back exacerbations" and recommended "he perform a more sedentary-type job that only involves periodic standing for no more than 10-15 minutes without a lead apron." Ex. 2, Expert Report at 2.

96.     To alleviate his back pain, Mr. Malzberg has performed exercises and taken anti-inflammatory medication. *See* Ex. B, Malzberg Dep. Tr. p. 263; Ex. 2, Expert Report at 1.

## II. Physical Demands of Plaintiff's Job Responsibilities Between July 2005 and March 2019

97.     Over the course of his career at NYU Langone, which lasted from January 2001 to April 2019, Plaintiff worked as a PA in the Interventional Radiology Department ("IR") (2005-2012), the Hospital for Joint Disease ("HJD") (2001-2012, 2013-2019), the Cancer Center (2012), and the Faculty Practice Group ("FPG") (also known as the Faculty Practice Organization or "FPO") (2012-2019). Ex. 25; Ex. 9; Ex. 3, LM 12:7-18, 14:18-15:4, 17:6-9, 18:21-19:2, 61:13-18, 64:10-65:14, 66:2-6, 67:6-17, 68:3-10; Ex. 10, LR 67:4-18; Ex. 2, Expert Report at 1; Ex. A, Compl. ¶¶ 11-12, 15, 17.

7465672

98.     At FPG and the Cancer Center, Plaintiff's work consisted primarily of CT scans, which were always performed while sitting down and did not require protective equipment. Ex. 3, LM 63:22-65:7, 67:18-68:10, 80:6-20, 84:5-85:16; Ex. 10, LR 67:4-18, 69:13-71:12; Ex. 9.

99.     Plaintiff's work in both IR and HJD involved the insertion of Peripherally Inserted Central Catheters ("PICC lines"), which required standing up and wearing a lead suit or apron. Ex. 9, P235; Ex. 3, LM 55:8-56:13, 71:19-73:17; Ex 10, LR 67:4-18, 85:9-21; Ex. 1, AS 55:21-58:25 (describing lead suit).

100.    Inserting PICC lines at HJD was less painful for Plaintiff's back than inserting PICC lines in IR. Ex. 3, LM 80:6-82:2; Ex. A, Compl. ¶¶ 15-16.

101.    Case volumes at HJD are "much less" than in IR. Ex. 10, LR 83:13-24; Ex. 3, LM 136:3-7 ("I worked there for seven and a half years. That big board gets more cases as the day goes by.").

102.    Plaintiff performed PICC-line insertions at HJD faster and more easily than he performed the same procedure in IR, at least in part because the patients' conditions were less severe and there was more time between patients. Ex. 3, LM 80:21-82:2; Ex. 10, LR 73:24-74:21 ("Larry I think was probably on the faster more efficient side."); Ex. A, Compl. ¶¶ 15-16.

103.    When inserting PICC lines at HJD, Plaintiff generally spent no more than 10-15 minutes standing at one time. Ex. 3, LM 82:3-84:4.

104.    From 2015 to 2019, PICC-line insertions at HJD were the only job responsibility Plaintiff had that required standing up while wearing a lead suit or apron. Ex. 9, P235-36; Ex. 11, DA 60:02-20; Ex. 10, LR 67:4-18, 70:8-13; Ex. 3, LM 81:20-82:2, 84:5-85:16.

105.    While working as a PA in IR from 2005-2012, Plaintiff was required to stand for up to 1-2 hours at a time while wearing a lead suit or apron weighing up to 20 pounds. Ex. 2, Expert Report at 1; Ex. A, Compl. ¶¶ 14, 35.

7465672

Case 1:19-cv-10048-LJL   Document 68   Filed 09/17/21   Page 19 of 31

106.    The internal posting for the IR job in March 2019 included PICC-line insertions, tunneled catheters, drainage catheter checks, and mediport insertions, all of which are typically performed while standing up and wearing a lead suit. Ex. 14, NYU1210; Ex. 10, LR 75:12-17, 77:14-79:5, 85:9-21, 88:15-90:10, 92:22-93:12; Ex. 1, AS 45:22-46:21, 52:15-52:24, 55:21-58:25, 62:3-64:25, 65:23-67:18, 70:3-22.

### III. Proposed Transfer to IR

107.    On January 15, 2019, Dr. Leon Rybak, Vice Chair of Operations in the Radiology Department, asked Plaintiff how he would feel about intermittently doing some work in IR in addition to his then-current responsibilities. Ex. 3, LM 11:16-12:12, 110:3-16; Ex. 10, LR 11:7-13, 14:3-10.

108.    Plaintiff told Dr. Rybak on January 15 that returning to IR would cause him severe back pain that has gotten worse over time. Ex. 3, LM 110:3-16, 111:25-112:9, 114:23-115:6, 134:13-25.

109.    Plaintiff also told Dr. Rybak on January 15 that he would be willing to consider the proposal pending further details about what the role would require. Ex. 3, LM 111:11-24, 113:10-114:2.

110.    According to Dr. Rybak, prior to February 14, 2019, Plaintiff told Dr. Rybak that he had reservations about doing "big cases" in IR. Ex. 10, LR 121:13-122:21.

111.    On February 14, 2019, in a meeting with Dr. Rybak and Dr. Akhilesh Sista, Division Chief of IR, and Daniel Alexa, Radiology Department Administrator, Plaintiff was informed that he would be required to report to IR on a fulltime basis beginning March 1, 2019. Ex.3, LM 125:10-126:8, 129:7-22, 171:8-16; Ex. 1, AS 9:17-20; Ex. 11, DA 8:8-14.

112.    In response, Plaintiff informed Rybak, Sista, and Alexa on February 14 that he was concerned about his physical ability to do the IR job. Ex. 1, AS 124:5-21.

113.    Specifically, Plaintiff informed them on February 14 that standing for long periods of time causes him severe back pain and that he physically could not do the IR job without pain. Ex. 3, LM 134:13-20, 136:13-22, 141:21-142:7 ("I let my management know that it's physically very difficult for me to perform those duties without pain for the job they want me to take.").

114.    Rybak, Sista, and Alexa responded to Plaintiff's concern about his back pain by "look[ing] at each other" quietly. Ex. 3, LM 136:13-25.

115.    Rybak, Sista, and Alexa did not contact NYU's Employee and Labor Relations Department ("ELR") to inform them of Plaintiff's concerns, nor did they advise Plaintiff to contact ELR. Ex. 1, AS 126:24-128:10; Ex. 3, LM 136:13-25, 143:11-15; Ex.10, LR 144:14-146:7, 155:11-14; Ex. 11, DA 27:10-20.

116.    Plaintiff felt forced, uncomfortable, and ganged up on during this meeting. Ex. 3, LM 136:13-25.

117.    Plaintiff was particularly disappointed in Rybak, "as he knew about the back issue" prior to the February 14 meeting. Ex. 3, LM 134:13-25.

118.    Dr. Rybak testified that the meeting "went well" and that Plaintiff "was asking questions" about the case mix and job responsibilities, including whether he would be doing PICC lines or "big" procedures. Ex. 10, LR 127:9-129:24 ("I know Larry pretty well by now. He wasn't being reserved, he was not being withdrawn. He was engaging, he was discussing and asking questions like anybody considering a new position would."), 132:19-133:3, 134:4-135:3,

119.    Rybak also described Plaintiff as a "very good advocate for himself." Ex. 10, LR 66:8-17.

7465672

120.     Alexa testified that the meeting went "very well," that Plaintiff agreed to move to IR, and that Plaintiff asked questions about the position. Ex. 11, DA 97:9-23, 97:24-99:23, 101:8-102:25.

121.     Sista testified that Plaintiff was "pretty quiet," "reserved," "didn't ask a lot of questions" during the meeting, and was "a bit apprehensive" towards the end of the meeting. Ex. 1, AS 121:15-124:04.

122.     Rybak and Alexa both denied or stated they could not recall whether Plaintiff ever discussed his back pain or physical ability to do the job on February 14 or any other date. Ex. 10, LR 7:16-24 ("Larry never communicated anything to me directly about his back."), 130:21-131:4; Ex. 11, DA 6:23-7:21,104:12-21.

123.     Dr. Sista specifically recalled that Plaintiff "did describe some concern about his physical abilities" and "described some physical impediment" on February 14 but could not remember whether Plaintiff mentioned back pain. Ex. 1, AS 124:5-21, 127:14-21.

124.     Sista did not ask Plaintiff any further questions about his physical impediment. Ex. 1, AS 127:14-128:10.

125.     Sista recalled that he "left that meeting waiting for the next steps for accommodation from Dan, Larry and Leon to come up with, you know, what are we gonna do next." Ex. 1, AS 126:19-127:13.

126.     Rybak, Sista, and Alexa all knew that Plaintiff would have a problem with transferring to IR prior to meeting with him on February 14, 2019. Ex. 15, NYU707; Ex. 11, DA 86:23-87:20, 91:12-92:20; Ex. 10, LR 121:16-122:14; Ex.1, AS 114:4-115:10; Ex. 3, LM 110:3-16, 111:11-112:9, 113:10-114:2, 114:23-115:6.

127.     On January 24, 2019, Alexa sent an email to Michael Recht, Chair of Operations and Dr. Rybak's boss, stating that "Leon [Rybak] has some concern that [Plaintiff] will not stay

21

[in IR] if we move him - I think it would be ok if he does happen to leave. ... We could replace him with a less expensive APP [advanced practice practitioner]." Ex. 12, NYU1402-03; Ex. 11, DA 70:6-73:21; Ex.10, LR 11:19-12:7.

128.    On February 13, 2019, Alexa emailed Rybak and Sista proposing they talk to Plaintiff about the transition back to IR and alerting them, "I recognize he may not love this and we will have to deal with that." Ex. 15, NYU707; Ex. 11, DA 86:23-87:20, 91:12-92:20; Ex. 10, LR 121:16-122:14; Ex.1, AS 114:4-115:10.

129.    Rybak responded to Alexa's email on February 13 with the following: "I know from speaking to him in the past that he is going to ask about the nature of the cases and will specifically ask about his fluoro exposure. He is reluctant to do any long cases which involve fluoro. We need to be as frank and open with him as possible and if the job doesn't fit for him, we will have to let him know that we will have to find someone else who does want the position." Ex. 15, NYU707; Ex. 10, LR 121:16-122:14.

130.    On February 14, 2019, Alexa sent an email to John Davidson, Senior Director of PA Services and Care Management, alerting him that "we will be meeting with Larry Malzberg at 1:30 today," that "[w]e are going to let him know that we need him to support the VIR dept at Tisch now," and that "Larry may not be very excited about this change and he may come to you." Ex. 29; Ex. 18, John Davidson Deposition Tr. ("JD") 21:20-25, 50:17-51:20.

131.    Plaintiff raised his concerns about the IR position for a third time a few days after the February 14 meeting. He called Dr. Rybak on the phone and told him that "to go back [to IR] would cause [him] a great deal of pain" and specifically "lower back pain which has worsened over time." Ex. 3, LM 137:02-25.

132.    When Plaintiff asked Dr. Rybak over the phone what would happen if he could not do the IR job due to physical pain, Dr. Rybak told him, "If you don't take the job, that's it,"

7465672

implying Plaintiff would be out of a job. Ex. 3, LM 137:25-138:20 ("So I said [to Rybak], what if I couldn't do the job due to the physical pain…[?] He said to me, well, that's it. I said, what do you mean? If you don't take the job, then that's it. So I said, what, I'm out? He goes, yep, that's it. I was shocked.").

133.     NYU Langone's "ADA & Requests for Accommodations Policy Statement" mandates the following: "In order to ensure compliance with this provision of the ADA, if a supervisor becomes aware of an individual's request for an accommodation contact the Employee & Labor Relations Department. … The Employee & Labor Relations Department is responsible for coordinating, tracking and retaining requests for accommodations. An employee who seeks a workplace accommodation under the ADA will be referred to CIGNA and provided with an ADA Accommodation Request Form for completion by the employee's physician. The Employee & Labor Relations Department representative will review documentation and discuss the accommodation request with the Department Manager to determine feasibility or if another accommodation can be provided." Ex. 13; Ex. 10, LR 28:3-19.

134.     NYU Langone's "ADA & Requests for Accommodations Policy Statement" also specifies: "If as a supervisor you manage an employee with a known disability who is having significant difficulty performing his/her job and it is reasonable to conclude that the performance problem may be related to the known disability, the Medical Center has a duty to ask the employee about the possible connection between their disability and the performance problem." Ex. 13; Ex. 10, LR 28:3-19.

135.     Dr. Rybak testified that, as of early 2019, he was familiar with NYU's reasonable accommodations policy requiring him to contact ELR if he became aware of an employee's need for an accommodation. Ex. 10, LR 28:3-19, 31:23-32:25; Ex. 13.

7465672

136.    As of early 2019, Dr. Rybak understood that he was obligated to "take it to HR" if "an employee let [him] know about a physical problem that might interfere with their ability to perform their job." Ex. 10, LR 32:19-25.

137.    Dr. Sista testified that he was also familiar with this reasonable accommodation policy and understood it was "[his] obligation" to "begin" the process of discussing a reasonable accommodation. Ex. 1, AS 79:15-83:17.

138.    Sista testified that, in 2018, when he learned that a colleague had back surgery, he raised the issue with leadership, went through NYU's policies, worked with faculty to get the colleague time off and adjustments for his job, and "engage[d] in dialogue" with him about what he would need. Ex. 1, AS 79:15-80:6, 143:16-144:11.

139.    Sista further testified that his "general practice" upon learning that an employee needs a reasonable accommodation is to "get the advice of departmental leadership for the next steps because N.Y.U. has clear policies on … what the next steps are and ... often it involves a liaison with H.R. and … referencing the official policies of N.Y.U. and then having those collaborative discussions with the employee." Ex. 1, AS 79:15-80:15.

140.    Both Rybak and Sista testified and believed that reasonable accommodations could have been made for Plaintiff in IR. Ex. 1, AS 125:6-14 ("[T]here are a lot of different things that [Plaintiff] can do in the section that we can emphasize that will reduce any sort of difficulty [he has] physically with the job."), 125:22-126:23 (confirming his "opinion" that "an accommodation could have been made"); Ex. 10, LR 124:15-21 ("I think that with the mix of cases and the mix of non-case related work that's involved in the VIR section that Larry very easily could have carved a nice niche for himself that didn't involve excessive periods of fluoro exposure, that didn't involve excessive periods where he was wearing lead."), 157:23-158:4 ("[T]here would be no reason that we couldn't transition him to this new position and get him

24

exactly what he wanted with respect to fluoro – overall fluoro time, and it wouldn't have been that much different than what he was already experiencing.").

141.     Sista testified that it was theoretically possible for many of the VIR job duties to be performed while sitting down, including mediport placements, tunneled catheters, drainage catheter check, superficial biopsies and PICC line insertions. Ex. 1, AS 52:15-24 (mediport placements), 65:2-22 (tunneled catheters), 65:23-67:18 (drainage catheter check), 67:19-68:21 (superficial biopsies), 71:5-7 (PICC line insertions).

142.     According to Dr. Rybak, "there may be rooms where you can accommodate a chair" during procedures, and that he personally could sit down during procedures if he needed to. Ex. 10, LR 80:19-24, 85:22-86:6.

143.     Plaintiff's job duties at IR could have been modified so he could perform them despite his back pain. Dr. Rybak stated "[t]here were lots of small simple cases [Larry] could do. There were lots of ultrasound guided procedures he could do that would be less taxing than when he was doing PICC lines." Ex. 10, LR 157:9-22.

144.     Dr. Sista also suggested that Plaintiff's job duties could have been modified: "So what I believe my response was to him when he raised his physical impediments was that there are a lot of different things that you can do in the section that we can emphasize that will reduce any sort of difficulty you have physically with the job, and I'm willing to work … with you to sort of carve out a position that … takes into account what you're describing." Ex. 1, AS 124:19-125:14.

### V. Defendant Fails to Initiate or Engage in the Interactive Process and Forces Plaintiff out of His Job

145.     When Rybak, Sista, and Alexa failed to respond to Plaintiff's concern that he could not do the job in IR as it was being offered to him because of his back pain, Plaintiff took

7465672

steps to obtain his own reasonable accommodation. Ex. 3, LM 142:8-19 ("[S]ince I was being told to take that job or you're out, I was forced to make my own – let's call it my own accommodation.").

146.     On February 20, 2019, Plaintiff called HR and described his situation to a receptionist. Ex. 3, LM 143:7-145:12, 150:8-16.

147.     Plaintiff then went to HR in person on February 20 and met with Kathleen Pacina, a Manager in NYU Langone's Employee and Labor Relations Department. Ex. 3, LM 145:17-24, 150:8-16; Ex. 16, Kathleen Pacina Deposition Tr. ("KP") 14:16-15:16, 88:15-93:2.

148.     After Plaintiff "told [Pacina] the entire story," including "that [he was] forced to endure pain to a do a job," she informed him that "if you're offered a job of the same level … and you decline it for any reason, you're seen as quitting." Ex. 3, LM 146:7-25, 148:2-19.

149.     Plaintiff stressed to Ms. Pacina that he was "being fired" and was "not quitting" his job. Ex. 3, LM 146:14-16, 147:8-21.

150.     It is standard operating procedure to for HR employees open a Salesforce case when an employee makes a reasonable accommodations request or a complaint about his working conditions. Ex. 16, KP 47:18-48:5.

151.     Pacina did not open a Salesforce case for Plaintiff in connection with their meeting on February 20. Ex. 16, KP 90:9-14.

152.     Feeling "very panicked," Plaintiff then spoke with John Davidson the same day to inquire about vacant positions. Ex. 3, LM 149:12-150:21; Ex. 18, JD 43:21-44:25; Ex. 21, Mandy Woodley Deposition Tr. ("MW") 49:20-50:7.

153.     Plaintiff told Davidson "what had happened to [him]," and Davidson responded that "he may have another job opportunity [for Plaintiff] in-house." Ex. 3, LM 151:3-22.

7465672

154.     Plaintiff then submitted his resume for the in-house PA opportunity with Dr. Horacio Kaufmann the same day, February 20, 2019.  Ex. 3, LM 151:8-22.

155.     On or about February 21, 2019, Plaintiff interviewed with Dr. Kaufmann. Ex. 3, LM 152:20-154:16, 158:2-15; Ex. 18, JD 54:24-56:16.

156.     During the interview, Dr. Kaufmann gave Plaintiff a verbal offer of employment which Plaintiff promptly accepted. Ex. 3, LM 152:20-154:16, 158:2-15.

157.     On March 14, Plaintiff received an email from Mandy Woodley, Internal Career Planning Specialist, informing him that he would not be offered the position with Dr. Kaufmann. Ex. 20, NYU344; Ex. 3, LM 174:21-175:16; Ex. 21, MW 7:18-8:6, 65:21-68:6.

158.     Plaintiff also spoke to Ms. Woodley on the phone on March 14 and March 15. Ex. 3, LM 183:17-23; Ex. 21, MW 63:13-64:4, 65:21-68:6, 79:16-20.

159.     After their second call, on March 15, Woodley emailed members of ELR, including Kathleen Pacina and her supervisor Beth Cooper, to inform them of her discussions with Plaintiff and alert them that "Larry's current department needs him to either move over to the IR team or resign" and that "Larry states he cannot go to IR based on health issues." Ex. 20, NYU353-54; Ex. 21, MW 93:23-95:11, 96:15-22, 99:19-100:11.

160.     Woodley also wrote in her March 15 email that the situation would "likely escalate" and that Plaintiff was "extremely distraught … and noted he will be pursuing legal recourse." Ex. 20, NYU353-54; Ex. 21, MW 93:23-95:11, 96:15-22, 99:19-100:11.

161.     On March 14 or 15, Woodley called Pacina on the phone and told her that Plaintiff "brought up health concerns" in connection with the position in IR. Ex. 21, MW 73:7-75:25.

162.     In this same conversation, Pacina told Woodley that Plaintiff would be terminated if he "elected not to take the position with the IR team." Ex. 21, MW 76:19-77:5.

7465672

163.     Ms. Woodley then told Plaintiff that "his options were to move into the IR position within radiology or he would be effectively resigning his position with NYU." Ex. 21, MW 79:23-80:10.

164.     On March 15, 2019, Plaintiff emailed Dr. Rybak to inform him that he would not be working with Dr. Kaufmann. Plaintiff's email states: "Just informed, and as promised am letting you know. No signed contract. As you stated, since I am not returning to IR, due to health concerns, and you asked I stay the month of March as a favor (which of course I complied as always), the end of March, as you told me, will be my last day." Ex. 15, NYU706; Ex. 10, LR 139:3-19.

165.     Dr. Rybak forwarded this email to Alexa the same day he received it. Ex. 15, NYU706.

166.     Plaintiff then texted Dr. Rybak the following, also on March 15: "I imagine since you told me my last day will be the end of March [it] will be since I physically cannot stand with my lower back wearing lead for all those hours." Ex. 19; Ex. 3, LM 183:24-184:13; Ex. 10, LR 146:11-23.

167.     Rybak testified that "it's entirely possible [he] saw this text message" on March 15. Ex. 10, LR 151:13-19.

168.     Though Rybak also testified that he is a "horrible texter," Ex. 10, LR 147:13-17, Alexa and Sista both testified that they text with Dr. Rybak. Ex. 11, DA 41:16-42:08, 117:04-120:19; Ex. 1, AS 32:14-21.

169.     Alexa recalled one instance where he texted Rybak and Rybak responded the same day. Ex. 11, DA 41:16-42:08, 117:04-120:19.

170.     Plaintiff also emailed John Davidson on March 15, informing him that he would not be working with Dr. Kaufmann and reiterating that NYU "gave [him] a choice of returning to

7465672

IR (where [he] can no longer stand for extended periods wearing heavy protection…).” Ex. 27, NYU350-52; Ex. 3, LM 186:8-187:12; Ex. 18, JD 67:6-17, 68:17-70:17.

171.    On March 22, 2019, Alexa drafted Plaintiff's March 26 termination letter. Ex. 23; Ex. 11, DA 130:3-131:23.

172.    Evelyn Taveras reviewed the March 22 draft letter and made revisions, which included removing the “voluntary resignation” language. Ex. 23; Ex. 17, Evelyn Taveras Deposition Tr. (“ET”) 50:15-51:8, 56:4-6; Ex. 11, DA 130:3-131:23.

173.    On March 27, Plaintiff met with Evelyn Taveras because he wanted to speak to someone higher up than Pacina. Ex. 3, LM 211:11-212:14, 217:2-9; Ex. 17, ET 46:22-48:6, 60:5-62:5.

174.    During his meeting with Taveras, Plaintiff told her about his back pain “in full detail.” Ex. 17, ET 67:13-23; Ex. 3, LM 212:10-21, 213:6-10.

175.    Taveras did not provide Plaintiff with any forms to request a reasonable accommodation, did not tell him any such forms existed, and did not ask him for any medical documentation. Ex. 3, LM 212:22-214:9.

176.    Though her usual practice was to open a file for employees coming to her with reasonable accommodations issues, Taveras could not recall opening such a file for Plaintiff. Ex., 17, ET 65:14-66:7.

177.    Taveras attempted to brush off his concerns about disability discrimination. Ex. 3, LM 217:3-218:9 (“It was more so that I was explaining to her about the medical issues and when she tried to brush that off that that wouldn't happen, they can't do that. I said, sarcastically, so what is it age discrimination?”), 215:6-14 (“Q: Did you also tell her that you thought that the reason that this change was made had to do with your age? A: No. After she said she's sure that's

7465672

not the case with the disability and there's regulations. I said, so what is it my age because I'm older? She said she's sure that's not the case either.").

178.    Believing that he was being fired, Plaintiff asked Taveras whether he was entitled to severance. Ex. 3, LM 147:8-21 ("I said, I am being fired. I am not quitting my job. … Do I get severance? I have 24 vacation days that I already earned in the bank. I said I have years behind me of my job. I said, what am I getting? I'm not quitting. What do I get?"), 214:22-215:5 ("After explaining I could not do the position due to physical disability and pain and that I was being fired, I wanted to know what I'm entitled to."), 218:10-25.

179.    On March 28, Taveras sent Plaintiff an email memorializing their meeting in which she wrote: "As for your concerns about the IR role the department would provide the appropriate training and would work with you to provide a reasonable accommodation that would allow you to support the essential functions of the role." Ex. 22, NYU278-79; Ex. 70, ET 70:2-20.

180.    Taveras's March 28 email was reviewed and revised by Alexa on March 27. Ex. 24, NYU709; Ex. 17, ET 77:5-78:3.

181.    Based on NYU's "words and actions," Plaintiff believed that "nobody seemed to care" about his pain, that he was being offered an "ultimatum," and he "felt defeated." Ex. 3, LM 148:12-149:8, 220:6-221:3 ("I had no reason to believe after what happened to me, upper management and HR[,] had no reason to believe anything. Nobody even asked for medical records. … Nobody asked me anything. I could not go back to a job and start training as Alexa wanted to on the 12th without accommodations and ways to make my back not hurt.").

182.    On April 1, 2019, when Alexa told Plaintiff he had to leave the hospital, Plaintiff told him once again about his back pain and physical inability to accept the IR position as it was

7465672

being offered to him. Ex. 3, LM 207:14-209:16, 210:4-211:10 ("[I]t's not that I don't want to

[return to IR], I physically can't.").

183.    Alexa admitted that he did not raise the possibility of reasonable accommodations

on April 1. Ex. 11, DA 144:10-14.

184.    At no point between January 15 and April 1, 2019, did NYU ask Plaintiff for any

medical records or medical information. Ex. 3, LM 220:9-16.

185.    Plaintiff was "released" from his position as of April 4, 2019, defined by NYU

policy as an "involuntary separation from employment for reasons of a non-disciplinary nature."

Ex. 25; Ex. 26; Ex. 16, KP 70:12-71:5, 114:13-16; Ex. 17, ET 55:21-56:6.


Dated:  September 17, 2021
        New York, New York

                                        MENKEN SIMPSON & ROZGER LLP

                        By:             *s/ Scott Simpson*
                                        *s/ Raya F. Saksouk*
                                        80 Pine St., 33rd Fl.
                                        New York, NY 10005
                                        Tel.: 212-509-1616
                                        Fax: 212-509-8088
                                        ssimpson@nyemployeelaw.com
                                        rsaksouk@nyemployeelaw.com

                                        *Attorneys for Plaintiff*

7465672