UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LAURENCE MALZBERG,

               Plaintiff,                       Case No. 19 Civ. 10048 (LJL)

     -against-

NEW YORK UNIVERSITY,

               Defendants
------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Dated: September 17, 2021
       New York, New York

                       MENKEN SIMPSON & ROZGER LLP

             By:   Scott Simpson
                    Raya F. Saksouk
                    80 Pine St., 33rd Fl.
                    New York, NY 10005
                    Tel.: 212-509-1616
                    Fax: 212-509-8088
                    ssimpson@nyemployeelaw.com
                    rsaksouk@nyemployeelaw.com

                    *Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................iii-vi

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF PERTINENT FACTS ..................................................................1

ARGUMENT ...........................................................................................................10

    I.     Applicable Legal Standards ...............................................................10

    II.    Plaintiff's Chronic and Severe Back Pain is a
         Qualified Disability under the ADA ..................................................10

         A.  Plaintiff's Inability to Stand for Longer than 15-20 Minutes Without Severe
              Pain Substantially Limits the Major Life Activity of Standing ......11

         B.  Defendant's Arguments, in Addition to Being Factually Inaccurate, Fail as a
              Matter of Law ...............................................................................14

             1.  Malzberg's Evidence is More Than Sufficient to Establish He Has a
                  Disability..................................................................................14

             2.  The Fact that Plaintiff Performed His Prior Role Without
                  Accommodation is Irrelevant to the Disability Inquiry .......16

    III.   Defendants Flouted the Interactive Process and Failed to Reasonably
         Accommodate Plaintiff's Disability ..................................................17

         A.  The Question of Whether Defendant Had Notice of Plaintiff's Disability Prior
              to March 27, 2019, Defeats Summary Judgment.............................18

             1.  January and February 2019: Plaintiff Informs NYU that He Cannot
                  Return to IR Without Suffering "Severe Pain"....................19

             2.  March 15, 2019: Plaintiff Informs NYU He "Physically Cannot Stand"
                  for Extended Periods of Time ...............................................20

         B.  With Reasonable Accommodations, Plaintiff Could Have Performed the
               Essential Job Functions at IR .........................................................22

         C.  Defendant Breached Its Legal Obligations under the ADA by Failing to
               Initiate the Interactive Process or Engage in Good Faith ................24

1. NYU Failed in Its Obligation to Initiate the Interactive Process .........24

2. To the Extent Any Interactive Process Took Place, NYU was Responsible for Its Breakdown ...............................................................26

3. Malzberg Did Not Obstruct the Interactive Process ...........................28

D. Defendant's Last-Ditch Effort to Offer a Reasonable Accommodation Underscores Its Lack of Good Faith ...............................................................30

IV. Defendant is Also Liable under the NYCHRL ....................................................32

CONCLUSION ...........................................................................................................................33

## **TABLE OF AUTHORITIES**

### <u>FEDERAL CASES</u>

*Agostini v. EmblemHealth, Inc.*,
No. 16CV7119(DLC), 2018 WL 3350324 (S.D.N.Y. July 9, 2018) ............................................33

*Bohen v. Potter*,
No. 04-cv-1039S, 2009 WL 791356 (W.D.N.Y. Mar. 23, 2009) ..................................26

*Brady v. Wal-Mart Stores, Inc.*,
531 F.3d 127 (2d Cir. 2008)..........................................................................................25

*Brizzi v. Utica Mut. Ins. Co.*,
No. 18CV4973RRMRER, 2021 WL 1163112(E.D.N.Y. Mar. 26, 2021)....................25

*Burns v. Nielsen*,
456 F. Supp. 3d 807 (W.D. Tex. 2020)..........................................................................14

*Capobianco v. City of New York*,
422 F.3d 47 (2d Cir. 2005).............................................................................................13

*Castagnozzi v. Phoenix Beverages, Inc.*,
208 F. Supp. 3d 461 (E.D.N.Y. 2016) ...........................................................................16

*Crispi v. Green Bus Line, Inc.*,
No. 00CV7159(NG)(RLM), 2003 WL 1903264 (E.D.N.Y. Jan. 7, 2003) ...................11

*Debell v. Maimonides Med. Ctr.*,
No. 09–CV–3491, 2011 WL 4710818 (E.D.N.Y. Sept. 30, 2011)................................32

*E.E.O.C. v. Yellow Freight Sys., Inc.*,
No. 98 CIV. 2270(THK), 2002 WL 31011859 (S.D.N.Y. Sept. 9, 2002) ..............11, 26

*Fox v. State Univ. of New York*,
686 F. Supp. 2d 225 (E.D.N.Y. 2010) ...........................................................................14

*Francis v. City of Meriden*, 129 F.3d 281 (2d Cir. 1997)...........................................10

*Giacomi v. Waterbury Hosp., Inc.*,
No. 3:13-cv-00225, 2015 WL 3796089 (D. Conn. Jun. 18, 2015) ................................21

*Glaser v. Gap, Inc.*,
994 F. Supp. 2d 569 (S.D.N.Y. 2014)..........................................................................22

*Goonan v. Fed. Rsrv. Bank of New York*,
916 F. Supp. 2d 470 (S.D.N.Y. 2013)..........................................................18, 24, 29

*Goonan v. Fed. Rsrv. Bank of New York*,
No. 12-CV-3859 JPO, 2014 WL 3610990 (S.D.N.Y. July 22, 2014) .............................. 13, 29-31

*Gorbea v. Verizon New York, Inc.*,
No. 11-CV-3758 KAM LB, 2014 WL 917198 (E.D.N.Y. Mar. 10, 2014) ...................................13

*Hensel v. City of Utica*,
No. 6:15-cv-0374 (LEK) (TWD), 2020 WL 1451579 (N.D.N.Y. Mar. 25, 2020)................21, 25

*Hamilton v. Westchester Cty.*,
3 F.4th 86 (2d Cir. 2021) ........................................................................ 11-12

*Hampson v. State Farm Mut. Auto Ins. Co.*,
No. 112CV00258BKSCFH, 2015 WL 12733387 (N.D.N.Y. Mar. 26, 2015) ............................29

*Heilweil v. Mount Sinai Hosp.*,
32 F.3d 718 (2d Cir. 1994)........................................................................ 14-15

*Kravtsov v. Town of Greenburgh*,
No. 10 Civ 3142 (CS), 2012 WL 2719663 (S.D.N.Y. Jul. 9, 2012)...........................................14

*Lewis v. Blackman Plumbing Supply L.L.C.*,
51 F.Supp.3d 289 (S.D.N.Y. 2014) ................................................................26

*Lievre v. JRM Constr. Mgmt., LLC*,
No. 17-CV-4439 (BCM), 2019 WL 4572777 (S.D.N.Y. Sept. 20, 2019)....................................24

*MacEntee v. IBM*,
783 F. Supp. 2d 434 (S.D.N.Y. 2011), *aff'd,* 471 F. App'x 49 (2d Cir. 2012)............................18

*Marinelli v. City of Erie, Pa.*,
216 F.3d 354 (3d Cir. 2000)....................................................................14, 16

*McBride v. BIC Consumer Prod. Mfg. Co.*,
583 F.3d 92 (2d Cir. 2009)........................................................................ 10, 22-24

*Meling v. St. Francis Coll.*,
3 F.Supp.2d 267 (E.D.N.Y. 1998) ................................................................12

iv

*Norman v. NYU Langone Health Sys.*,
492 F. Supp. 3d 154 (S.D.N.Y. 2020)....................................................................10, 16

*Parada v. Banco Indus. De Venezuela, C.A.*,
753 F.3d 62 (2d Cir. 2014)....................................................................12, 16

*Picinich v. United Parcel Serv.*,
321 F. Supp. 2d 485 (N.D.N.Y. 2004) ....................................................................13

*Rodriguez v. Vill. Green Realty, Inc.*,
788 F.3d 31 (2d Cir. 2015)....................................................................14, 16

*Sivio v. Vill. Care Max*,
436 F. Supp. 3d 778 (S.D.N.Y. 2020)....................................................................24, 29

*Spiegel v. Schulmann*,
604 F.3d 72, 83 (2d Cir. 2010)................................................................... 32-33

*Sussle v. Sirina Prot. Sys. Corp.*,
269 F. Supp. 2d 285 (S.D.N.Y. 2003)....................................................................14

*Thomson v. Odyssey House*,
No. 14–CV–3857, 2015 WL 5561209 at *18, (E.D.N.Y. Sept. 21, 2015) ....................................32

*Vangas v. Montefiore Med. Ctr.*,
 6 F. Supp. 3d 400 (S.D.N.Y. 2014)....................................................................33

*Weixel v. Bd of Educ. of City of New York*,
287 F.3d 138 (2d Cir. 2002)....................................................................10

## STATE CASES

*Cruz v. Schriro*,
51 Misc.3d 1203(A) (N.Y. Sup. Ct. 2016) ....................................................................33

*Chernov v. Sec. Training Corp.*,
146 A.D.3d 493, 44 N.Y.S.3d 439 (2017) ....................................................................33

## FEDERAL STATUTES

29 C.F.R. § 1630.2....................................................................10-12

42 U.S.C. § 12102....................................................................10, 12

STATE STATUTES

N.Y.C. Admin. Code § 8–102.................................................................................................32

N.Y.C. Admin. Code § 8-107 ...............................................................................................33

OTHER AUTHORITY

April Chang-Miller, M.D., *Degenerative changes in the spine: Is this arthritis?*,
https://www.mayoclinic.org/diseases-conditions/osteoarthritis/expert-answers/arthritis/faq-
20058457....................................................................................................................................13


John Hopkins Medicine, *Conditions We Treat: Degenerative Disc Disease*,
https://www.hopkinsmedicine.org/orthopaedic-surgery/specialty-areas/spine/conditions-we-
treat/degenerative-disc-disease.html............................................................................................16

John Hopkins Medicine, *Degenerative Disc Disease*,
https://www.hopkinsmedicine.org/health/conditions-and-diseases/degenerative-disc-disease.....13

## PRELIMINARY STATEMENT[1]

In the 21 years since the Americans with Disabilities Act ("ADA") came into effect, courts in the Second Circuit have made clear where an employer's obligations under the law begin and end. If an employer knows or reasonably should know one of its employees needs an accommodation, it is required by the ADA to act in good faith and participate in an interactive process. If the employer obstructs that interactive process and fails to reasonably accommodate the disabled employee, it is liable for disability discrimination, even in the absence of a formal request for an accommodation. Thus, where the record is sufficient for a reasonable juror to find that (1) Plaintiff suffers from a chronic, ADA-qualified disability of the lumbar spine, (2) Defendant knew Plaintiff needed a reasonable accommodation, (3) Defendant repeatedly failed to engage Plaintiff in an interactive process, and (4) Defendant forced Plaintiff to choose between abandoning his career or accepting a job that would cause him severe pain with no guarantee of relief, summary judgment must be denied.

### STATEMENT OF PERTINENT FACTS

#### Malzberg's Disability

For 18 years, Plaintiff Laurence "Larry" Malzberg worked as a physician's assistant ("PA") at New York University ("NYU") Langone Health. Declaration of Joan M. Gilbride ("Gilbride Decl."), Ex. A, Compl. ¶¶ 10, 18, 26.[2] From 2005 to 2012, he worked primarily in the Interventional Radiology Department ("IR"), where complex cases required him to stand for 1-2 hours at a time while wearing a heavy lead vest to protect him from radiation. *Id.* at ¶¶ 12-14, 35;

---

[1] Pursuant to the Court's Individual Practice in Civil Cases §§ 2(L) and 6, Plaintiff respectfully requests oral argument on this motion.  If the Court should grant the request, Raya F. Saksouk, an associate of Menken Simpson & Rozger LLP beginning her third year of practice, will argue for the Plaintiff.  Ms. Saksouk played a substantial role in the drafting of this filing.

[2] Hereafter, citations to Exhibit A of the Gilbride Declaration (the Complaint) will be referred to as "Compl."

Declaration of Scott Simpson,[3] Ex. 1, Sista Deposition Transcript ("AS") 55:21-58:25
(describing "lead suit").

Beginning in or around 2005 or 2006—the same period in which he performed the
physically demanding IR work—Malzberg began to experience severe, chronic pain in his lower
back. Ex. 2, Expert Report at 1; Compl. ¶ 33; Ex. 3, Malzberg Deposition Transcript ("LM")
213:17-214:3 (noting existence of 2006 records); Joint Rule 56.1 Statement of Material Facts
Not in Dispute ("Jt. SOF") ¶ 9. By November 2008, the pain was so intense that Malzberg
consulted with Dr. Christopher Gharibo, an NYU pain management specialist, and obtained an
MRI. Ex. 3, LM 234:3-17; Ex. 4, P177-78; Compl. ¶ 33. In the resulting MRI report, dated
November 13, 2008, Malzberg was diagnosed with "mild multilevel discogenic degenerative
changes" characterized by, *inter alia*, Schmorl's nodes, disc bulging, and suspected annular
fissure. Ex. 4, P177-78; Ex. 2, Expert Report at 2.

Malzberg's pain then worsened between 2008 and 2019, requiring a second MRI. Ex. 5;
Ex. 3, LM 110:3-16, 137:12-25. In the resulting MRI report, dated March 29, 2019, just days
before his termination, Malzberg was diagnosed with "multilevel changes of the lumbar spine"
characterized by compression deformity, Schmorl's nodes, multilevel disc desiccation, mild disc
space narrowing, facet arthropathy, disc bulging, possible foraminal disc protrusions, possible
annular fissures, mild ligamentous thickening, foraminal stenosis, and mild degenerative changes
of the sacroiliac joints. Ex. 5; Ex. 2, Expert Report at 2. The report also noted that the MRI
findings had "progressed" as compared to the findings of Plaintiff's MRI in 2008. Ex. 5, P113.

These conditions are corroborated and expanded upon by medical records created in
November and December 2019 and March 2021. Based on a physical exam of Malzberg on

---

[3] For ease of reading, any reference to a numbered exhibit automatically refers to an exhibit attached to the
Declaration of Scott Simpson, unless otherwise noted.

November 18, 2019, for example, Dr. Kiril Kiprovski, a physician in NYU's Clinical Neurophysiology Department, noted that Malzberg experiences "intermittently exacerbated lower back pain" that "is worse upon standing". Ex. 6, P134. Dr. Kiprovski recommended physiotherapy for Plaintiff's back pain and noted that, "[i]f the pain exacerbates," he would consider "referring [Malzberg] for lumbar spinal epidural injection." Ex. 6, P139; Ex. 3, LM 236:19-25, 261:14-19.

Dr. Kiprovski also ordered an MRI of Malzberg's lumbosacral plexus, which took place in December 2019. Ex. 7, P172-74. The resulting MRI report, dated December 26, 2019, identified the following conditions in Malzberg's lumbosacral spine: (1) small disc bulges contacting the descending nerve roots, and (2) mild bilateral facet joint osteoarthritis. *Id*. The December 2019 report also referenced "lower back pain for years" and "chronic axial lumbar pain." *Id*.

On November 21, 2019, Malzberg was examined by Dr. Robert Meislin, who diagnosed him with degenerative disc disease, chronic bilateral low back pain without sciatica, herniated lumbar disc without myelopathy, and lumbosacral radiculopathy. Ex. 8, P316.

Malzberg's expert witness, Dr. Jeff Silber, performed a physical exam of Malzberg's back on March 10, 2021. Ex. 2. He noted "periodic significant bouts [of] low back pain" and "palpatory tenderness in the paraspinal musculature across [Malzberg's] lumbosacral joints." *Id*. In his expert report, dated March 25, 2021, Dr. Silber also confirmed that the conditions identified in Mr. Malzberg's March 2019 MRI report are consistent with someone who experiences back pain. *Id*. at 2. Dr. Silber summarized Malzberg's diagnoses as a "lumbar degenerative condition" with "disc bulging and facet arthropathy (arthritis) as well as foraminal narrowing (pinched nerves) at multiple levels" and advised him to "perform a more sedentary-

3

type job that only involves periodic standing for no more than 10-15 minutes without a lead apron." *Id.*

At his deposition, Malzberg repeatedly described his pain as "severe" and as worsening over time. Ex. 3, LM 87:12-21, 110:3-16, 134:15-21, 137:13-22, 195:9. He also explained that his back pain limited his ability to stand, such that he "cannot stand through pain." *See, e.g.,* Ex. 3, LM 76:15-19, 79:24-25, 110:3-16, 136:3-7, 210:13-23. In 2019, Malzberg could not stand for longer than 15-20 minutes at a time without experiencing substantial back pain. Compl. ¶ 34; Ex. 2.

### The Physical Demands of Malzberg's PA Role After 2012

Fortunately for Malzberg, after September 2012, he was reassigned from IR to the Hospital for Joint Disease ("HJD"), the Cancer Center, and the Faculty Practice Group ("FPG"), where he worked between 2012 and 2019. Ex. 9; Ex. 3, LM 61:13-18. His job responsibilities between 2012 and 2019 were significantly less physically demanding than when he worked in IR. *See, e.g.,* Ex. 3, LM 80:6-82:2. For example, though he was still required to perform certain procedures like Peripherally Inserted Central Catheter insertions ("PICC lines") while standing and wearing protective equipment at HJD, the procedures were shorter, the cases less complex, and the time between patients longer than in IR. Ex. 9, P235; Ex. 3, LM 55:8-56:13, 71:19-73:17, 80:6-82:2; Ex. 10, Leon Rybak Deposition Transcript ("LR") 67:4-18, 85:9-21; Ex. 1, AS 55:21-58:25. The case volume was also much lower at HJD compared to IR. Ex. 10, LR 83:13-24; Ex. 3, LM 136:3-7 ("I worked there for seven and a half years. That big board gets more cases as the day goes by."). At HJD, Malzberg generally spent no more than 10-15 minutes standing while performing PICC-line insertions. Ex. 3, LM 82:3-84:4. At FGP and the Cancer Center, he primarily performed CT scans, which were always done while sitting down and did

not require protective equipment. Ex. 3, LM 63:22-65:7, 67:18-68:10, 80:6-20, 84:5-85:16; Ex. 10, LR 67:4-18, 69:13-71:12. Thus, while Malzberg experienced some "discomfort" during these years, he was still able to perform his job duties without a reasonable accommodation. Ex. 3, LM 80:6-81:19, 87:4-88:2.

**NYU Presents Plaintiff with an Ultimatum: Work Through the Pain or Lose Your Job**

On February 14, 2019, Malzberg was called into a meeting with Dr. Leon Rybak, Vice Chair of Operations in the Radiology Department; Dr. Akhilesh Sista, IR Division Chief; and Daniel Alexa, Radiology Department Administrator. Ex. 3, LM 121:15-18, 168:4-16; Ex. 1, AS 9:17-20; Ex. 11, Daniel Alexa Deposition Transcript ("DA"), 8:8-14; Ex. 10, LR 11:7-13, 14:3-10. Rybak, Sista, and Alexa informed Malzberg that starting on March 1, 2019,[4] he would be required to return to IR on a full-time basis. Ex. 3, LM 125:10-126:8.

Rybak presented this ultimatum with full knowledge that Malzberg could not perform the more physically demanding IR work, as it was being described to him, without severe pain. A month earlier, on January 15, 2019, Rybak had approached Malzberg with a similar proposal, to work at IR a couple of times a week, and Malzberg told him that doing so would cause him a great deal of back pain. Ex. 3, LM 11:16-12:12, 110:3-16, 111:25-112:9, 114:23-115:6, 134:13-25. Malzberg was forced to reiterate this point to Rybak at the February 14 meeting, as well as to Sista and Alexa. Specifically, Malzberg informed them that standing for long periods of time causes him severe back pain and that he physically could not do the IR job as it was being offered to him without pain. Ex. 3, LM 134:13-20, 136:13-22, 141:21-142:7; Ex. 1, AS 124:5-21.[5]

---

[4] This date was later changed to April 1, 2019. Ex. 23, NYU586.

[5] Even before February 14, 2019, Rybak, Sista, and Alexa knew that Malzberg would be reluctant to return to IR. On January 24, 2019, Alexa sent an email to Michael Recht, Chair of Operations and Dr. Rybak's boss, stating that

Both Rybak and Alexa denied or stated they could not recall whether Plaintiff ever discussed his back pain or physical ability to do the job on February 14 or any other date. Ex. 10, LR 7:16-24 ("Larry never communicated anything to me directly about his back."), 130:21-131:4; Ex. 11, DA 6:23-7:21, 104:12-21. In direct contradiction of his colleagues' testimony, Sista specifically recalled Malzberg "did describe some concern about his physical abilities" and "described some physical impediment." Ex. 1, AS 124:5-21, 127:14-21. Though Rybak and Sista were both familiar with NYU's reasonable accommodations policy, which obligated them to contact the Employee and Labor Relations Department ("ELR") upon learning that an employee needed an accommodation, they did not contact ELR nor did they advise Malzberg to contact ELR either. Ex. 13, NYU601; Ex. 10, LR 28:3-19, 31:23-32:25; Ex. 11, AS 79:15-83:17, 127:14-128:10, 143:16-144:11; Ex. 3, LM 136:13-25, 143:11-15. Instead, they just looked at each other. Ex. 3, LM 136:13-25.

In the days after the February 14 meeting, Malzberg raised concerns about his ability to fulfill his job responsibilities without pain in the IR position for a *third* time. He called Dr. Rybak on the phone and repeated that "to go back [to IR] would cause [him] a great deal of pain" because of "lower back pain which has worsened over time." Ex. 3, LM 137:02-25. When Malzberg asked Rybak what would happen if he could not do the IR job due to physical pain, Dr. Rybak told him in no uncertain terms: "If you don't take the job, that's it." Ex. 3, LM 137:25-138:20.

---

"Leon [Rybak] has some concern that [Malzberg] will not stay [in IR] if we move him." Ex. 12, NYU1402-03; Ex. 11, DA 70:6-73:21; Ex. 10, LR 11:19-12:7. On February 13, 2019, Alexa emailed Rybak and Sista proposing they talk to Malzberg about the transition back to IR, alerting them, "I recognize he may not love this and we will have to deal with that." Ex. 15, NYU707; Ex. 11, DA 86:23-87:20. That same day, Rybak responded that Malzberg "is reluctant to do any long cases which involve fluoro," stressing that "if the job doesn't fit for him, we will have to let him know that we will have to find someone else who does want the position." Ex. 15, NYU707; Ex. 10, LR 121:16-122:14.

According to Malzberg, at no point did Rybak, Sista, or Alexa raise the possibility of providing Plaintiff with a reasonable accommodation. Ex. 3, LM 148:12-149:8, 220:6-221:3; Ex. 11, DA 144:10-14; Ex. 1, AS 126:24-127:13. But both Rybak and Sista testified that reasonable accommodations for Malzberg in IR would have been possible. Ex. 1, AS 125:6-14, 125:22-126:23; Ex. 10, LR 124:15-21, 157:23-158:4. Sista testified that it was theoretically possible for many of the IR job duties to be performed while sitting down. Ex. 1, AS 52:15-24, 65:2-22, 65:23-67:18, 67:19-68:21, 71:5-7. Rybak testified that "there may be rooms where you can accommodate a chair" during procedures. Ex. 10, LR 80:19-24, 85:22-86:6. Both doctors also suggested that Plaintiff's job duties could have been modified to reduce any physical difficulty he had with the job. Ex. 10, LR 124:15-21, 157:9-22; Ex. 1, AS 125:6-14. Still, neither Rybak nor Sista offered any of these proposals to Plaintiff in January, February, or March 2019. Ex. 3, LM 136:13-25.

**Faced with NYU's Repeated Failure to Act, Plaintiff Seeks Out
His Own Reasonable Accommodation**

In the period of time between January 15 and April 1, 2019, Plaintiff informed NYU of his back pain on no fewer than six occasions to at least eight different people in positions to help him. Between February 20 and March 27, he contacted ELR three times and spoke to three different people about his health concerns and the ultimatum NYU had thrust upon him. Ex. 3, LM 143:7-145:24, 150:8-16, 211:11-212:14, 217:2-9; Ex. 16, Kathleen Pacina Deposition Transcript ("KP") 14:16-15:16, 88:15-93:2; Ex. 17, Evelyn Taveras Deposition Transcript ("ET") 46:22-48:6, 60:5-62:5. On February 20, he contacted John Davidson, Senior Director of PA Services and Care Management, and inquired into vacant positions in an attempt to secure his continued future with NYU. Ex. 3, LM 149:12-150:21, 151:3-22; Ex. 18, John Davidson Deposition Transcript ("JD") 43:21-44:25. When he applied, interviewed, and ultimately did not

receive a job offer in another department—in other words, when he officially had no other option but to return to IR or leave NYU—he tried once more to plead with Dr. Rybak, sending him a text message *and* an email on March 15 reiterating that he physically could not stand for long periods of time and that he could not return to IR due to health concerns. Ex. 3, LM 151:8-22, 174:21-175:16; Ex. 19; Ex. 15, NYU706.

Malzberg was so effusive in his requests for help from NYU that Mandy Woodley, the recruiter who informed Plaintiff that he would not be getting a job offer in the other department, emailed ELR to alert them that "Larry's current department needs him to either move over to the IR team or resign" and that "Larry states he cannot go to IR based on health issues." Ex. 20, NYU353-54; Ex. 21, Mandy Woodley Deposition Transcript ("MW") 93:23-95:11, 96:15-22, 99:19-100:11. Woodley warned her colleagues that a lawsuit was on the horizon, asserting in her March 15 email that the situation would "likely escalate," that Malzberg was "extremely distraught," and that he "noted he will be pursuing legal recourse." Ex. 20, NYU353-54; Ex. 21, MW 93:23-95:11, 96:15-22, 99:19-100:11.

On March 27, Malzberg then met with a representative from ELR, Evelyn Taveras. The parties dispute what took place in that meeting. Malzberg testified that he was not offered reasonable accommodations, he was not advised to fill out one of NYU's reasonable accommodation forms, and he was not informed that any such forms existed. Ex. 3, LM 211:11-214:9, 217:2-9; Ex. 17, ET 46:22-48:6, 60:5-62:5. Taveras asserted that she engaged or attempted to engage in the interactive process, but her claims are contradicted by her failure to document any of those efforts in NYU's internal HR computer system in accordance with her standard practice. Ex. 17, ET 62:06-20, 65:10-66:07, 67:13-23.

Critically, the parties do not dispute that Malzberg raised the issue of his disability with ELR on March 27. Jt. SOF ¶ 54. The very next day, Taveras sent Malzberg an email purporting to memorialize their meeting and, buried in the fourth paragraph of the email, referencing reasonable accommodations: "As for your concerns about the IR role the department would provide the appropriate training and would work with you to provide a reasonable accommodation that would allow you to support the essential functions of the role." Ex. 22; Ex. 17, ET 70:2-20. Plaintiff, having dealt with NYU's inaction and stonewalling for over a month, believed NYU's "offer" of reasonable accommodation—which came one day before his last day of work—was disingenuous and did not respond. Ex. 3, LM 148:12-149:8, 219:22-221:3.

Malzberg's instincts were correct. On March 22, six days *before* NYU made its first and only "offer of reasonable accommodation," Dan Alexa was already drafting Malzberg's termination letter. Ex. 23, NYU3782, NYU586; Ex. 11, DA 130:3-131:23. Alexa hand-delivered the letter on April 1, when Malzberg reported to work in an exasperated attempt to demonstrate that he was not quitting his job. Ex. 23, NYU586; Ex. 11, DA 135:13-19. The letter, dated March 26, stated that since he chose not to report to IR for "personal reasons," he would be "released" from his position. Ex. 23, NYU586. Notably, Alexa had reviewed and revised Taveras's March 28 email and therefore indisputably knew of Malzberg's need for a reasonable accommodation on April 1. Ex. 24; Ex. 17, ET 77:5-78:3. When Malzberg told Alexa that he wanted the job but could not do it without pain, Alexa did not raise the possibility of reasonable accommodations and instead maintained NYU's inflexible take-it-or-leave-it position. Ex. 11, DA 142:16-24; Ex. 3, LM 208:11-211:10. Internal HR documents reflect that Malzberg was then "released" from his position at NYU as of April 4, 2019, defined as an involuntary separation for non-disciplinary reasons. Ex. 25; Ex. 26; Ex. 16, KP 70:12-71:5, 114:13-16; Ex. 17, ET 55:21-56:6.

## ARGUMENT

## I. APPLICABLE LEGAL STANDARDS

Malzberg alleges that Defendant NYU discriminated against him in violation of the ADA (and, as discussed further *infra*, the NYCHRL) by failing to accommodate his disability. He successfully states a *prima facie* case of discrimination by demonstrating that (1) he is a person with a disability within the meaning of the ADA; (2) NYU had notice of his disability; (3) with reasonable accommodations, he could have performed the essential functions of the job at issue; and (4) NYU refused to make such accommodations. *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009).[6] "Summary judgment is warranted only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, 'there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.'" *Id.* at 96. This is a high burden that Defendant cannot meet.

## II. PLAINTIFF'S CHRONIC AND SEVERE BACK PAIN IS A QUALIFIED DISABILITY UNDER THE ADA[7]

First, a reasonable juror could find (and case law supports) that Malzberg's chronic back condition is a disability as defined by Section 12102(2)(A) of the ADA: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2); *see also* 29 C.F.R. §§ 1630.2(i), (j) (defining "major life activity" and "substantially limits").[8] Pursuant to the three-step test in *Weixel v. Bd of Educ. of City of New*

---

[6] The burden then "shifts to the defendant to rebut the reasonableness of the proposed accommodation" by demonstrating "undue hardship." *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 162 (S.D.N.Y. 2020). Defendant, however, focuses exclusively on Plaintiff's ability to make out a *prima facie* case and does not reach the question of undue hardship. Consequently, Plaintiff's brief will focus on the four prongs of the *prima facie* test.

[7] Malzberg concedes that his eye impairments, *see* Compl. ¶¶ 41-44, were not ADA-qualified disabilities during the relevant time period (January to April 2019). Plaintiff will therefore focus exclusively on his chronic back condition.

[8] "Although the [EEOC] regulations are not binding, courts in the Second Circuit afford them significant deference." *Norman*, 492 F. Supp. 3d at 163, citing *Francis v. City of Meriden*, 129 F.3d 281, 283 n.1 (2d Cir. 1997).

*York*, 287 F.3d 138, 147 (2d Cir. 2002), Malzberg can successfully 1) show that he suffers from a physical impairment (back pain caused by a degenerative condition of the lumbar spine);[9] 2) identify the activity claimed to be impaired and establish that it constitutes a "major life activity" (standing); and 3) show that the impairment "substantially limits" his ability to engage in the major life activity identified (Malzberg cannot stand for longer than 15-20 minutes at a time without substantial pain). *Id.*

A.   Malzberg's Inability to Stand for Longer than 15-20 Minutes Without Severe Pain
     Substantially Limits the Major Life Activity of Standing

Malzberg alleges, and medical evidence supports, that he cannot stand for longer than 15-20 minutes at a time without experiencing substantial back pain.[10] Compl. ¶ 34. In light of longstanding precedent in this Circuit, combined with the basic fact that "most people in the general population" can likely stand for 15-20 minutes at a time without severe pain, a reasonable juror could find that Malzberg's condition meets the "substantially limits" threshold. *See* 29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.");[11] *see also id.* ("An impairment need not

---

[9] Defendant only briefly challenges whether Plaintiff suffers from a qualified physical impairment. *See, e.g.,* ECF No. 61, Defendant's Memorandum of Law ("Def") at 17. The record is more than sufficient for a reasonable juror to find in Plaintiff's favor on this point. *See* 29 C.F.R. § 1630.2(h)(1) (defining physical impairment as, *inter alia*, "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as … musculoskeletal"); *Crispi v. Green Bus Line, Inc.*, No. 00CV7159(NG)(RLM), 2003 WL 1903264, at *5 (E.D.N.Y. Jan. 7, 2003) (recognizing herniated lumbar disc, lumbosacral sprain, degenerative disc disease as impairments under ADA).

[10] Standing is indisputably a major life activity. 29 C.F.R. § 1630.2(i)(1)(i); *Hamilton v. Westchester Cty.*, 3 F.4th 86, 92 (2d Cir. 2021) ("'[M]ajor life activities' expressly include standing.").

[11] "The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(1)(v); *E.E.O.C. v. Yellow Freight Sys., Inc.*, No. 98 CIV. 2270(THK), 2002 WL 31011859, at *14 (S.D.N.Y. Sept. 9, 2002) ("On its face, the quoted language of the regulations does not mandate that the comparison must be made using a specific type of evidence; nor do the interpretative guidelines to the regulations dictate any such requirement.").

11

prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.").[12]

Additionally, courts in this circuit, including the Second Circuit itself, have found that the inability to engage in a major life activity for longer than 10-30 minutes at a time can be sufficient to establish a disability under the ADA. *See also* 29 C.F.R. § 1630.2(j)(4)(i) ("Consideration of facts such as condition, manner, or duration may include … the length of time a major life activity can be performed."). In *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 66, 70 (2d Cir. 2014), for example, the Second Circuit vacated and remanded the district court's grant of summary judgment for the defendant where the plaintiff reported not being able to sit for longer than 10-15 minutes at a time because of "lumbosacral and cervical sprains and several spinal disc herniations." It opined:

> If a plaintiff offers evidence that she cannot sit for a prolonged period of time, she may well be disabled under the ADA, depending on her specific factual circumstances. Of course, we recognize that the inability to sit for even an abbreviated period of time is more likely to be a substantial limitation of a major life activity than is the inability to sit for prolonged periods; few people are able to sit for hours on end without genuine discomfort.

*Id.*; *see also Meling v. St. Francis Coll.,* 3 F.Supp.2d 267, 273–74 (E.D.N.Y. 1998) (restrictions on ability to walk, sit, and stand for no more than 15 minutes each were substantially limiting impairments). Thus, not only is Malzberg's inability to stand "for a prolonged period of time"

---

[12] The 2008 amendments to the ADA expanded the definition of "disability" in order to "overrule the Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability … and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Hamilton*, 3 F.4th at 92 (internal quotation marks and citations omitted); 42 U.S.C. § 12102(4)(A) (stating that "disability" "shall be construed in favor of broad coverage of individuals ... to the maximum extent permitted"). The substantial-limitation question is no longer central to the disability analysis. 29 C.F.R. § 1630.2(j)(1)(iii) ("The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, *not* whether an individual's impairment substantially limits a major life activity.") (emphasis added); *see also* 29 C.F.R. § 1630.2(j)(1)(i) ("'Substantially limits' is not meant to be a demanding standard."); 29 C.F.R. § 1630.2(j)(1)(iii) ("[T]he threshold issue of whether [Plaintiff's] impairment 'substantially limits' a major life activity should not demand extensive analysis.").

evidence of a disability—his inability to stand "for even an *abbreviated* period of time" is particularly probative evidence that he is disabled under the ADA. *Id.* (emphasis added).

Similarly, in *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 491, 502 (N.D.N.Y. 2004), the court found the plaintiff's back injury substantially limited a major life activity based in part on the fact that, according to his doctor, he "was unable to stand, sit, or walk for, at most, 30 minutes at a time" as a result of "multilevel lumbar disc herniations" and "degenerative disc disease."[13] The court reasoned that these were limitations which "clearly … exceed[ed] those that the average adult in the general population is subject to." *Id.*; *see also Capobianco v. City of New York*, 422 F.3d 47, 59–60 (2d Cir. 2005) (reasonable juror could find night blindness a disability where, *inter alia*, "after only 20 minutes in the darkness, [plaintiff] requires more than 100 times as much light to see as does a normally-sighted person"). The court also found it significant that, according to the plaintiff's doctor, his "limitations were expected to be permanent." *Picinich*, 321 F. Supp. 2d at 502. Here, too, the fact that Malzberg's back condition shows no signs of dissipating further supports a finding that he is disabled within the meaning of the ADA. *See, e.g.,* Ex. 5, P113 (noting progressed findings). Malzberg's testimony and medical records reflect his condition *worsening* over time. *Id*. In light of the foregoing, the record is more than sufficient for a reasonable juror to conclude that Malzberg is disabled within the meaning of the ADA.[14]

---

[13] As Plaintiff's expert witness will surely testify at trial, "degenerative disc disease" and "degenerative changes" both refer to a form of arthritis of the spine. *See* John Hopkins Medicine, *Degenerative Disc Disease*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/degenerative-disc-disease; April Chang-Miller, M.D., *Degenerative changes in the spine: Is this arthritis?*, https://www.mayoclinic.org/diseases-conditions/osteoarthritis/expert-answers/arthritis/faq-20058457.

[14] Notably, spinal conditions like those identified in Plaintiff's medical records have previously been recognized by courts as potential disabilities under the ADA even without consideration of how many minutes the plaintiff was able or unable to perform a major life activity. *See Gorbea v. Verizon New York, Inc.*, No. 11-CV-3758 KAM LB, 2014 WL 917198, at *6-7 (E.D.N.Y. Mar. 10, 2014) (finding, based on plaintiff's affidavit, deposition testimony, and physician report, triable issues of fact as to whether lumbosacral sprain substantially limited ability to bend,

B. <u>Defendant's Arguments, in Addition to Being Factually Inaccurate,
Fail as a Matter of Law</u>

**i. Malzberg's Evidence is More Than Sufficient to Establish He Has a Disability**

At the outset, this Court must reject Defendant's bald and inaccurate claim that Malzberg "has no medical evidence" and therefore cannot establish he has a disability. ECF No. 61, Defendant's Memorandum of Law ("Def.") at 12-15. As described above, Malzberg has produced medical evidence spanning over 10 years that supports his back disability, specifically from 2008 and 2019, as well as an expert report from March 2021 interpreting some of that evidence.[15] *See* Exs. 2, 4, 5, 7 and 8; Ex. 2, Expert Report at 2.  NYU's assertion that Malzberg cannot rely on his March 29, 2019 MRI results is meritless. Def. at 14. First, the MRI cannot fairly be characterized as "subsequent" medical evidence. It was obtained *during* Malzberg's employment, just three days before he was supposed to report to IR, and one day after he received the letter from Evelyn Taveras purporting to offer him a reasonable accommodation. Exs. 5, 22. From a temporal standpoint, it is about as probative as a piece of evidence could be. But by Defendant's logic, ADA plaintiffs would be required to submit medical evidence

---

twist, push, pull, climb, and lift) (emphasis added); *Fox v. State Univ. of New York*, 686 F. Supp. 2d 225, 229 (E.D.N.Y. 2010) (noting but not deciding that plaintiff's medical conditions, which included "<u>degenerative disc disease</u>" causing lower back pain, would "likely" pose triable issues of fact with respect to whether plaintiff was disabled under ADA) (emphasis added); *Burns v. Nielsen*, 456 F. Supp. 3d 807, 825–26 (W.D. Tex. 2020) (finding triable issue of fact as to whether "<u>degenerative disc disease of the lumbar spine</u>" constituted disability) (emphasis added).

[15] Even if Plaintiff had not produced these medical records corroborating his testimony, the ADA *<u>does not require</u>* a party to produce medical evidence to defeat a summary judgment motion. *See Rodriguez v. Vill. Green Realty, Inc*., 788 F.3d 31, 43–44 (2d Cir. 2015) ("Neither the ADA or the FHA's text, nor the respective implementing regulations require medical evidence to establish a genuine dispute of material fact regarding the impairment of a major life activity at the summary judgment stage."), distinguishing *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718 (2d Cir. 1994); *Kravtsov v. Town of Greenburgh*, No. 10 Civ. 3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. Jul. 9, 2012) ("[S]uch determinations may be made without regard to scientific, medical, or statistical analysis or the ameliorative effects of mitigating measures."). Medical evidence may be particularly unnecessary when it comes to limitations like chronic back pain that are easily understood by a lay jury. *See, e.g., Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 357, 361 (3d Cir. 2000) (holding that failure to present medical evidence of neck and back injuries after car accident, "in and of itself, [did] not warrant judgment as a matter of law in favor" of the defendant); *compare with Sussle v. Sirina Prot. Sys. Corp*., 269 F. Supp. 2d 285, 304 (S.D.N.Y. 2003) (noting Hepatitis C is more difficult for lay jury to understand and requires medical evidence).

acquired at the *exact moment* they request a reasonable accommodation (and, for that matter, could never rely on expert witness reports).[16]

To the extent NYU argues that the MRI cannot be used to show Malzberg was disabled in January or February 2019, when Malzberg testified that he informed NYU of his disability for the first, second, and third time, that argument also fails. There is nothing in the record to suggest that the back conditions diagnosed in his 2019 MRI—many of which were also present in his 2008 MRI—were sudden or rapidly onset afflictions. *See* Ex. 4, P177-78 (2008 MRI report identifying Schmorl's nodes, disc desiccation, stenosis, and possible annular fissure) and Ex. 5 (2019 MRI report identifying same). On the contrary, Malzberg's 2019 MRI report clearly states that the "findings [were] progressed compared with [the] prior [2008] study." *Id.* at P113. His back condition had only gotten worse between 2008 and March 29, 2019, which strongly suggests it never went away. The same applies to all repeated diagnoses in Malzberg's records from November 2019 and December 2019, all of which offer information on clearly preexisting conditions. *See* Ex. 7, P172-74; Ex. 8. Similarly, Dr. Silber's expert report, dated March 25, 2021, relies in large part on the results of Malzberg's March 2019 MRI and cannot be disregarded simply because it was obtained during the litigation. Ex. 2, Expert Report at 2.

Finally, Defendant's argument that Malzberg could not have been disabled because "the only treatment [he] sought" was in 2006 and 2008, apart from being untrue (he was under the care of a chiropractor and an acupuncturist at one time and obtained two MRIs in 2019), is of no moment. Ex. 3, LM 236:6-237:2; Ex. 5, P113-14; Ex. 7, P172-74; SOF ¶¶ 71, 77, 85. Just as the

---

[16] Defendant's case law is totally inapposite. In *Heilweil*, 32 F.3d at 719, a pre-2008 amendments case, the plaintiff provided records from 1991 to prove a disability existed in 1989—two *years* prior. This is hardly analogous to Plaintiff's MRI, which was obtained less than three months after he first informed NYU of his disability in January 2019 and speaks directly to the condition of his back during the period of time he needed a reasonable accommodation.

ADA does not mandate medical evidence of a disability on a motion for summary judgment, *Rodriguez*, 788 F.3d at 43–44, it does not mandate the amount or frequency of treatment a plaintiff must receive in order to prove a qualified disability. It is simply one form of evidence whose relevance depends on Malzberg's individual circumstances. *See Parada*, 753 F.3d at 69 (inquiry is "fact-specific"). Much like a person who was born without the ability to walk or see or hear but is otherwise healthy (someone the ADA would surely recognize as disabled), Malzberg's disability is such that he does not need regular medical treatment. Back conditions like degenerative disc disease are often treated with self-care measures like exercise and over-the-counter pain medication, making it less likely the sufferer will be consistently under the care of a physician.[17] *See, e.g.,* Ex. 3, LM 263:19-23; Ex. 2, Expert Report at 1; SOF ¶ 96. The ADA's case-specific analysis requires consideration of these facts.[18]

### ii. The Fact that Malzberg Performed His Prior Role Without Accommodation is Irrelevant to the Disability Inquiry

Defendant's argument that Malzberg could not have been disabled in February or March 2019 because "[h]e did not request any accommodations to allow him to perform his [then

---

[17] *See, e.g.,* John Hopkins Medicine, *Conditions We Treat: Degenerative Disc Disease*, https://www.hopkinsmedicine.org/orthopaedic-surgery/specialty-areas/spine/conditions-we-treat/degenerative-disc-disease.html.

[18] Defendant's case law does not help its argument. In *Norman*, 492 F. Supp. 3d at 164, Def. at 11, the fact that the plaintiff did not seek further medical attention in connection with her adverse reaction to the flu vaccine was just one piece of evidence in the Court's fact-specific analysis. Its probative value hinged on two factors: (1) the plaintiff's admission that she did not seek further medical attention because "the [adverse] reaction itself never occurred again," and (2) case law holding that "a substantial limitation on breathing is established when a plaintiff puts forward evidence of episodes *requiring medical interventions* or chronic breathing problems." *Id.* (emphasis added). Neither of these is applicable to the case at bar. First, Plaintiff's testimony and medical records establish that his back condition is chronic and continues to affect him long after his termination. Second, the case law on back-related disabilities does not require evidence of medical intervention. *See, e.g., Marinelli*, 216 F.3d at 357, 361. Moreover, unlike in *Castagnozzi v. Phoenix Beverages, Inc.*, 208 F. Supp. 3d 461, 476 (E.D.N.Y. 2016), Def. at 11-12, where the plaintiff did "not provide any evidence that [his] neck injury substantially limited his ability to lift, stand, sit or work," Plaintiff has provided medical and other evidence that he had conditions associated with back pain in March 2019 and that he had difficulty standing for prolonged periods of time in February and March 2019. Ex. 5, P113-14; Ex. 2, Expert Report; Compl. ¶ 34. Defendant's assertion that Plaintiff "did not provide the Hospital with any evidence that he would not be able to perform the essential functions of the new position," Def. at 12, has absolutely no bearing on the question of whether Plaintiff's back conditions constitute a disability under the law.

current] job" is similarly inapposite. Def. at 15. The record is full of evidence supporting Malzberg's assertion that PICC-line insertion at IR, located in the main hospital, would have been much more physically demanding than those he was performing at HJD. *See, e.g.,* Ex. 3, LM 80:6-82:2; Ex. 1, AS 112:18-113:21; Ex. 11, DA 76:21-77:3; SOF ¶¶ 99-106. Based on Malzberg's prior experience in IR, where he worked for seven and a half years, he would have been required to stand for up to 1-2 hours at a time while wearing a lead vest that exacerbated his pain.[19] Ex. 2, Expert Report at 1; Compl. ¶¶ 14, 35; SOF ¶ 105. The patients in IR were typically sicker and required more care than those at HJD, which meant that PICC-line insertions often took longer. Ex. 3, LM 80:6-82:2. And Rybak himself acknowledged that the patient volume at the main hospital—where Malzberg never worked between 2016 and 2019 (Ex. 1, AS 111:23-112:5)—was much greater than at HJD. A juror could therefore easily infer that Malzberg would have had to spend more time standing to perform PICC-line insertions potentially back to back. Ex. 10, LR 83:13-24. By contrast, at HJD, where the case volume was lower, Malzberg performed most of his duties while sitting down and rarely needed to stand for longer than 10-15 minutes at a time. Ex. 3, LM 82:3-84:4. The question of whether he needed a reasonable accommodation prior to February or March 2019 is therefore completely irrelevant to his claims.

### III. DEFENDANT FLOUTED THE INTERACTIVE PROCESS AND FAILED TO REASONABLY ACCOMMODATE PLAINTIFF'S DISABILITY

Under the second, third, and fourth prongs of the disability discrimination analysis, Malzberg has produced sufficient evidence for a reasonable juror to conclude that (2) NYU was on notice of his disability during the relevant time period, (3) a reasonable accommodation

---

[19] Though Dr. Rybak noted that lighter-weight options are available, the problem is not resolved by a five- or six-pound lead vest. Ex. 10, LR 78:19-24. Plaintiff is substantially limited in his ability to stand *without* a lead vest. *See, e.g.,* Ex. 3, LM 110:3-16 ("It's the actual standing, the extra weight *and just standing alone* for all of that time has caused me severe back pain.") (emphasis added).

existed that would have enabled him to perform the essential functions of the IR role, and (4) NYU failed to reasonably accommodate him.

   A.   The Question of Whether Defendant Had Notice of Malzberg's Disability Prior to March 27, 2019, Defeats Summary Judgment

   Defendant does not dispute that it had notice of Malzberg's disability. Def. at 4-5 (noting Malzberg told Evelyn Taveras he had a "physical disability" at March 27 meeting); *see MacEntee v. IBM*, 783 F. Supp. 2d 434, 444 (S.D.N.Y. 2011) ("Defendants cannot be held liable for failing to provide reasonable accommodations when it had no actual or constructive knowledge of the need for any accommodations."), *aff'd*, 471 F. App'x 49 (2d Cir. 2012). But Defendant does appear to dispute *when* it had notice of Malzberg's disability. *See, e.g.,* Def. at 4 ("The parties dispute whether Mr. Malzberg mentioned any physical concerns at [the February 14] meeting.").[20] This question, though not explicitly addressed in Defendant's brief, is critical to fleshing out when NYU's obligations were triggered under the law, whether it flouted those obligations, and whether it was therefore responsible for the breakdown of the interactive process.[21] *See Goonan v. Fed. Rsrv. Bank of New York*, 916 F. Supp. 2d 470, 484 (S.D.N.Y. 2013) ("[L]iability for failure to provide a reasonable accommodation ensues … when the employer is responsible for a breakdown in [the interactive] process."). The record is replete with

---

[20] Defendant fails to acknowledge or address the significance of Plaintiff's electronic communications on March 15, 2019. Moreover, though Defendant's brief states that "the parties dispute whether Mr. Malzberg mentioned any physical concerns at [the February 14] meeting," Defendant's Rule 56.1 Statement of Material Facts Not in Dispute ("SOF") appears to contradict that same statement. In Defendant's SOF ¶¶ 36-37, it states the following as fact: "Dr. Akhilesh Sista told Mr. Malzberg [on February 14] that he was willing to work with him to carve out a position that accommodated his physical needs," and "Dr. Sista told Mr. Malzberg that … NYU would 'reduce any sort of difficulty [Mr. Malzberg has] physically with the job.'" SOF ¶¶ 36-37. Were a juror to credit Dr. Sista's statement, a juror would almost certainly conclude that he was aware Malzberg had "physical needs" or concerns that needed to be addressed.

[21] If, for example, Defendant only had notice of Plaintiff's disability on March 27 and then made its offer of reasonable accommodation on March 28, that would suggest Defendant acted in good faith and did *not* in fact cause the breakdown of the interactive process.

evidence that between January 15 and March 15, 2019, NYU was indisputably on notice of Malzberg's "health issues" and "health concerns," his "severe" and worsening back pain, his inability to stand for extended periods of time, and his concern about a "physical impediment" that would interfere with his ability to do the IR job that was described to him.

**(1) January and February 2019: Malzberg Informs NYU that He Cannot Return to IR Without Suffering "Severe Pain**." Malzberg first gave notice of his back condition to NYU in January and February 2019. On January 15, February 14, and once more a few days later, Malzberg told Rybak, Sista, and Alexa that he was concerned about the IR position because of his back condition. He described that concern in the following terms: "[G]oing back [to IR and] standing in that type of position causes me back pain which has gotten worse over time," Ex. 3, LM 110:3-12; "[S]tanding for long periods causes me severe back pain," *Id.* at 134:13-20; "I couldn't do the [IR] job without pain," *Id.* at 136:13-22; and "[T]o go back there would cause me a great deal of pain" and "lower back pain which has worsened over time." *Id.* at 137:02-25; SOF ¶¶ 108, 112, 131. That Malzberg mentioned his back pain on February 14 in front of Rybak, Sista, and Alexa is corroborated in part by the testimony of Dr. Sista, who distinctly remembered Malzberg "did describe some concern about his physical abilities" during their February 14 meeting. Ex. 1, AS 124:5-21; SOF ¶¶ 36-37. Evidence in the record also supports the conclusion that Malzberg raised his back concerns with Rybak *prior* to February 14. In an email to Sista and Alexa on February 13, Rybak explained: "I know from speaking to [Malzberg] in the past that … [h]e is reluctant to do any long cases which involve fluoro." Ex. 15, NYU707; Ex. 10, LR 121:13-122:21. "Long cases" involving "fluoro" are the types of cases Malzberg would be required to do while standing and wearing a lead suit. Ex. 1, AS 70:23-71:4; SOF ¶ 106.

**(2) March 15, 2019: Malzberg Informs NYU He "Physically Cannot Stand" for Extended Periods of Time**. Even without Malzberg's or Sista's testimony, the record contains documentary evidence reflecting that NYU knew or reasonably should have known Malzberg was disabled as of March 15 at the absolute latest. That day, Malzberg sent Dr. Rybak a text message[22] *and* an email raising the issue of his health concerns and back pain. Ex. 19 ("I imagine since you told me my last day will be the end of March [it] will be since I physically cannot stand with my lower back wearing lead for all those hours."); Ex. 15, NYU706 ("As you stated, since I am not returning to IR, due to health concerns…"); SOF ¶¶ 164, 166. Rybak then forwarded the email to Dan Alexa, who drafted the termination letter disingenuously citing Malzberg's "***personal reasons***"[23] for not accepting the position. Ex. 15, NYU706; Ex. 23, NYU586; SOF ¶¶ 61, 165. Malzberg also sent an email to head PA John Davidson on March 15, explaining that "[he] can no longer stand for extended periods wearing heavy protection." Ex. 27, NYU350-52; SOF ¶ 170. The same day, recruiter Mandy Woodley emailed Kathleen Pacina and Beth Cooper—both of whom were employees in Defendant's ELR department and would have been responsible for facilitating the reasonable accommodations process, *see* Ex. 13, NYU601—to inform them that "Larry's current department needs him to either move over to the IR team or resign" and "Larry states he cannot go to IR based on health issues." Ex. 20, NYU353-54; Ex. 21, MW 93:23-95:11, 96:15-22, 99:19-100:11; SOF ¶ 159.

---

[22] Dr. Rybak testified in his deposition that he "can't" say whether he was on notice of Plaintiff's back condition as of March 15 "because it wouldn't have been the first time [he] missed a text." Ex. 10, LR 147:9-17. He described himself as a "horrible texter" and explained that he often "clear[s] things out" and deletes text messages from his phone. *Id.* at 147:24-148:11. He then clarified, "It's entirely possible I saw this text message at that time." *Id.* at 151:13-19. Notably, both Sista and Alexa testified that they text with Dr. Rybak. Ex. 11, DA 41:16-42:08; Ex. 1, AS 32:14-21. Alexa even recalled a particular instance where he texted Rybak and Rybak responded the same day. Ex. 11, DA 117:04-120:19; SOF ¶¶ 167-169.

[23] Alexa's "personal reasons" language undoubtedly raises a question of fact as to whether he was aware of Plaintiff's disability on March 22, 2019, when he appears to have first drafted the letter. Ex. 23, NYU3782; SOF ¶ 171.

In brief, Malzberg informed Rybak, Sista, Alexa, and no fewer than five administrative staff that he suffered from an impairment so severe he "couldn't do the job without pain," he was concerned about his "physical abilities" to do what was required of him, and he was "physically" incapable of standing for extended periods of time. *See, e.g.,* Ex. 3, LM 141:6-142:7 ("I let my management know that it's physically very difficult for me to perform those duties without pain."); SOF ¶¶ 113, 146-48, 153, 157-59. It is difficult to imagine a clearer indication (short of "I have an ADA-qualified disability pursuant to 42 U.S.C. § 12102") that Malzberg struggled with a substantially limiting impairment.

Thus, a juror could reasonably find these statements were sufficient for NYU to conclude he was disabled. In *Hensel v. City of Utica*, No. 6:15-cv-0374 (LEK) (TWD), 2020 WL 1451579, at *2, 9 (N.D.N.Y. Mar. 25, 2020), for example, the court found the defendant employer was on notice of the plaintiff's disability where, *inter alia*, it received a letter from him explaining that he suffered from a permanent work-related injury that caused him "severe," "unbearable," and progressively worsening pain. *See id.*, ECF No. 135-6, Ex. 3 ("January 19, 2012" letter). Similarly, in *Giacomi v. Waterbury Hosp., Inc.*, No. 3:13-cv-00225, 2015 WL 3796089, at *7 (D. Conn. Jun. 18, 2015), the plaintiff put her employer on notice when she "informed her supervisor … on numerous occasions of the pain and difficulties relating to her spine and knee impairments" and "produced evidence that the [employer] was aware of the permanent physical impairments to her spine and knee."

At the very least, viewed in the light most favorable to Malzberg, the evidence is sufficient to raise a triable issue of fact. Indeed, Defendant's *own witnesses* dispute when and if they had notice of Malzberg's disability. Dr. Sista, for example, specifically recalled Malzberg "did describe some concern about his physical abilities" at the February 14 meeting. Ex. 1, AS

21

124:5-21, 127:14-21; SOF ¶ 123. Rybak and Alexa, who work closely together as administrators in the Radiology Department (Ex. 10, LR 11:7-13, 14:3-10; Ex. 11, DA 8:8-14), both denied or stated they could not recall whether Malzberg discussed his back condition or physical abilities that day (or ever). Ex. 10, LR 7:16-24 ("Larry never communicated anything to me directly about his back."), LR 130:21-131:4 ("I don't recall" whether Malzberg mentioned his physical ability during February 14 meeting); Ex. 11, DA 6:23-7:21 (Malzberg never told him about back pain), DA 104:12-21 ("I don't remember" whether Malzberg brought up physical ability at February 14 meeting); SOF ¶ 122.[24] Given the centrality of the notice question to this litigation, the parties' dispute on this issue alone defeats summary judgment. *See Glaser v. Gap, Inc.*, 994 F. Supp. 2d 569, 580 (S.D.N.Y. 2014) ("[W]hether Gap knew or should have known that Glaser was disabled constitutes a genuine issue of material fact").

## B. <u>With Reasonable Accommodations, Malzberg Could Have Performed the Essential Job Functions at IR</u>

The question of whether Defendant could have reasonably accommodated Malzberg cannot genuinely be disputed.[25] Defendant has effectively conceded that such an accommodation was possible. *See, e.g.,* Def. at 23 ("Dr. Akhilesh Sista testified…"); SOF ¶¶ 37, 39. Moreover, both Rybak and Sista testified that they could have reasonably accommodated Malzberg. When asked whether an accommodation could be made for a PA who could not stand for longer than

---

[24] Their testimony also differed on the extent of Plaintiff's participation in the meeting. Sista described Plaintiff as "pretty quiet," "reserved," and noted he "didn't ask a lot of questions." Ex. 1, AS 121:15-124:04; SOF ¶ 121. Rybak testified: "I know Larry pretty well by now. He wasn't being withdrawn. He was engaging, he was discussing and asking questions like anybody considering a new position would." Ex. 10, LR 127:25-129:14, 66:8-17 (describing Malzberg as a good advocate for himself); SOF ¶¶ 118-19.

[25] In order to prevail on the third prong of the ADA's *prima facie* test, Plaintiff bears the burden of persuasion and production as to the existence of "some accommodation that would allow [him] to perform the essential functions of [his] employment." *McBride*, 583 F.3d at 97. "[W]ith regard to the *reasonableness* of a proposed accommodation," a question Defendant does not address in its brief, "a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits." *Id.* at 97 n.3 (emphasis added).

15-20 minutes at a time, Dr. Sista, IR Division Chief, explicitly confirmed that "an accommodation could have been made." Ex. 1, AS 125:6-126:23. Dr. Rybak, Vice Chair of Operations, corroborated this fact. Ex. 10, LR 124:15-21 ("Larry very easily could have carved a nice niche for himself."); SOF ¶¶ 140-44.

In particular, based on Dr. Sista and Dr. Rybak's testimony, such accommodations could have included: (1) allowing Malzberg to sit while performing certain procedures, Ex. 1, AS 52:15-24, 65:2-22, 65:23-67:18, 67:19-68:21, 71:5-7; (2) arranging for his procedures to take place in facilities that could accommodate a chair, Ex. 10, LR 85:22-86:6; and/or (3) modifying his job duties to include fewer procedures that involved standing while wearing lead. Ex. 1, AS 125:6-126:23 ("[T]here are a lot of different things that [Malzberg] can do in the section that we can emphasize that will reduce any sort of difficulty [he has] physically with the job."); Ex. 10, LR 124:15-21, 157:9-22; SOF ¶¶ 140-44; *see McBride*, 583 F.3d at 97 ("[R]easonable accommodation may include, *inter alia*, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties…."). Given that Rybak and Sista were in a superior position to know what the position required (presumably, they would have been involved with Malzberg and ELR in the interactive process), their testimony is sufficient for a reasonable juror to conclude that a reasonable accommodation did in fact exist.

Instead of challenging Malzberg's ability to satisfy the third prong of the *prima facie* test, Defendant continues to harp on its arguments that Malzberg never requested a reasonable accommodation, was not interested in a reasonable accommodation, "did not attempt to communicate with his superiors at NYU to determine any modifications to the proposed position," and "never even attempted to show that he could perform the job with a reasonable

accommodation." Def. at 23-24. These are red herrings, each of which is addressed further *infra* in the context of the interactive process. The relevant question at this prong of the analysis is not what Malzberg communicated or did not communicate to NYU, but whether he can establish now and at trial that a reasonable accommodation *would have* been possible. *See, e.g., Lievre v. JRM Constr. Mgmt., LLC*, No. 17-CV-4439 (BCM), 2019 WL 4572777, at *20 (S.D.N.Y. Sept. 20, 2019) ("Plaintiff fails to identify any further accommodation which, if granted him, *would have* permitted him 'to perform the essential functions of the job at issue.'") (emphasis added), citing *McBride*, 583 F.3d at 96-97. Based on the admissions of Defendant's own witnesses, Malzberg can establish that would have been possible.

C. Defendant Breached Its Legal Obligations under the ADA by Failing to Initiate the Interactive Process or Engage in Good Faith

      The evidence is sufficient for a reasonable juror to conclude that NYU sabotaged the interactive process and is therefore responsible for its failure to reasonably accommodate Malzberg's disability. *Goonan*, 916 F. Supp. 2d at 484; *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 794 (S.D.N.Y. 2020) ("In considering a claim regarding a breakdown in the interactive process, courts should attempt to isolate the cause of the breakdown and then assign responsibility.") (internal citation omitted). Even if Malzberg's evidence does not settle this question once and for all, however, the parties' fundamental disagreement as to who was responsible for the breakdown of the interactive process is sufficient to defeat summary judgment. *Goonan*, 916 F. Supp. 2d at 480–81 ("Courts must deny … motions for summary judgment when presented with conflicting facts about the provenance of a breakdown.") (collecting cases).

      **(1) NYU Failed in Its Obligation to Initiate the Interactive Process**. Viewing the facts in the light most favorable to Malzberg, when presented with clear evidence that Malzberg

24

needed a reasonable accommodation, Defendant failed to initiate an interactive process as required by law. This is compelling evidence that it never had any intention of engaging with him in good faith. Though Defendant attempts to hang its hat on the fact that Malzberg did not specifically request a reasonable accommodation, Def. at 19-21, there are no magic words a person must recite in order to trigger his employer's obligations under the ADA. *See Brizzi v. Utica Mut. Ins. Co*., No. 18CV4973RRMRER, 2021 WL 1163112, at *6 (E.D.N.Y. Mar. 26, 2021) ("While Brizzi never formally requested an accommodation through HR, a formal request to HR is not necessary to trigger Utica's responsibility to investigate the request and engage in an interactive process."). This is particularly true where, as here, Malzberg made his disability obvious to everyone empowered to help him. This is also acknowledged by NYU's own policy, which requires a supervisor "to contact the Employee & Labor Relations Department" if he or she "*becomes aware* of an individual's need for an accommodation." Ex. 13 (emphasis added); SOF ¶¶ 133-34. "Whether a plaintiff affirmatively requests an accommodation or obviously needs one, 'the [employer's] duty to engage [in] the interactive accommodations process' is 'trigger[ed]' either way." *Hensel*, 2020 WL 1451579, at *10; *Brady v. Wal-Mart Stores, Inc*., 531 F.3d 127, 135 (2d Cir. 2008) ("[A]n employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled."). For the same reasons already discussed in the context of whether NYU had notice of Malzberg's disability, a reasonable juror could conclude that Malzberg made his disability and need for a reasonable accommodation obvious to ELR and upper management. NYU's repeated failure to act in the face of this information underscores its role in obstructing the interactive process.

**(2) To the Extent Any Interactive Process Took Place, NYU was Responsible for Its Breakdown.** Defendant's unwillingness to engage in an interactive process was evident from the moment it responded to Malzberg's health concerns with ultimatums instead of addressing his need for a reasonable accommodation. *See, e.g.,* Ex. 3, LM 137:25-138:20 ("So I said [to Rybak], what if I couldn't do the job due to the physical pain…[?] He said to me … [i]f you don't take the job, then that's it."); Ex. 21, MW 79:23-80:10 (recalling she followed up with Malzberg that "his options were to move into the IR position within radiology or he would be effectively resigning his position with NYU"), MW 76:19-77:5; Ex. 3, LM 145:7-148:19 (recalling Pacina told him "if you're offered a job of the same level … and you decline it for *any reason*, you're seen as quitting") (emphasis added); SOF ¶¶ 145, 148, 159, 162-64, 166. This type of stonewalling has been recognized by courts as a sign of bad faith. *See Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F.Supp.3d 289 (S.D.N.Y. 2014) (issue of fact existed on whether employer was responsible for breakdown of interactive process where manager, when told by disabled employee that he was concerned about returning to work under abusive supervisor, said that "transfer was still going to happen" and he should address his concerns with the supervisor); *see also Bohen v. Potter*, No. 04-cv-1039S, 2009 WL 791356, at *13 (W.D.N.Y. Mar. 23, 2009) ("[A] party acts in bad faith when it fails to make reasonable efforts to help the other party determine what specific accommodations are necessary. Further, a party that fails to communicate, by way of initiation or response, may be acting in bad faith.") (internal quotation marks and citations omitted); *Yellow Freight System,* 2002 WL 31011859, at *35 (finding defendant's "consistent stonewalling" evidence of reasonable accommodation offer made in bad faith).

Similarly, the fact that NYU decided to terminate Malzberg prior to its first offer to engage in the interactive process shows that NYU never had any intention of accommodating him or engaging in good faith. Alexa's March 26 termination letter was drafted by him on March 22 and finalized two days *before* NYU made its supposed "offer of reasonable accommodation" on March 28. Def. at 11, 23; Ex. 22; Ex. 23, NYU3782; SOF ¶¶ 171, 179. A juror could surely conclude that Alexa knew about Malzberg's disability when he drafted and finalized that letter. Indeed, Rybak forwarded Alexa an email from Malzberg on March 15 in which Malzberg explicitly stated he was "not returning to IR, due to health concerns." Ex. 15, NYU706; SOF ¶¶ 165-66. A juror could also conclude that Alexa's ambiguous "personal reasons" language in the March 26 letter was a nod to those "health concerns." *See* Ex. 23, NYU586.

Defendant's failure to follow its own policies also demonstrates its bad faith. According to Malzberg, Defendant did not ask Malzberg for any medical information (or any information at all) or provide him with information about the reasonable accommodations process. Ex. 3, LM 220:9-16, 136:13-25; Ex. 11, DA 144:10-14; Ex. 1, AS 126:19-128:10; SOF ¶¶ 115, 124, 175, 183-84. When Malzberg raised the issue of his back pain during the parties' February 14 meeting, for example, Sista, Rybak, and Alexa just "looked at each other. It was quiet and they looked at each other and my thought internally was, uh-oh, I felt ganged up on. I felt forced and very uncomfortable." Ex. 3, LM 136:13-22; SOF ¶ 114. Malzberg did not leave that meeting with any information about reasonable accommodations and, ultimately, had no reason to believe there was any flexibility in what was to come. *See* Ex. 3, LM 137:25-138:20 ("[Rybak] said to me … [i]f you don't take the job, then that's it."); SOF ¶¶ 131-32.

Similarly, when Malzberg sent various emails to members of Radiology and ELR on March 15, no one sent him any forms or requested any information from him. *See, e.g.,* Ex.21,

MW 79:23-80:10; SOF ¶ 163. When he met with Evelyn Taveras on March 27, during which

Defendant admits they discussed his back pain, she did not offer him one of NYU's reasonable

accommodation request forms, *see* Ex. 28, NYU587-97, or tell him that any such forms existed.

Ex. 3, LM 211:11-213:5; SOF ¶¶ 173-75. Tellingly, she did not open a file on her computer for

him and no notes from their meeting were produced in discovery. Ex. 17, ET 65:14-19 (noting

she would create a file on her computer "most times" an employee came to her office with a

reasonable accommodation issue). Instead, she "tried to brush … off" Malzberg's concerns about

disability discrimination by saying that it "wouldn't happen" and "they [NYU] can't do that."

Ex. 3, LM 216:7-218:25. Though she testified that she "mentioned to him that we can talk about

reasonable accommodations," Ex.17, ET 61:20-62:10, her testimony is contradicted by her

failure to follow protocol and provide him with any forms or take any notes. Ex. 3, LM 212:22-

214:9; Ex. 17, ET 65:14-19; SOF ¶¶ 175-77. Given that NYU had previously opened up a

number of files documenting Malzberg's communications with HR—including for much less

significant events like benefits inquiries—its failure to create any record now, when it was on

notice that Malzberg would be "pursuing legal recourse" against NYU in connection with his

proposed transfer to IR, is powerful evidence that NYU did not actually engage in the interactive

process. Ex. 20, NYU353-54; Ex. 16, KP 58:6-60:11 (describing search for Malzberg's HR cases

on Defendant's internal system); SOF ¶¶ 159-60.

(3) **Malzberg Did Not Obstruct the Interactive Process**. Finally, the fact that Malzberg

went to extraordinary lengths to keep his job is compelling evidence that he was not responsible

for the breakdown of the interactive process. On multiple occasions, he asked for help from

NYU staff, including upper management. *See, e.g.,* Ex. 3, LM 211:11-212:14, 147:7-148:19;

SOF ¶¶ 146-48, 173. When that failed, he tried to arrange for his *own* accommodation by seeking

out and applying for a vacant position. Ex. 3, LM 142:8-19 ("[S]ince I was being told to take that job or you're out, I was forced to make my own – let's call it my own accommodation."). When that too failed, he went so far as to show up for work on April 1 just to show NYU that he was not quitting his job. Ex. 3, LM 206:25-207:4: Jt. SOF ¶ 17. Malzberg's departure was entirely involuntary. Though Defendant repeatedly attempted to characterize it as a "resignation," *see, e.g.,* Ex. 21, MW 79:23-80:10, this was plainly not the case. Ex. 3, LM 173:17-174:2 ("I never resigned from my job."); Ex. 17, ET 56:04-06 (acknowledging she removed the "voluntary resignation" language from Alexa's March 26 termination letter). This is confirmed by NYU's own records, which show Malzberg was "released" from his position, defined as an involuntary separation for non-disciplinary reasons. Ex. 26; Ex. 25; Ex. 16, KP 114:13-16; SOF ¶ 185. Moreover, there is evidence in the record to establish that Malzberg *was* in fact considering the transfer to IR, contrary to Defendant's assertions to the contrary. Def. at 1, 12; s*ee* Ex. 10, LR 127:25-129:14 ("[Larry] was engaging, he was discussing and asking questions like anybody considering a new position would."); Ex. 11, DA 101:8-102:25; Ex. 3, LM 191:9-197:23 ("I was not saying no to the position."); SOF ¶¶ 118, 120.

Even if the Court concludes that Malzberg indisputably did act in some way to impede the interactive process, he can still prevail under the "futile gesture doctrine" by demonstrating that NYU had "essentially foreclosed the interactive process through its policies or explicit actions." *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 112CV00258BKSCFH, 2015 WL 12733387, at *13 (N.D.N.Y. Mar. 26, 2015); *Sivio*, 436 F. Supp. 3d at 795; *Goonan*, 916 F. Supp. 2d at 483-84 (rejecting employer argument on motion to dismiss that plaintiff disrupted interactive process when employer foreclosed possibility of reasonable accommodation); *see also Goonan v. Fed. Rsrv. Bank of New York*, No. 12-CV-3859 JPO, 2014 WL 3610990, at *7–8

(S.D.N.Y. July 22, 2014) (deciding same on motion for summary judgment). In light of Defendant's repeated failure to address Malzberg's concerns about the IR position between January 15 and March 27 (other than with ultimatums), combined with Alexa's termination letter, which demonstrates that NYU had no intention of accommodating him, a reasonable juror could surely conclude that NYU foreclosed the interactive process and that any further attempts by Malzberg would have been futile. Ex. 3, LM 148:12-149:8, 220:6-221:3 ("I had no reason to believe after what happened to me, upper management and HR[,] had no reason to believe anything. Nobody even asked for medical records. … Nobody asked me anything. I could not go back to a job and start training … without accommodations and ways to make my back not hurt."); SOF ¶ 181.

### D. Defendant's Last-Ditch Effort to Offer a Reasonable Accommodation Underscores Its Lack of Good Faith

Relatedly, Defendant's last-ditch effort to squeeze in an offer of reasonable accommodation, two days after it had already drafted Malzberg's termination letter, does not spare it from liability. Def. at 23. In *Goonan v. Fed. Rsrv. Bank of New York*, 2014 WL 3610990, at *7–8, the Court considered the same question on even less favorable facts to the plaintiff and still decided in favor of the plaintiff. The defendant employer argued that Goonan disrupted the interactive process because he (a) refused the defendant's offer of reasonable accommodation, which was given on his last day of his employment, and (b) chose to retire instead of "continue a discussion." *Id.* The Court flatly rejected these arguments. First, the Court noted that the ADA's interactive process "is not governed by any brittle last-shot rule." *Id.* ("The heart of the interactive process … is an exchange of information and proposed accommodations *in a good-faith and timely manner*.") (emphasis added). Second, the Court rejected the defendant's arguments based on the futile gesture doctrine (though not referring to it as such):

> When a breakdown occurs because an employer creates an objectively reasonable perception that the process is clearly at an end, the employer is as well placed as the employee to avoid the situation. It knows what it said, and how a reasonable person would interpret it, and thus bears responsibility for salvaging the process.

*Id.* at \*8 (internal citation omitted). Based on the employer's statements that it was "not going to change its mind" about Goonan's accommodation request, a reasonable juror could conclude that the employer created an objectively reasonable perception that the interactive process was over and that "Goonan had to choose between inadequate accommodations and ending his career." *Id.*

The facts of this case are even more favorable to Malzberg than they were to Goonan. First, the defendant in *Goonan* actually did engage in the interactive process. It proposed multiple accommodations. Here, despite being on notice of Malzberg's disability for two and a half months before he separated from NYU, Defendant only indisputably uttered the words "reasonable accommodation" at close to the last possible moment, *one day* before Malzberg's last day of work. Ex. 22; SOF ¶ 179. Second, the purported "offer of reasonable accommodation" in this case was sent two days *after* Defendant had already completed Malzberg's termination letter. Ex. 23, NYU586; SOF ¶¶ 171-72. Taveras, who wrote the email purporting to offer Malzberg reasonable accommodations, participated in drafting the termination letter and therefore knew he was slated for termination.[26] Ex. 23, NYU3782; Ex. 17, ET 50:15-51:8, 56:4-6; SOF ¶ 172.

Defendant's attempt to distinguish *Goonan* fails. Def. at 21. Malzberg, like Goonan, also sought assistance from his employer and "made his needs known to … management at several levels." *Goonan*, 2014 WL 3610990, at \*7; Ex. 3, LM 211:11-213:5 (noting he met with Taveras because he wanted someone higher up than Pacina). Defendant's insistence that Malzberg was

---

[26] Even if a juror were to credit Taveras's testimony that Plaintiff was "outright" not interested in hearing about reasonable accommodations during their March 27 meeting, Ex. 17, ET 62:06-20, his actions must be considered in the same context. Any offer that was made during the March 27 meeting, to the extent there was one, was yet another "last-ditch effort" that Plaintiff knew was disingenuous and made in bad faith.

required to request a reasonable accommodation and provide NYU with documentation of his disability misconstrues the spirit and intent of the ADA's interactive process. It refuses to acknowledge Defendant's own obligations under the law. Finally, the question of whether Dr. Sista "told Plaintiff that NYU would work with him to figure out how he could perform his job while reducing any physical difficulty," Def. at 22, is disputed by Malzberg and disputed by Defendant's own witnesses, who could not recall any mention of Malzberg's physical impairments during the February 14 meeting. Ex. 10, LR 7:16-24, 130:21-131:4; Ex. 11, DA 6:23-7:21,104:12-21; SOF ¶ 122. It is also contradicted by Dr. Sista's and Dr. Rybak's own acknowledgment that, despite being familiar with NYU policy, they did not contact ELR after the February 14 meeting to inform them of Malzberg's concerns. Ex. 1, AS 79:15-83:17, 126:24-128:10, 143:16-144:11; Ex. 10, LR 28:3-19, 31:23-32:25, 144:14-146:7, 155:11-14; SOF ¶¶ 115, 135-39. Defendant's untimely "last-ditch attempt" to engage in the interactive process cannot negate or excuse its repeated failures to carry out its obligations under the law.

### III. DEFENDANT IS ALSO LIABLE UNDER THE NYCHRL

The NYCHRL offers protections for individuals with disabilities far exceeding those provided by the ADA. *Debell v. Maimonides Med. Ctr.,* No. 09–CV–3491, 2011 WL 4710818, at *5 (E.D.N.Y. Sept. 30, 2011) (noting NYCHRL claims are "analytically distinct" from federal counterpart). First, the NYCHRL defines "disability" more broadly and involves no "substantial limitation" of a "major life activity." *Thomson v. Odyssey House*, No. 14–CV–3857, 2015 WL 5561209 at *18, (E.D.N.Y. Sept. 21, 2015); N.Y.C. Admin. Code § 8-102(16)(a) (defining disability as "any physical, medical, mental or psychological impairment"). The NYCHRL is so broad that courts have recognized conditions as common as obesity may satisfy its definition of disability. *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) (remanding case to district court

32

to determine whether plaintiff's obesity was a disability under NYCHRL). Similarly, in one of the cases Defendant cites, *Cruz v. Schriro*, 51 Misc.3d 1203(A) (N.Y. Sup. Ct. 2016), the court found an allergic reaction may constitute a disability. Once again, Defendant places the burden on Plaintiff to affirmatively present medical evidence when the law has no such requirement. In any event, NYU was so quick to slam the door on the possibility of a cooperative dialogue that Plaintiff had no opportunity to provide medical documentation.

Second, unlike the ADA, failure to engage in a cooperative dialogue creates a separate source of liability under the NYCHRL and the city law *expressly* applies to employees who do not affirmatively request a reasonable accommodation. N.Y.C. Admin. Code § 8-107(28)(a); *Chernov v. Sec. Training Corp.*, 146 A.D.3d 493, 44 N.Y.S.3d 439 (2017) (finding genuine issues of material fact as to whether, based on employee's disclosure that she suffered anxiety and stress, her employer should have known she was suffering from a disabling condition).

Finally, the NYCHRL assesses the reasonableness of a proposed accommodation with a much broader lens and "places the burden on the *employer* to show the unavailability of any safe and reasonable accommodation" as an affirmative defense. *Agostini v. EmblemHealth, Inc.*, No. 16CV7119(DLC), 2018 WL 3350324, at *7 (S.D.N.Y. July 9, 2018) (emphasis added, internal citations and quotation marks omitted); *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 416 (S.D.N.Y. 2014) ("[T]here is no accommodation (whether it be indefinite leave time or any other need created by a disability) that is categorically excluded from the universe of reasonable accommodation.") (internal citation and quotation marks omitted). Based on the foregoing, a reasonable juror could find Defendant liable under the NYCHRL.

## <u>CONCLUSION</u>

Defendant has failed to carry its burden of showing that no reasonable juror could find in Malzberg's favor. Malzberg therefore respectfully requests this Court deny Defendant's Motion for Summary Judgment.


Dated: September 17, 2021
        New York, New York


                         MENKEN SIMPSON & ROZGER LLP

                   By:   *s/ Scott Simpson*
                         *s/ Raya F. Saksouk*
                         80 Pine St., 33rd Fl.
                         New York, NY 10005
                         Tel.: 212-509-1616
                         Fax: 212-509-8088
                         ssimpson@nyemployeelaw.com
                         rsaksouk@nyemployeelaw.com

                         *Attorneys for Plaintiff*