UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

:

LAURENCE MALZBERG,                                    :

Plaintiff,                   :

:                        19-cv-10048 (LJL)

-v-                                   :

:                        OPINION AND ORDER

NEW YORK UNIVERSITY,                                  :

:

Defendant.                   :

:

---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _03/25/2022__

LEWIS J. LIMAN, United States District Judge:

Plaintiff Laurence Malzberg ("Malzberg" or "Plaintiff") brings claims against his former employer New York University ("NYU" or the "Hospital" or "Defendant"), alleging that Defendant discriminated against him in violation of the Americans with Disabilities Act and the New York City Human Rights Law by failing to accommodate his back-related disability.  Dkt. No. 1.  Defendant moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing Plaintiff's complaint with prejudice.  Dkt. No. 60.

For the following reasons, the motion for summary judgment is denied.

## BACKGROUND

The following facts are undisputed for purposes of this motion except where otherwise indicated.

### I.      Malzberg's Work as a Physician's Assistant and His Back Pain

Over the course of his eighteen-year career at NYU Langone, from 2001 to 2019, Malzberg worked as a physician's assistant ("PA") at various locations—the Hospital for Joint Disease (2001–2012, 2013–2019), the Interventional Radiology Department ("IR") (2005–2012), the Cancer Center (2012), and the Faculty Practice Group (also known as the Faculty Practice

Organization) (2012–2019).  Dkt. No. 68 ¶ 97; Dkt. No. 74 ¶ 97.  Malzberg began working as a

PA at the Hospital for Joint Disease in 2001, and, in or around July 2005, he accepted a position

as a PA in IR.  Dkt. No. 63 ¶¶ 2–3.  In the IR PA position, Malzberg learned to insert

Peripherally Inserted Central Catheters ("PICC lines"), mediport placements and removals,

permcath placements, insertion of drainage catheters, and generally assisted the IR doctors with

paperwork and patient care.  *Id.* ¶ 4.  Beginning in or around September 2005, in addition to

working in IR, Malzberg worked at other locations—the Hospital for Joint Disease and NYU's

main hospital—inserting PICC lines, mediports, and permcaths.  *Id.* ¶ 5.

Plaintiff developed back pain in or around 2005 or 2006 while he was a PA in IR.  Dkt.

No. 68 ¶ 67; Dkt. No. 74 ¶ 67.  Beginning at approximately that same time, Malzberg

experienced difficulty standing for more than fifteen to twenty minutes at a time because of his

back pain.[1]  Dkt. No. 68 ¶ 72; Dkt. No. 74 ¶ 72.  In or around 2006, Malzberg had an X-ray of

his back, and in or around 2008, he had an MRI scan of his back.  Dkt. No. 63 ¶ 9.  The resulting

MRI report summarizing the results as "[m]ild multilevel discogenic degenerative changes."

Dkt. No. 68 ¶ 70; Dkt. No. 74 ¶ 70.  Malzberg did not provide the X-ray records or the MRI

scans to NYU.  Dkt. No. 62 ¶ 20; Dkt. No. 68 ¶ 20.  At some time between November 2008 and

March 2019, Malzberg sought treatment for his back from an acupuncturist and a chiropractor.

Dkt. No. 68 ¶ 71; Dkt. No. 74 ¶ 71.

---

[1] Defendant contends that this fact is disputed because Plaintiff testified that he was capable of walking back and forth from the Hospital for Joint Disease and the faculty practice and because Plaintiff never requested any accommodation to do his job.  Dkt. No. 74 ¶ 72.  But walking is a major life activity distinct from standing, *see* 42 U.S.C. § 12102(2)(A), and any failure to request an accommodation does not contradict the fact that Plaintiff had difficulty standing.  Defendant's contention thus does not create a genuine issue of fact, and the fact is deemed admitted for purposes of summary judgment.

In or around October 2012, Malzberg was instructed to report to NYU's Cancer Center where he performed outpatient CT scans.  Dkt. No. 63 ¶ 6.  In or around 2013, Malzberg resumed his position inserting PICC lines at the Hospital for Joint Disease while continuing to perform outpatient CT scans.  Dkt. No. 63 ¶ 8.  From 2013 through 2019, Malzberg performed his PA job without accommodations.  Dkt. No. 62 ¶ 16; Dkt. No. 68 ¶ 16.

There is no genuine dispute regarding the different physical demands required by Malzberg's PA role in IR versus his other PA roles.  Regarding performing CT scans, which was not part of Malzberg's PA role in IR, the parties agree that Malzberg always performed CT scans while sitting down and that the CT scans did not require Malzberg to wear protective equipment.  Dkt. No. 63 ¶ 7; Dkt. No. 68 ¶ 98; Dkt. No. 74 ¶ 98.  By contrast, inserting PICC lines required standing up and wearing a lead suit or apron.  Dkt. No. 68 ¶ 99; Dkt. No. 74 ¶ 99.  Malzberg inserted PICC lines as part of his work in both IR and the Hospital for Joint Disease.  Dkt. No. 63 ¶¶ 4–5, 8.  But there is no genuine dispute that inserting PICC lines at the Hospital for Joint Disease was less painful for his back than inserting PICC lines in IR; that case volumes at the Hospital for Joint Disease are "much less" than in IR; that Malzberg performed PICC-line insertions at the Hospital for Joint Disease faster and more easily than he performed the same procedure in IR, at least in part because the patients' conditions were less severe and there was more time between patients; and that, when inserting PICC lines at the Hospital for Joint Disease, Malzberg generally spent no more than ten to fifteen minutes standing at one time.  Dkt. No. 68 ¶¶ 100–103; Dkt. No. 74 ¶¶ 100–103.  There is also no genuine dispute that, from 2015 to 2019, PICC-line insertions at the Hospital for Joint Disease were the only job responsibility Malzberg had that required standing up while wearing a lead suit or apron.  Dkt. No. 68 ¶ 104; Dkt. No. 74 ¶ 104.

## II.     Discussions Regarding Malzberg's Return to IR

On January 15, 2019, Dr. Leon Rybak ("Rybak"), Vice Chair of Operations in the

Radiology Department, asked Malzberg how he would feel about intermittently doing some

work in IR in addition to his then-current responsibilities.  Dkt. No. 68 ¶ 107; Dkt. No. 74 ¶ 107.

Malzberg testified that he told Rybak that "going back there standing in that type of position

causes [him] back pain which has gotten worse over time."  Dkt. No. 67 ("Simpson Decl."), Ex.

3 at 110; *see also* Dkt. No. 68 ¶ 108.  But Rybak denies ever recalling hearing Malzberg say

directly that he suffers from back pain.  Simpson Decl., Ex. 10 at 7; *see also* Dkt. No. 74 ¶ 108.

It is undisputed, however, that Malzberg asked Rybak to "give [him] details and we will talk" or

to "let [him] know what it all entails and we will discuss."  Dkt. No. 68 ¶ 109; Dkt. No. 74 ¶ 109.

On January 24, 2019, Daniel Alexa ("Alexa"), Radiology Department Administrator, sent

an email to Michael Recht, Chair of Operations and Rybak's boss, stating that "Leon [Rybak]

has some concern that [Plaintiff] will not stay [in IR] if we move him – I think it would be okay

if he does happen to leave. . . . We could replace him with a less expensive APP [advanced

practice practitioner]."  Dkt. No. 68 ¶¶ 111, 127; Dkt. No. 74 ¶¶ 111, 127.

On February 13, 2019, Alexa emailed Rybak and Dr. Akhilesh Sista ("Sista"), who was

Division Chief of IR, proposing they talk about Plaintiff's transition back to IR and alerting

them, "I recognize he may not love this and we will have to deal with that."  Dkt. No. 68 ¶¶ 111,

128; Dkt. No. 74 ¶¶ 111, 128.  Rybak responded to the email, "I know from speaking to him in

the past that he is going to ask about the nature of the cases and will specifically ask about his

fluoro[2] exposure.  He is reluctant to do any long cases which involve fluoro.  We need to be as

---

[2] "Fluoro" appears to be shorthand for fluoroscopy or fluoroscope, which is defined as "an
instrument used for observing the internal structure of an opaque object (such as the living body)
by means of X-rays."  Merriam-Webster Online Dictionary, accessible at https://www.merriam-
webster.com/dictionary/fluoroscope (accessed Mar. 25, 2022).

frank and open with him as possible and if the job doesn't fit for him, we will have to let him know that we will have to find someone else who does want the position." Dkt. No. 68 ¶ 129; Dkt. No. 74 ¶ 129.  The next day, Alexa emailed John Davidson ("Davidson"), Senior Director of PA Services and Care Management, alerting him that "we will be meeting with Larry Malzberg at 1:30 today," that "[w]e are going to let him know that we will need him to support the VIR[3] dept at Tisch now," and that "Larry may not be very excited about this change and he may come to you." Dkt. No. 68 ¶ 130; Dkt. No. 74 ¶ 130.

On February 14, 2019, Malzberg attended a meeting with Rybak, Alexa, and Sista. Dkt. No. 62 ¶ 33.  The parties dispute what happened at this meeting.  According to Defendant, at that meeting, Malzberg was advised that his current position was ending, effective March 1, 2019, and he was offered a position in IR, where he previously worked.  Dkt. No. 62 ¶¶ 33–34. Defendant submits that Malzberg did not ask anyone at the meeting about the specifics of the offered position and did not inquire about job duties other than doing procedures.  *Id.* ¶ 35. Defendant submits that the only questions Malzberg asked had to do with "the nature of the position in terms of what his responsibilities would be and what kind of cases he would be doing." Dkt. No. 74 ¶ 113 (quoting Simpson Decl., Ex. 10 at 130).  In Defendant's view, Malzberg did not appear to consider accepting the offered IR position and said that he could not perform the job.  Dkt. No. 62 ¶¶ 38, 44.

Each of the supervisors at the February 14, 2019 meeting remember what happened at the meeting somewhat differently.  Sista testified that Malzberg mentioned something about a physical impediment but could not recall what impediment it was, Dkt. No. 74 ¶ 113 (citing Simpson Decl., Ex. 1 at 124); Rybak testified that Malzberg made no references to his back pain,

---

[3] VIR appears to be an acronym for Vascular and Interventional Radiology.

*id.* (citing Dkt. No. 73, Ex. P at 131); and Alexa testified that Malzberg did not raise any

concerns about his physical abilities at the meeting, *id.* (citing Simpson Decl., Ex. 11, at 103).

Defendant further states that Sista told Malzberg that he was willing to work with him to carve

out a position that accommodated his physical needs; that there were many different tasks

involved in the offered IR position; and that NYU would "reduce any sort of difficulty

[Malzberg has] physically with the job."  Dkt. No. 62 ¶¶ 36–37 (quoting Dkt. No. 64 ("Gilbride

Decl."), Ex. E at 124–25).

　　　　Plaintiff, however, disputes this version of events.  Plaintiff submits that, at the February

14, 2019 meeting, he was advised that his help was needed in IR and that he would be required

to report there on a fulltime basis, effective March 1, 2019.  Dkt. No. 68 ¶¶ 33–34.  He does not

remember if he asked if the position would include anything other than doing procedures.  *Id.*

¶ 35.  Plaintiff states that he told NYU that he could not perform the IR position as it was

described to him without experiencing physical pain.  *Id.* ¶¶ 43–44.  He informed Rybak, Sista,

and Alexa that he was concerned about his physical ability to do the IR job without pain because

standing for long periods of time causes him severe back pain.  Dkt. No. 74 ¶¶ 112–113.

Plaintiff submits that, when he raised the issue of his back pain at the meeting, "[i]t was quiet

and they looked at each other."  Dkt. No. 68 ¶¶ 36–37 (quoting Simpson Decl., Ex. 3 at 136).

And, contrary to Defendant's version of events, there is testimony to support that Malzberg, at a

minimum, considered the position.  Dkt. No. 68 ¶ 38.  For example, Rybak testified that

Malzberg "was engaging" and "asking questions like anybody considering a new position

would," Simpson Decl., Ex. 10 at 129, and that there was "a sense during and after that meeting

to a certain extent of relief that . . . this was gonna work out, . . . that [Malzberg] was seriously

considering taking the position and trying it out," *id.* at 127.  Alexa also testified that Plaintiff

agreed to move to IR.  *Id.*, Ex. 11 at 101.

The parties agree, however, that at the February 14, 2019 meeting, Malzberg did not

request an accommodation for the IR position or offer any suggestions of any accommodations

that would enable him to perform the IR position.  Dkt. No. 62 ¶¶ 42, 45; Dkt. No. 68 ¶¶ 42, 45.

They also agree that Malzberg inquired about a severance package.  Dkt. No. 62 ¶ 46; Dkt. No.

68 ¶ 46.  They also agree that Sista recalled that he "left that meeting waiting for the next steps

for accommodation from Dan, Larry and Leon to come up with, you know, what are we gonna

do next, where does the interest lie here in this job."  Dkt. No. 68 ¶ 125; Dkt. No. 74 ¶ 125.

Rybak, Sista, and Alexa did not contact NYU's Employee and Labor Relations Department

("ELR" or "Employee Relations") regarding Malzberg.  Dkt. No. 68 ¶ 115; Dkt. No. 74 ¶ 115.

### III.    Malzberg's Response to the February 14, 2019 Meeting

The day after this meeting, on February 15, 2019, Malzberg called Employee Relations

and spoke to Michelle Hawkins.  Dkt. No. 62 ¶ 47; Dkt. No. 68 ¶ 47.  He then called her back

and left a voicemail for her stating: "If a job is being offered to me that I do not want, and then I

have to leave based on that, am I eligible for unemployment?"  Gilbride Decl., Ex. M; *see also*

Dkt. No. 62 ¶ 47; Dkt. No. 68 ¶ 47.

The parties dispute whether Malzberg raised concerns with Rybak about the IR position

after the meeting.  According to Plaintiff, a few days after the February 14, 2019 meeting,

Malzberg called Rybak on the phone and told him that "to go back [to IR] would cause [him] a

great deal of pain" and specifically "lower back pain which has worsened over time."  Dkt. No.

68 ¶ 131.  Plaintiff submits that when he asked Rybak what would happen if he could not do the

IR job due to physical pain, Rybak told him, "If you don't take the job, that's it," implying

Plaintiff would be out of a job.  *Id.* ¶ 132.  By contrast, Defendant contends that the next times

Rybak heard from Malzberg after the February 14, 2019 meeting were when Rybak learned that Malzberg was transferring internally and when he heard that the internal position had fallen through.  Dkt. No. 74 ¶¶ 131–132.

On February 20, 2019, Plaintiff called HR and described his situation to a receptionist. Dkt. No. 68 ¶ 146; Dkt. No. 74 ¶ 146.  Later that same day, Plaintiff went in person to HR and met with Kathleen Pacina ("Pacina"), a manager in NYU Langone's Employee and Labor Relations Department.  Dkt. No. 68 ¶ 147; Dkt. No. 74 ¶ 147.  The parties dispute what was discussed at this meeting.  Plaintiff testified that, after he told Pacina "the entire story," including "that [he was] forced to endure pain to do a job," she informed him that "if you're offered a job of the same level . . . and you decline it for any reason, you're seen as quitting."  Dkt. No. 68 ¶ 148 (quoting Simpson Decl., Ex. 3 at 146, 148).  He also told Pacina that he was "being fired" and was "not quitting."  *Id.* ¶ 149.  In contrast, Pacina testified that Plaintiff did not mention anything about his back during their meeting, did not mention any physical issues that he would have with the new position, dismissed her explanation of the accommodation process, and demanded to get severance.  Dkt. No. 74 ¶¶ 148–149.

After meeting with Pacina in Employee Relations, Malzberg spoke with Davidson to ask if he knew about any positions available within NYU Health System.  Dkt. No. 68 ¶ 152; Dkt. No. 74 ¶ 152.  Davidson either helped connect Malzberg with an open in-house PA position, Dkt. No. 68 ¶ 153, or connected him with a recruiter in human resources, Dkt. No. 74 ¶ 153.

Later that same day, on February 20, 2019, Malzberg applied for an in-house PA position in the Dysautonomia Center.  Dkt. No. 63 ¶ 13; Dkt. No. 68 ¶ 154; Dkt. No. 74 ¶ 154.  He interviewed for the position.  Dkt. No. 63 ¶ 14; Dkt. No. 68 ¶ 155; Dkt. No. 74 ¶ 155.  But, on March 14, 2019, he learned that he would not be offered the position by an email from Mandy

Woodley ("Woodley"), Internal Career Planning Specialist.  Dkt. No. 68 ¶ 157; Dkt. No. 74 ¶ 157.  Malzberg spoke to Woodley on the phone on March 14 and March 15, 2019.  Dkt. No. 68 ¶ 158; Dkt. No. 74 ¶ 158.

After the second phone call, on March 15, 2019, Woodley emailed members of ELR, including Pacina and her supervisor Beth Cooper to inform them of the situation with Malzberg "as this will likely escalate."  Simpson Decl., Ex. 20; Dkt. No. 68 ¶ 160; Dkt. No. 74 ¶ 160.  The email stated that "[Malzberg's] current department needs him to either move over to the IR team or resign" and that "[Malzberg] states he cannot go to IR based on health issues."  Simpson Decl., Ex. 20; Dkt. No. 68 ¶ 159; Dkt. No. 74 ¶ 159.  The email also stated that Malzberg was "extremely distraught about this situation and noted he will be pursuing legal recourse."  Simpson Decl., Ex. 20; Dkt. No. 68 ¶ 160; Dkt. No. 74 ¶ 160.

On March 14 or March 15, 2019, Woodley called Pacina on the phone and, among other things, told her that Malzberg "had brought up health concerns" related to the position in IR and relayed Malzberg's questions regarding his options in taking or not taking the position in IR.  Simpson Decl., Ex. 21 at 74–75; Dkt. No. 68 ¶ 161; Dkt. No. 74 ¶ 161.  Pacina responded that Malzberg was being offered a position in IR, his current position was being dissolved, and if he elected not to take the position in IR, that he would be terminated without severance.  Simpson Decl., Ex. 21 at 76–77; Dkt. No. 68 ¶ 162; Dkt. No. 74 ¶ 162.

On March 15, 2019, Malzberg emailed Rybak to inform him that he would not be transferring to the different PA position to which he had applied internally.  Simpson Decl., Ex. 15; Dkt. No. 68 ¶ 164; Dkt. No. 74 ¶ 164.  The email stated: "since I am not returning to IR, due to health concerns, and you asked I stay the month of March as a favor (which of course I complied as always), the end of March, as you told me, will be my last day."  Simpson Decl., Ex.

15; Dkt. No. 68 ¶ 164; Dkt. No. 74 ¶ 164.  Rybak forwarded the email to Alexa the same day.
Dkt. No. 68 ¶ 165; Dkt. No. 74 ¶ 165.

That same day, on March 15, 2019, Malzberg texted Rybak: "More information no job.
So I imagine since you told me my last day will be the end of March [it] will be since I
physically cannot stand with my lower back wearing lead for all those hours and I'm fearful of
the radiation for other health reasons."  Simpson Decl., Ex. 19; Dkt. No. 68 ¶ 166; Dkt. No. 74
¶ 166.  Rybak, however, testified that he is a "horrible texter," that "it wouldn't have been the
first time [he] missed a text," and that "[i]t's entirely possible [he] saw this text message at that
time."  Simpson Decl., Ex. 10 at 147, 151; Dkt. No. 68 ¶¶ 167–168; Dkt. No. 74 ¶¶ 167–168.

Malzberg also emailed Davidson on March 15, 2019, stating in part:  "I told Radiology of
my new position, since they gave me a choice of returning to IR (where I can no longer stand for
extended periods wearing heavy protection, and do not want more radiation exposure due to
health issues).  They asked if I could work the month of March and I of course complied.  My
choices were IR or no position at all."  Simpson Decl., Ex. 27; Dkt. No. 68 ¶ 170; Dkt. No. 74
¶ 170.

Though the parties dispute exactly when this took place, Alexa drafted a termination
letter dated March 22, 2019 and sent it to Evelyn Taveras ("Taveras") of Employee Relations.
Dkt. No. 68 ¶ 171; Dkt. No. 74 ¶ 171.  Taveras reviewed the March 22 draft letter and made
revisions.  Dkt. No. 68 ¶ 172; Dkt. No. 74 ¶ 172.  The final version of this termination letter is
dated March 26, 2019.  Simpson Decl., Ex. 23; Dkt. No. 68 ¶ 171; Dkt. 74 ¶ 171.

## IV.    Malzberg's Final Meeting with Employee Relations and Termination

After learning he would not be offered the position in the Dysautonomia Center,
Malzberg requested a meeting with Employee Relations at NYU, and, on March 27, 2019, he
met with Taveras in her office.  Dkt. No. 63 ¶ 15.  The parties agree that Malzberg wanted to

know what severance he was entitled to receive.  Dkt. No. 62 ¶ 53; Dkt. No. 68 ¶ 53.  Malzberg

also told Taveras that he could not do the IR position because he had a physical disability.  Dkt.

No. 62 ¶ 54; Dkt. No. 68 ¶ 54.  The parties dispute the specifics of what took place at the

meeting.  According to Plaintiff, he told Taveras about his back pain, but she brushed off his

concerns.  Dkt. No. 68 ¶¶ 174, 177.  However, Taveras testified that Malzberg mentioned that he

was not interested in transferring over to the IR role because of medical concerns and that, when

she said they could talk about reasonable accommodations, he told her that he was not interested

in an accommodation and did not want that job.  Dkt. No. 74 ¶ 177.

Though the parties dispute exactly what happened at the meeting between Malzberg and

Taveras, they agree that Malzberg did not provide her with any medical documentation during

the March 27, 2019 meeting and that Taveras did not provide him with any forms to request a

reasonable accommodation and did not ask him for any medical documentation.  Dkt. No. 62

¶ 55; Dkt. No. 68 ¶¶ 55, 175; Dkt. No. 74 ¶ 175.  Moreover, though her usual practice was to

open a file for employees coming to her with reasonable accommodations issues, Taveras could

not recall opening such a file for Plaintiff.  Dkt. No. 68 ¶ 176; Dkt. No. 74 ¶ 176.

The day after the meeting, on March 28, 2019, Taveras sent an email to Malzberg.  Dkt.

No. 63 ¶ 16.  The email had been reviewed and revised by Alexa the previous day.  Dkt. No. 68

¶ 180; Dkt. No. 74 ¶ 180.  The fourth paragraph of the email stated that, with respect to the IR

role, NYU would provide Malzberg with appropriate training and offered to "work with [him] to

provide a reasonable accommodation that would allow [him] to support the essential functions of

the role."  Dkt. No. 63 ¶ 16.  Malzberg did not respond to Taveras's email.  Dkt. No. 62 ¶ 57;

Dkt. No. 68 ¶ 57.  There is no genuine dispute that Malzberg believed that "nobody seemed to

care" about his pain, that he was being offered an "ultimatum," and he "felt defeated."  Dkt. No.
68 ¶ 181; Dkt. No. 74 ¶ 181.

On April 1, 2019, Malzberg reported to work at the Hospital for Joint Disease to
demonstrate that he did not quit his job.  Dkt. No. 63 ¶ 17.  Alexa gave Malzberg a letter dated
March 26, 2019 advising him that he would be required to return to IR or be "released" from his
position.  Dkt. No. 63 ¶ 18.  HR documents state that Malzberg was officially "released" from
his position with NYU on April 4, 2019.  Dkt. No. 63 ¶ 19.

**V.    Accommodations**

The parties do not dispute that, during his career as a PA at NYU, Malzberg never asked
for any accommodation to do his job.  Dkt. No. 62 ¶¶ 7, 17, 58; Dkt. No. 68 ¶¶ 7, 17, 58.  In
particular, he did not request any accommodations related to back pain during his employment.
Dkt. No. 62 ¶ 26; Dkt. No. 68 ¶ 26.  There is also no genuine dispute that, at no point between
January 15 and April 1, 2019, did NYU ask Plaintiff for any medical records or medical
information.  Dkt. No. 68 ¶ 184; Dkt. No. 74 ¶ 184.

The parties do not dispute that Malzberg's job duties in IR could have been modified so
he could perform them.  Dkt. No. 68 ¶ 143; Dkt. No. 74 ¶ 143.  Both Rybak and Sista testified
and believed that reasonable accommodations could have been made for Plaintiff.  Dkt. No. 68
¶ 140; Dkt. No. 74 ¶ 140.  Sista testified that it was theoretically possible for many of the IR job
duties to be performed while sitting down.  Dkt. No. 68 ¶ 141; Dkt. No. 74 ¶ 141.  Sista also
suggested that Plaintiff's job duties could have been modified.  Dkt. No. 68 ¶ 144; Dkt. No. 74
¶ 144.  Rybak testified that there may be rooms where a chair could be accommodated during
procedures and that there were lots of small, simple cases that Malzberg could do that would be
less taxing than when Malzberg was doing PICC lines.  Dkt. No. 68 ¶¶ 142–143; Dkt. No. 74
¶¶ 142–143.

VI.     **Medical Examinations of Malzberg's Back**

On March 29, 2019, before he was terminated, Malzberg received an MRI for his back.

Dkt. No. 63 ¶ 10.  The MRI report's impression noted "[m]ultilevel degenerative changes of the

lumbar spine with possible small left foraminal disc protrusions at L1-2 and L3-4."  Simpson

Decl., Ex. 5; Dkt. No. 68 ¶ 78; Dkt. No. 74 ¶ 78.  The report also noted that the findings had

"progressed" as compared to the findings of Malzberg's MRI in 2008.  Simpson Decl., Ex. 5;

Dkt. No. 68 ¶ 79; Dkt. No. 74 ¶ 78.  Malzberg did not provide medical records from this MRI to

anyone at NYU.  Dkt. No. 62 ¶ 23; Dkt. No. 68 ¶ 23.  For the entirety of his employment with

NYU, Malzberg did not provide NYU with any medical documentation regarding any issue with

his back.  Dkt. No. 62 ¶ 25; Dkt. No. 68 ¶ 25.

On November 18, 2019, several months after he was terminated and after this lawsuit was

commenced, Malzberg was examined by Dr. Kiril Kiprovski ("Kiprovski"), a physician in

NYU's Clinical Neurophysiology Department.  Dkt. No. 68 ¶ 81; Dkt. No. 74 ¶ 81.  Kiprovski's

notes reflect that Malzberg experiences "intermittently exacerbated lower back pain" that "is

worse upon standing."  Simpson Decl., Ex. 6; *see also* Dkt. No. 68 ¶ 82; Dkt. No. 74 ¶ 82.  The

notes also reflect that Malzberg "has pain in the gluteal areas, which is likely referred somatic

spinal pain."  Simpson Decl., Ex. 6; *see also* Dkt. No. 68 ¶ 83; Dkt. No. 74 ¶ 83.  Kiprovski

recommended physiotherapy for Malzberg's back pain and noted that, "[i]f the pain

exacerbates," he would consider "referring [Malzberg] for lumbar spinal epidural injection."

Simpson Decl., Ex. 6; *see also* Dkt. No. 68 ¶ 84; Dkt. No. 74 ¶ 84.  Kiprovski also ordered an

MRI of Malzberg's lumbosacral plexus, which took place on December 26, 2019.  Dkt. No. 68

¶ 85; Dkt. No. 74 ¶ 85.

On November 21, 2019, Malzberg was examined by Dr. Robert Meislin ("Meislin") who

diagnosed him with acquired hypothyroidism, hyperglycemia, vitamin D deficiency, nasal valve

stenosis, pure hypercholesterolemia, degenerative disc disease lumbar, meralgia paresthetica of both lower extremities, chronic bilateral low back pain without sciatica, herniated lumbar disc without myelopathy, lumbosacral radiculopathy, and primary osteoarthritis of the right knee. Simpson Decl., Ex. 8; *see also* Dkt. No. 68 ¶ 88; Dkt. No. 74 ¶ 88.

On March 10, 2021, Malzberg was examined by Dr. Jeff Silber ("Silber"), an orthopedic surgeon affiliated with Hofstra Northwell School of Medicine.  Dkt. No. 68 ¶ 90; Dkt. No. 74 ¶ 90.  Silber concluded that Malzberg "suffers from a lumbar degenerative condition" with "disc bulging and facet arthropathy (arthritis) as well as foraminal narrowing (pinched nerves) at multiple levels."  Simpson Decl., Ex. 2 at 2; Dkt. No. 68 ¶ 94 Dkt. No. 74 ¶ 94.  Silber noted that Malzberg "has palpatory tenderness in the paraspinal musculature across his lumbosacral junction."  Simpson Decl., Ex. 2 at 2; Dkt. No. 68 ¶ 92; Dkt. No. 74 ¶ 92.  He further concluded that Malzberg "will suffer periodic low back exacerbations" and "recommended that he perform a more sedentary-type job that only involves periodic standing for no more than 10–15 minutes without a lead apron."  Simpson Decl., Ex. 2 at 2; Dkt. No. 68 ¶ 95; Dkt. No. 74 ¶ 95.  He also stated, "[i]n my opinion, [Malzberg's] MRI findings are consistent with someone who suffers from back pain."  Simpson Decl., Ex. 2 at 2; Dkt. No. 68 ¶ 93; Dkt. No. 74 ¶ 93.

## PROCEDURAL HISTORY

Plaintiff filed his complaint against Defendant on October 30, 2019.  Dkt. No. 1.  The complaint alleges two causes of action: (1) discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and (2) discrimination under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*  Dkt. No. 1 ¶¶ 1, 94–103.  Defendant answered on January 24, 2020.  Dkt. No. 15.

14

On July 21, 2021, Defendant moved for summary judgment.  Dkt. No. 60.  Plaintiff filed his opposition papers on September 17, 2021.  Dkt. Nos. 67–69.  Defendant replied on October 25, 2021.  Dkt. Nos. 72–74.  The Court held oral argument on the motion on March 22, 2022.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

In cases involving claims of discrimination, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz*, 258 F.3d at 69) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short

and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

## DISCUSSION

The Court addresses Plaintiff's failure-to-accommodate claim under the ADA before turning to his NYCHRL claim.[4]

### I.     ADA Claim

Defendant argues that it is entitled to summary judgment on Plaintiff's failure-to-accommodate claim under the ADA.

"Discrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)

---

[4] Plaintiff's complaint also included allegations regarding his eye impairments. *See* Dkt. No. 1 ¶¶ 24–31, 41–44. But in his memorandum of law in opposition to Defendant's motion for summary judgment, Plaintiff "concedes that his eye impairments were not ADA-qualified disabilities during the relevant time period (January to April 2019)." Dkt. No. 69 at 10 n.7. Because Plaintiff has abandoned his claims to the extent they relied on the allegations regarding his eyes, this Opinion focuses on the issues concerning Plaintiff's back.

(quoting 42 U.S.C. § 12112(b)(5)(A)); *see also McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) ("An employer may also violate the ADA by failing to provide a reasonable accommodation.").  "[F]or purposes of the ADA, a 'qualified individual' is 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *McBride*, 583 F.3d at 96 (quoting 42 U.S.C. § 12111(8)).

"A plaintiff states a *prima facie* failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."[5]  *McMillan*, 711 F.3d at 125–26; *see also McBride*, 583 F.3d at 97 (same); *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (same).

Defendant argues that it is entitled to summary judgment because Plaintiff cannot establish the prima facie case.  In particular, Defendant argues that Plaintiff does not have a disability within the meaning of the ADA; Plaintiff caused the breakdown of the interactive process; and Plaintiff cannot show that he can perform the essential functions of the job with or without reasonable accommodations.  Dkt. No. 61 at 1.  Plaintiff responds that summary judgment in favor of Defendant is not warranted because Plaintiff has a disability under the ADA; there is a factual question regarding whether Defendant had notice of Plaintiff's disability;

---

[5] "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *McBride*, 583 F.3d at 96; *see also Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 304 (S.D.N.Y. 2014) (stating that plaintiff's failure-to-accommodate claim under the ADA is "subject to the *McDonnell Douglas* three-step burden-shifting framework").  Because Defendant focuses on the elements of the prima facie case, the Court will direct its analysis to the prima facie case as well.

Plaintiff could have performed the essential job functions at IR with reasonable accommodations; and Defendant failed to initiate or engage in good faith in the interactive process.  Dkt. No. 69 at 10, 17–18.

The Court turns to each of these arguments in turn.

A.    **Disability**

Defendant argues that Plaintiff does not have a disability within the meaning of the ADA. Dkt. No. 61 at 9–10.  First, Defendant argues that Plaintiff's back pain does not substantially limit a major life activity.  *Id.* at 10–12.  Second, Defendant argues that Plaintiff has no medical evidence of his back pain and that self-diagnosis is insufficient to constitute a disability under the ADA.  *Id.* at 12–13.  Plaintiff responds that a reasonable juror could find that his back condition is a disability under the ADA because his back pain substantially limits his ability to stand for longer than fifteen to twenty minutes.  Dkt. No. 69 at 10–13.

"Courts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA."  *Cody v. Cty. of Nassau*, 577 F. Supp. 2d 623, 637 (E.D.N.Y. 2008) (quoting *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 296 (S.D.N.Y. 2003)), *aff'd*, 345 F. App'x 717 (2d Cir. 2009).  "First, a plaintiff must demonstrate that she suffers from a physical or mental impairment.  Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a major life activity.  Third, a plaintiff must demonstrate that her impairment substantially limits the major life activity identified in step two."  *Id.* at 638 (internal quotation marks and citations omitted and alteration adopted); *see also Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 163 (S.D.N.Y. 2020) ("To establish a disability, a plaintiff must: (1) 'show that she suffers from a physical or mental impairment'; (2) 'identify the activity claimed to be impaired and establish that it constitutes a major life activity'; and (3) 'show that her impairment substantially limits the major life activity previously identified.'"

19

(quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002))), *aff'd*, 2021 WL 5986999 (2d Cir. Dec. 17, 2021).

Equal Employment Opportunity Commission ("EEOC") regulations implementing the ADA define physical or mental impairment to include "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1).

"Under the ADA, 'major life activities' include, but are not limited to, 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working,' 42 U.S.C. § 12102(2)(A), as well as the operation of major bodily functions, including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions,' *id.* § 12102(2)(B)." *Norman*, 492 F. Supp. 3d at 163.

"To determine what constitutes a 'substantial limitation' of a major life activity, courts have looked to the EEOC regulations implementing the ADA. Although the regulations are not binding, courts in the Second Circuit afford them significant deference." *Id.* "Though the effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of the ADA, the duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe." *Id.* (internal quotation marks and citations omitted and alteration adopted). Further, in 2008, Congress amended the ADA and "instructed courts that the definition of

disability . . . shall be construed in favor of broad coverage of individuals, and that an

impairment that substantially limits one major life activity need not limit other major life

activities in order to be considered a disability." *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020)

(internal quotation marks and citations omitted).  The "principal purpose" of these amendments

was to "make clear that the substantial-limitation requirement in the definition of 'disability' is

not an exacting one." *Id.*

Reading the record in the light most favorable to Plaintiff, as the Court must on

Defendant's motion for summary judgment, the Court concludes that Plaintiff has demonstrated

that a reasonable jury could find that Plaintiff has a disability under the ADA.  First, Plaintiff's

back condition qualifies as a physical impairment; at a minimum, it is a physiological disorder or

condition affecting the musculoskeletal system.  And there is no genuine dispute that Plaintiff's

back pain began in or around 2005 or 2006 when he was a PA in IR.  Second, Plaintiff has

identified standing to be the major life activity that has been impaired by his back pain.  Standing

is indisputably a major life activity under the ADA.  *See* 42 U.S.C. § 12102(2)(A); *see also*

*Hamilton v. Westchester Cty.*, 3 F.4th 86, 92 (2d Cir. 2021) ("'[M]ajor life activities' expressly

include standing . . . .").  Third, by preventing Plaintiff from standing for longer than fifteen to

twenty minutes, Plaintiff's back pain substantially limits the major life activity of standing.

"[T]he substantial-limitation requirement in the definition of 'disability' is not an exacting one,"

*Woolf*, 949 F.3d at 94, and courts look to the EEOC regulations implementing the ADA to

determine what constitutes a substantial limitation of a major life activity, *see Norman*, 492 F.

Supp. 3d at 163.  The EEOC regulations provide that "[a]n impairment is a disability within the

meaning of this section if it substantially limits the ability of an individual to perform a major

life activity as compared to most people in the general population."  29 C.F.R.

§ 1630.20(j)(1)(ii).  Courts in this Circuit have held that the inability to stand for extended periods of time constitutes a substantial limitation.  *See, e.g.*, *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 502 (N.D.N.Y. 2004) (holding that plaintiff's inability to stand, sit, or walk for thirty minutes at a time constitutes an ADA disability because "[c]learly these limitations exceed those that the average adult in the general population is subject to"); *Meling v. St. Francis Coll.*, 3 F. Supp. 2d 267, 273 (E.D.N.Y. 1998) (concluding that restricted ability to walk, sit, and stand for no more than fifteen minutes at a time was a substantial limitation on a major life activity).  A reasonable jury could conclude that, as compared to most people in the general population, not being able to stand for longer than fifteen to twenty minutes due to back pain constitutes a substantial limitation of a major life activity.

Defendant's arguments to the contrary are unavailing.  Defendant argues that Plaintiff has no medical evidence of his back pain and that self-diagnosis is insufficient.  Dkt. No. 61 at 12–15.  This argument fails.  Characterizing Plaintiff's back pain as self-diagnosis is incongruous with the medical evidence in the record.  It is undisputed that Plaintiff's 2008 MRI report found "[m]ild multilevel discogenic degenerative changes," Dkt. No. 68 ¶ 70; Dkt. No. 74 ¶ 70; that his March 2019 MRI report found "[m]ultilevel degenerative changes of the lumbar spine with possible small left foraminal disc protrusions at L1-2 and L3-4" and noted "progressed" findings compared to the 2008 MRI report, Simpson Decl., Ex. 5; that notes from physicians who examined Plaintiff in November 2019 included findings regarding Plaintiff's back, Simpson Decl., Exs. 6, 8; and that a March 2021 report by an orthopedic surgeon concluded that Plaintiff "suffers from a lumbar degenerative condition" with "disc bulging and facet arthropathy (arthritis) as well as foraminal narrowing (pinched nerves) at multiple levels," Simpson Dec., Ex. 2.  Plaintiff's back condition is a far cry from mere self-diagnosis.

Defendant then argues that Plaintiff cannot rely on the MRI records obtained shortly before he was terminated and on the expert report because these pieces of evidence were obtained after the employment decision at issue.  Dkt. No. 61 at 14.  Defendant's argument relies on *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718 (2d Cir. 1994), and *Emanuel v. New York*, 2009 WL 4277075 (S.D.N.Y. Nov. 25, 2009).  In *Heilweil*, the plaintiff asked the district court to consider medical evidence showing a new diagnosis that was obtained two years after she was discharged.  32 F.3d at 724–25.  *Emanuel* is cited by Defendant for the proposition that a medical incident two months after a request for an accommodation is not probative as to whether the plaintiff was disabled at the time the accommodation was sought.  Dkt. No. 61 at 14 (citing 2009 WL 4277075, at *7 & n.7).  Both cases are distinguishable from the case at hand.  First, there is a disputed fact regarding when the relevant employment decision was made.  Moreover, the March 2019 MRI was obtained while Plaintiff was still employed by Defendant.  And viewing the evidence and drawing all inferences in favor of Plaintiff, the record does not show that there was any intervening event that acutely worsened Plaintiff's back condition such that subsequently obtained medical evidence would no longer be probative of whether Plaintiff was disabled during the time period at issue.

At any rate, in describing the ADA in the context of a Fair Housing Act case, the Second Circuit has discussed how the ADA does not require "medical evidence to establish a genuine dispute of material fact regarding the impairment of a major life activity at the summary judgment stage."  *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 43 (2d Cir. 2015); *see also Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 609 (S.D.N.Y. 2016).  Not every individual who has a disability—an impairment that substantially limits a major life activity— can afford to or does obtain medical care.  Thus, while, "conclusory declarations are insufficient

to raise a question of material fact," "non-medical evidence that conveys, in detail, the substantially limiting nature of an impairment may be sufficient to survive summary judgment." *Rodriguez*, 788 F.3d at 44; *see also Mazzocchi*, 204 F. Supp. 3d at 609.  Additionally, the EEOC regulations provide that, as part of the substantial-limitation inquiry, "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis."  29 C.F.R. § 1630.20 (j)(1)(v); *see also Kravtsov v. Town of Greenburgh*, 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) ("This inquiry usually will not require scientific, medical, or statistical analysis . . . ." (internal quotation marks omitted)).  Here, the record reflects non-medical evidence that Plaintiff cannot stand for more than fifteen to twenty minutes.  In addition, this non-medical evidence is corroborated by subsequent, relevant medical evidence submitted by Plaintiff.

Defendant further argues that Plaintiff's back pain does not substantially limit a major life activity because Plaintiff did not seek medical treatment for it for over ten years.[6]  Dkt. No. 61 at 10–12.  This argument also fails.  To reiterate, although the fact that Plaintiff did not seek medical care may be relevant to whether he suffered a qualifying disability under the ADA, it is not dispositive:  Medical evidence is not required to determine if an impairment substantially limits a major life activity.  *See Rodriguez*, 788 F.3d at 43.  And, in any event, the record here shows that at some time between November 2008 and March 2019, Plaintiff sought treatment for his back from an acupuncturist and a chiropractor.  Further, the case on which Defendant relies,

---

[6] Defendant also highlights the fact that Plaintiff never requested an accommodation or expressed difficulty in performing his non-IR PA job.  *See* Dkt. No. 61 at 15.  But this evidence is irrelevant to whether Plaintiff would require an accommodation to perform the PA job in IR, given the lack of genuine dispute over the differing physical demands of the two roles.

*Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154 (S.D.N.Y. 2020), is inapposite.  In

*Norman*, the court held that the plaintiff did not establish that she had a qualifying disability

because she failed to show that her allergy to the flu vaccine substantially limited her breathing.

*Id.* at 163–65.  The record showed that the plaintiff experienced two adverse reactions to the flu

vaccine—once as a child and once in nursing school—and that, for ten to twenty minutes after

the second reaction, the plaintiff experienced shortness of breath and chest palpitations for which

she did not seek medical attention.  *Id.* at 163–64.  The court explained that "courts in this circuit

have held that a substantial limitation on breathing is established when a plaintiff puts forward

evidence of episodes requiring medical interventions or chronic breathing problems."  *Id.* at 164.

But *Norman* did not state that evidence of medical intervention was necessary to show

substantial limitation.  In fact, the court in *Norman* noted that *either* "evidence of episodes

requiring medical interventions" *or* "chronic breathing problems" could suffice.  *Id.*  Thus,

*Norman* merely stands for the unobjectionable proposition that evidence of medical treatment

may sometimes help establish the substantial-limitation requirement to establish a disability.

For these reasons, Defendant is not entitled to summary judgment on the issue of whether

Plaintiff has a disability.[7]

_____

[7] Citing *Castagnozzi v. Phoenix Beverages, Inc.*, 208 F. Supp. 3d 461 (E.D.N.Y. 2016),
Defendant also argues that Plaintiff cannot show that he has a disability because he never told a
supervisor that he could not perform his duties.  Dkt. No. 61 at 10–12.  But Defendant misreads
*Castagnozzi* and appears to conflate the disability prong and the notice prong of the prima facie
case.  In *Castagnozzi*, the court concluded that the plaintiff did not provide evidence that his neck
injury substantially limited his ability to lift, stand, sit, or work at any time after returning to
work in April 2011.  208 F. Supp. 3d at 474.  The court noted that the only evidence that could
support the plaintiff was a letter in November 2011 in which the plaintiff alleged that he could
not perform the job of merchandiser, but the court determined that the plaintiff's "actions . . .
belie these words."  *Id.* at 475.  The court then recounted, among other things, how the plaintiff
had performed the duties of a merchandiser after the date of the letter and how he had reassured a
supervisor that he felt fine.  *Id.*  Contrary to Defendant's argument, *Castagnozzi* does not stand
for the proposition that a plaintiff must notify a supervisor of a disability for a plaintiff to have an

B.      Notice

Genuine disputes of material facts also preclude granting Defendant summary judgment

based on the prima facie element regarding notice.

"To satisfy the notice requirement, a plaintiff must demonstrate that the defendant was

aware that the plaintiff was disabled within the meaning of the ADA." *Lewis v. Blackman*

*Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 305 (S.D.N.Y. 2014) (internal quotation marks

omitted). "The notice requirement is rooted in common sense. Obviously, an employer who acts

or fails to act without knowledge of a disability cannot be said to have discriminated based on

that disability. Moreover, the notice requirement prevents an employee from keeping her

disability a secret and suing later for failure to accommodate." *Felix v. New York City Transit*

*Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001) (citations omitted), *aff'd*, 324 F.3d 102 (2d Cir.

2003). "Defendants cannot be held liable for failing to provide a reasonable accommodation

when it was plaintiff who stymied the extent of their knowledge of her alleged disability in the

first instance." *Thompson v. City of New York*, 2002 WL 31760219, at *8 (S.D.N.Y. Dec. 9,

2002).

The record reflects a host of disputed facts regarding whether Plaintiff notified Defendant

of his disability. For example, the parties dispute whether, in January 2019, Plaintiff informed

Rybak that standing as part of the IR position causes him back pain, which has gotten worse over

time; whether, at the February 14, 2019 meeting, Plaintiff told Rybak, Sista, and Alexa that he

could not perform the IR position without experiencing physical pain because standing for long

periods of time causes him severe back pain; whether Plaintiff told Rybak a few days after the

February 14, 2019 meeting that going back to IR would cause him lower back pain; whether, at

---

actual disability under the ADA. Further, as will be discussed *infra*, there are material disputes
of fact in this case regarding notice.

the February 20, 2019 meeting with Pacina of Employee Relations, Plaintiff told Pacina that he was being forced to endure pain to do a job; whether Rybak saw Plaintiff's March 15, 2019 text message in which Plaintiff said he physically cannot stand with his lower back wearing lead; and whether, at the March 27, 2019 meeting with Taveras, Plaintiff told Taveras about his back pain.

In addition to these disputed facts, there are undisputed facts in the record suggesting that Defendant may have had notice of Plaintiff's disability.  For example, on March 15, 2019, Woodley emailed members of Employee Relations, noting that Plaintiff told him he cannot go to IR based on health issues, and, around the time of this email, Woodley told Pacina on the phone that Plaintiff had brought up health concerns related to the IR position.  Around that time, Plaintiff also emailed Rybak to inform him that he would not be returning to IR due to health concerns, and Rybak forwarded this email to Alexa.  Plaintiff also emailed Davidson, mentioning that he can no longer stand for extended periods wearing heavy protection in IR.  It is also undisputed that, at the March 27, 2019 meeting with Taveras, Plaintiff told Taveras that he could not do the IR position because he had a physical disability.

Defendant appears to address notice as part of its arguments regarding other elements of the prima facie case, but Defendant's argument seems to boil down to pointing out that Plaintiff did not provide medical documentation to NYU and did not specifically request an accommodation.  Dkt. No. 61 at 15, 18–19.  But Defendant does not cite case law holding that an employee must provide medical documentation for an employer to be on notice of the employee's disability and that, in the absence of medical documentation, the employer cannot be on notice.  Additionally, as discussed further *infra*, the interactive process may involve the employer asking the employee for additional information of the disability, which thus suggests that such information need not be provided in the first instance to put the employer on notice.

27

Further, Defendant's argument regarding the lack of a request for an accommodation does not directly address whether Defendant had notice of a *disability*.  An "employer is obligated to provide a reasonable accommodation when it perceives the employee to be disabled, whether or not the employee has asked for an accommodation."  *Miller v. McHugh*, 814 F. Supp. 2d 299, 312 (S.D.N.Y. 2011); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("[A]n employer has a duty to reasonably accommodate an employee's disability . . . if the employer knew or reasonably should have known that the employee was disabled."); *Lewis*, 51 F. Supp. 3d at 307 (stating that, once an employer is aware of an employee's disability, employer has "a duty to provide a reasonable accommodation . . . regardless of whether [employee] explicitly requested a reasonable accommodation" (citations omitted)).  And, regardless, a request for an accommodation need not be explicitly made with certain "formalisms"; rather, what is important is if the employer has "enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Goonan v. Fed. Rsrv. Bank of New York*, 2014 WL 3610990, at *5 (S.D.N.Y. July 22, 2014). Here, as discussed, there are disputed facts that affect whether Defendant can be fairly said to know of the disability.  In terms of the desire for an accommodation, the record, when read in the light most favorable to Plaintiff, reflects that Plaintiff wanted to continue working for Defendant and not be terminated—even going so far as to independently apply to another internal PA position and to show up to work on April 1, 2019—and that Defendant had notice of these actions.  Plaintiff also indicated that the job, as it was described to him, could not be performed without suffering significant pain.  Thus, these facts are sufficient to demonstrate that he desired an accommodation and that Defendant can be fairly said to have known of this desire for an accommodation.  *Cf. Dipinto v. Westchester Cty.*, 2020 WL 6135902, at *7 (S.D.N.Y. Oct. 19,

2020) (finding, on motion to dismiss, plaintiff plausibly pleaded defendants knew of plaintiff's disability as well as his desire for an accommodation based on transfer requests and complaints to supervisor regarding his injured foot and how the amount of walking on the job hurt his foot).

In any event, Defendant appears to concede in its briefing that it had notice of Plaintiff's disability because it highlights evidence in record regarding Defendant's offer to discuss accommodations, and Defendant does not explain why it would offer to discuss accommodations in the absence of any notice of a possible disability. *See, e.g.*, Dkt. No. 61 at 20 (referencing "NYU's offer to discuss an accommodation"); Dkt. No. 72 at 10 ("In reality, the offer for a reasonable accommodation immediately followed the first unequivocal notice of Mr. Malzberg's disability that NYU received.").

The disputed facts regarding notice preclude summary judgment in favor of Defendant.

### C.     Performing the Essential Functions of the Job at Issue with Reasonable Accommodation

Defendant also argues that it is entitled to summary judgment because Plaintiff cannot show that he can perform the essential functions of the job with or without reasonable accommodations.  Dkt. No. 61 at 22–24.  But Defendant's briefing merely repackages its arguments regarding notice and the interactive process and does not address what the essential functions of the IR job are and whether the undisputed facts support that Plaintiff could not perform them.  Indeed, when the record is read in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff could have performed the essential job functions in IR with reasonable accommodations.  The parties do not dispute that Plaintiff's job duties in IR could have been modified so he could perform them, and both Rybak and Sista testified that they believed that reasonable accommodations—such as sitting for certain procedures and modifications of some job duties—could have been made for Plaintiff.  Defendant points to no

evidence in the record, let alone undisputed evidence, that Plaintiff was unable to perform the IR job with reasonable accommodations.

>    **D.    Interactive Process**

Defendant argues that Plaintiff thwarted the interactive process by failing to request an accommodation, offer a proposed accommodation, provide any medical documentation, or respond to NYU's offer to provide reasonable accommodations.  Dkt. No. 61 at 17–19.  Plaintiff responds that Defendant failed to initiate the interactive process, Defendant was responsible for the breakdown to the extent any interactive process took place, Plaintiff did not obstruct the interactive process, and Defendant failed to engage in good faith.  Dkt. No. 69 at 24–32.

"The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 98 (2d Cir. 2015) (quoting *Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)); *see also Noel v. BNY-Mellon Corp.*, 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011) ("[F]ederal law requires that employer and employee engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." (quoting 29 C.F.R. § 1630.2(o)(3))), *aff'd*, 514 F. App'x 9 (2d Cir. 2013).

"To trigger the duty to engage in the interactive accommodations process, the employer must have known, or have had sufficient notice such that the employer reasonably should have known, that the employee has a disability within the meaning of the Act, as opposed to a mere impairment."  *Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020).[8]  "[G]enerally, it is the responsibility of the individual with a disability to inform the

---

[8] Though *Costabile* was decided in the context of a motion to dismiss a claim under the Rehabilitation Act, "[d]iscrimination claims under the Rehabilitation Act are determined using

employer that an accommodation is needed." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (internal quotation marks omitted); *see also Felix*, 154 F. Supp. 2d at 657 ("The general rule, therefore, is that the initial burden of requesting an accommodation is on the employee and it is only after such a request has been made that the employer must engage in the 'interactive process' of finding a suitable accommodation."). "What matters under the ADA are not formalisms about the manner of the request, but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Goonan*, 2014 WL 3610990, at *5 (on motion to dismiss); *see also Dipinto v. Westchester Cnty.*, 2020 WL 6135902, at *6 (S.D.N.Y. Oct. 19, 2020) (same); *Kurlender v. Ironside Grp., Inc.*, 2019 WL 1317405, at *3 (E.D.N.Y. Mar. 22, 2019) (same); *Quadir v. New York State Dep't of Lab.*, 39 F. Supp. 3d 528, 540 (S.D.N.Y. 2014) (same).

"[S]teps toward engaging in an interactive process" include "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218–19 (2d Cir. 2001) (internal quotation marks omitted and alterations adopted).

"When the interactive process breaks down, a court should look for signs of good faith or bad faith, in assessing liability. A party that obstructs the process is not acting in good faith. Further, a party that fails to communicate, or withholds important information solely within the

---

the standard set forth in the ADA," *Veldran v. Dejoy*, 839 F. App'x 577, 578 (2d Cir. 2020) (summary order), and the rule stated in *Costabile* has been applied in cases on summary judgment, *id.* at 579.

knowledge of that party, can be found to have obstructed the process in bad faith." *Thompson v. City of New York*, 2002 WL 31760219, at *8 (S.D.N.Y. Dec. 9, 2002) (citations omitted).  In other words, "[i]n evaluating a claim for failure to accommodate, . . . courts should attempt to isolate the cause of the breakdown [of the interactive process] and then assign responsibility." *Zito v. Donahoe*, 915 F. Supp. 2d 440, 446–47 (S.D.N.Y. 2012) (internal quotation marks omitted and alteration in original).  "Courts must deny motions to dismiss or motions for summary judgment when presented with conflicting facts about the provenance of a breakdown . . . ."  *Goonan v. Fed. Rsrv. Bank of New York*, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013).

An employee may be responsible for obstructing the interactive process when, after requests from the employer, the employee fails to provide documentation in support of a request for accommodation.  *See Zito v. Donahoe*, 915 F. Supp. 2d 440, 448 (S.D.N.Y. 2012) (determining that employee's failure to respond to requests for documentation constitutes bad faith participation); *Thompson v. City of New York*, 2002 WL 31760219, at *8 (S.D.N.Y. Dec. 9, 2002) (concluding that employee obstructed the interactive process by "refusing to provide any requested medical documentation").  By contrast, "[a]n employer impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; the employee does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith." *Goonan*, 916 F. Supp. 2d at 480; *see also E.E.O.C. v. Yellow Freight Sys., Inc.*, 2002 WL 31011859, at *23 (S.D.N.Y. Sept. 9, 2002) (concluding, after bench trial, that employer's "utter refusal to engage in a meaningful dialogue" with employee constituted evidence of bad faith).

Different consequences result depending on whether the employee or the employer obstructed the interactive process. "Under the ADA, an employee who withdraws from the interactive process cannot later allege failure to accommodate." *Noel*, 2011 WL 4633884, at *2; *see also Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 946 (2d Cir. 2008) ("An employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate."); *Zito*, 915 F. Supp. 2d at 446 (same). An employee's withdrawal, however, may be excused where "defendant's statements effectively indicated that the defendant had no intention of engaging in the interactive process in good faith with the plaintiff." *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 794–95 (S.D.N.Y. 2020) (internal quotation marks omitted and alterations adopted); *see also Goonan*, 916 F. Supp. 2d at 483–84 ("Where an employer offers an employee a battery of unreasonable accommodations, that employee is not obligated to try them all out before returning to the interactive process.").

On the other hand, "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." *McBride*, 583 F.3d at 101. The Second Circuit has "held that 'failure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible.'" *Noll*, 787 F.3d at 98 (quoting *McBride*, 583 F.3d at 100–01). "That is because 'the ADA imposes liability for . . . discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible." *Id.* (quoting *McBride*, 583 F.3d at 100). Nevertheless, "an employer, by failing to engage in a sufficient interactive process, risks not discovering a means by which an employee's disability

could have been accommodated and thereby increases the chance that it will be found to have violated the ADA." *Id.*; *see also Sheng v. M&TBank Corp.*, 848 F.3d 78, 86 (2d Cir. 2017) ("[D]istrict courts may admit an employer's failure to engage in an interactive process as evidence of discrimination under the ADA.").

Here, there are many disputed issues of material fact that preclude summary judgment in favor of Defendant. First, as discussed *supra* Section I.B, there are genuine disputes of fact regarding whether Defendant "must have known" or "had sufficient notice such that [it] reasonably should have known" that Plaintiff had a disability to trigger the duty to engage in the interactive process. *Costabile*, 951 F.3d at 81. Second, assuming the interactive process was triggered, the record is replete with disputed facts regarding whether Defendant or Plaintiff obstructed the process. For example, the parties dispute whether, at the February 14, 2019 meeting, Sista offered to work with Plaintiff to carve out a position that accommodated his physical needs. There are also disputes regarding whether Defendant engaged in good faith by, for instance, asking what Plaintiff wanted or showing signs of considering Plaintiff's request. Construing the evidence and all inferences in favor of Plaintiff, Plaintiff asked Rybak what would happen if he could not do the IR job due to physical pain, and, rather than engaging in the interactive process, Rybak responded that Plaintiff had to take the job or be fired. Rybak disputes this account. Similarly, the parties dispute whether Plaintiff dismissed Pacina's explanation of the accommodations process at the February 20, 2019 meeting. It is also unclear on this record whether Rybak ignored or did not see Plaintiff's email and text message from March 15, 2019 about Plaintiff's health concerns with the IR position. Further, Plaintiff submits that he told Taveras about his back pain at the March 27, 2019 meeting but she brushed off his

concerns.  According to Defendants, Plaintiff was the one who told Taveras that he was not interested in an accommodation.

Defendant contends that Plaintiff thwarted the interactive process because it is undisputed that Plaintiff failed to request an accommodation, offer a proposed accommodation, provide medical documentation, or respond to Defendant's offer to provide accommodations.[9]  The Court addresses these arguments in turn.  First, though it is undisputed that Plaintiff did not request an accommodation, the parties dispute whether Defendant had notice of Plaintiff's disability—this is the event that triggers the interactive process, not any magic words specifically requesting an accommodation.  *See Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 52 (E.D.N.Y. 2021) ("An employee need not mention the ADA or even the term 'accommodation' so long as the employer has knowledge of the disability." (quoting *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 341–42 (D. Conn. 2016))); *see also Krow v. PineBridge Investment Holdings*, 2022 WL 836916, at *11 (S.D.N.Y. Mar. 21, 2022) ("[E]ven where an employee has not requested a reasonable accommodation, the employer should have known about the employee's disability where it has received some other kind of concrete notice, as when the employee has required hospitalization or extended leave, or the employee has otherwise provided notice to the employer about a specific disability or health condition, beyond general health problems.").  And even though Defendant disputes whether Plaintiff triggered the interactive process, Defendant fails to

---

[9] Defendant also argues that Plaintiff rejected the IR position and thus there was no opportunity to discuss whether he could perform it with or without reasonable accommodation.  *See* Dkt. No. 61 at 12.  But because there is a disputed issue of fact concerning whether Plaintiff rejected the IR job, summary judgment is unwarranted.  *See Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 53 (E.D.N.Y. 2021) ("Drawing all factual inferences in [the plaintiff's] favor, there is a disputed issue of fact as to whether [the plaintiff] rejected the Administrative Assistant position.  Therefore, the Court cannot accept [the defendant employer's] argument that the need to engage in an interactive process in making the Administrative Assistant position offer was foreclosed by [the plaintiff's] rejection of the offer.").

explain how it can simultaneously argue that there is no evidence that the process was triggered and at the same time that the evidence is undisputed that it attempted to engage in the process. Next, Defendant's argument regarding Plaintiff's failure to offer a proposed accommodation or provide medical documentation contravene the spirit of the interactive process. The interactive process does not impose on Plaintiff the unilateral obligation to offer a proposed accommodation or provide medical documentation unprompted. (It is undisputed that Defendant never requested any medical records or medical information from Plaintiff.) Rather the process envisions a back-and-forth between employer and employee wherein the two parties work in concert to determine the feasibility of a reasonable accommodation. Lastly, it is true that it is undisputed that Plaintiff did not respond to Taveras's email offering to work with him to provide a reasonable accommodation. But, given the disputed facts at issue, Plaintiff's failure to respond to this email alone cannot establish that Plaintiff obstructed the interactive process. A fuller picture of the process must be available so that it may be determined, in context, whether a plaintiff's withdrawal from the process may be excused by a defendant's bad faith engagement. *See Yellow Freight Syst.*, 2002 WL 31011859, at *23 ("Plaintiff's doubts about [employer's] good faith, and his belief that no bona fide accommodation was being offered, are further warranted by the context in which the letter was sent."); *Sivio*, 436 F. Supp. 3d at 796 ("[B]ecause a reasonable jury could conclude either that [the employee] did not abandon the interactive process, or that she abandoned the interactive process after [the employer] had already improperly denied a reasonable accommodation, her failure to accommodate claim survives summary judgment.").

In short, there are "conflicting facts about the provenance of a breakdown" in the interactive process so that the Court must deny Defendant's motion for summary judgment. *Goonan*, 916 F. Supp. 2d at 480.

* * *

For the reasons given, Defendant is not entitled to summary judgment on Plaintiff's ADA claim.

## II.    NYCHRL Claim

Plaintiff also brings a failure-to-accommodate claim under the NYCHRL.  "The Second Circuit has interpreted the amended NYCHRL as establishing a '"one-way ratchet," by which interpretations of state and federal statutes can serve only "as a *floor* below which the City's Human Rights law cannot fall."'" *Limauro v. Consol. Edison Co. of New York, Inc.*, 2021 WL 466952, at *4 (S.D.N.Y. Feb. 9, 2021) (quoting *Mihalik v. Credit Agricole Cheuvreaux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).  Put another way, the NYCHRL "affords protections broader than the ADA." *Howard v. City of New York*, 62 F. Supp. 3d 312, 323 (S.D.N.Y. 2014) (alteration adopted) (quoting *Romanello v. Intesa Sanpaolo, S.p.A.*, 998 N.E.2d 1050, 1052 (N.Y. 2013)).  For example, the NYCHRL defines disability more broadly than the ADA and does not require a showing that an impairment substantially limit a major life activity, *see Rodriguez v. Verizon Telecom*, 2014 WL 6807834, at *7 (S.D.N.Y. Dec. 3, 2014); unlike the ADA, the NYCHRL "unquestionably forecloses summary judgment where the employer has not engaged in a good faith interactive process regarding a specifically requested accommodation," *Elmessaoudi v. Mark 2 Rest. LLC*, 2016 WL 499258, at *8 (S.D.N.Y. Sept. 15, 2016); and, unlike the ADA, the NYCHRL "places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation would

place an undue hardship on its business," *Howard v. City of New York*, 62 F. Supp. 3d 312, 323 (S.D.N.Y. 2014).

Because the Court denies Defendant's motion for summary judgment on Plaintiff's ADA claim, the Court also denies Defendant's motion for summary judgment on Plaintiff's claim under the broader NYCHRL for the same reasons. *See Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261–62 (S.D.N.Y. 2009); *Ugactz v. United Parcel Serv., Inc.*, 2013 WL 1232355, at *14 n.25 (E.D.N.Y. Mar. 26, 2013); *cf. Limauro*, 2021 WL 466952, at *4 ("Practically speaking, because the NYCHRL is more protective than its state and federal counterparts, a claim is automatically stated under the NYCHRL if it is stated under the federal and state statutes . . . .").

## CONCLUSION

The motion for summary judgment is DENIED.  A telephonic case management conference is scheduled for April 14, 2022 at 3:00 p.m.  Parties are directed to dial into the Court's teleconference line at 888-251-2909 and use access code 2123101.

The Clerk of Court is respectfully directed to close Dkt. No. 60.


SO ORDERED.


Dated: March 25, 2022
      New York, New York
                                     LEWIS J. LIMAN
                           United States District Judge