M3MVMAL1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    LAURENCE MALZBERG,

4                    Plaintiff,

5           v.                              19 Civ. 10048 (LJL)

6    NEW YORK UNIVERSITY,

7                    Defendant.             Argument

8    ------------------------------x
                                            New York, N.Y.
9                                           March 22, 2022
                                            5:00 p.m.
10
     Before:
11
                        HON. LEWIS J. LIMAN,
12
                                            District Judge
13
                             APPEARANCES
14
     MENKEN SIMPSON & ROZGER
15        Attorneys for Plaintiff
     BY:  RAYA SAKSOUK
16        SCOTT SIMPSON

17   KAUFMAN BORGEEST & RYAN
          Attorneys for Defendant
18   BY:  JOAN M. GILBRIDE
          ESTHER B. FEUER
19

20

21

22

23

24

25

M3MVMAL1

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Starting with counsel for
 3    plaintiffs, please state your appearance for the record.
 4              MS. SAKSOUK:  Raya Saksouk for the plaintiff, Larry
 5    Malzberg.
 6              THE COURT:  Good afternoon.
 7              MR. SIMPSON:  Scott Simpson, also for the plaintiff,
 8    Larry Malzberg.  Good afternoon.
 9              THE COURT:  Good afternoon.
10              MS. GILBRIDE:  Good afternoon, your Honor.
11              Joan Gilbride from Kaufman, Borgeest & Ryan, for the
12    defense.
13              THE COURT:  Good afternoon.
14              MS. FEUER:  Esther Feuer, also from Kaufman, Borgeest
15    & Ryan for defendant.
16              THE COURT:  Good afternoon.
17              So it's defendant's motion.  I'll hear first from
18    defendants.  And then I'll hear from Ms. Saksouk.
19              Is it the correct pronunciation?
20              At the end of the proceedings today, I'm going to ask
21    defendant to order a copy of the transcript on an expedited
22    basis.
23              As I think my courtroom deputy probably informed you,
24    if you would like to address the Court without the mask on, you
25    may do so from the podium.  And I think I really need about 15
```

M3MVMAL1

1    or so minutes from each side.  If you want to in your argument

2    focus me on the parts of the 56.1 statements that you think are

3    most helpful to your case, that would be helpful to the Court.

4            Let me hear from defendant.

5            MS. GILBRIDE:  Thank you, your Honor.

6            I will take advantage of the ability to take my mask

7    off.

8            THE COURT:  It's a welcome one.

9            MS. GILBRIDE:  Yes.

10           Good afternoon, your Honor.

11           My name is Joan Gilbride.  I represent the defendant,

12   New York University, in this matter.  And we have filed a

13   motion for summary judgment.

14           Plaintiff, Laurence Malzberg, was a physician's

15   assistant at NYU.  He was there for quite a period of time and

16   he worked in the radiology department.

17           Essentially, this is a case about a failure -- alleged

18   failure to accommodate a disability.  But as we argue in our

19   summary judgment motion, it's a plaintiff who, we argue, does

20   not have a disability within the meaning of the statute and

21   never asked for an accommodation.  So essentially, as we went

22   through discovery here in this case, we were able to focus upon

23   those issues.  And significantly, the arguments that we're

24   making here are that Mr. Malzberg does not have a disability,

25   and that he never requested an accommodation.

M3MVMAL1

| | |
|---|---|
| 1 | During the course of discovery, Mr. Malzberg in his |
| 2 | deposition — and this is in our Rule 56, your Honor — he |
| 3 | admitted that he was not under the care of a physician.  So |
| 4 | initially he alleged that he had two disabilities.  He said he |
| 5 | had an issue with his back, and also an issue with his eyes. |
| 6 | He had had cataract surgery.  Through the course of the |
| 7 | briefing here for summary judgment, plaintiffs had withdrawn |
| 8 | their argument about the eyes.  So, you know, there's a lot of |
| 9 | briefing on that, information on Rule 56, please, you can |
| 10 | ignore that. |
| 11 | But with respect to his back, plaintiff admitted at |
| 12 | his deposition that he had not been under the care of a |
| 13 | physician. |
| 14 | THE COURT:  I can understand why that might be |
| 15 | relevant in an evidentiary sense, but why would that be |
| 16 | considered to be dispositive? |
| 17 | MS. GILBRIDE:  Well, your Honor, what we think is |
| 18 | dispositive is that he does not satisfy the statutory |
| 19 | definition of "disability."  And the courts in the Second |
| 20 | Circuit look -- the evidence that they look to see to support a |
| 21 | claim of disability, of course, there could be obvious things, |
| 22 | like somebody has -- is deaf or is missing an arm or things |
| 23 | like that.  But in the absence of that, what courts look for is |
| 24 | some medical evidence. |
| 25 | And here, plaintiff was not in the care of a |

M3MVMAL1

| | |
|---|---|
| 1 | physician.  He had not been in the care of a physician for |
| 2 | almost eleven years.  He had had an MRI back in 2008.  This |
| 3 | situation arose in 2019.  He had been working in the radiology |
| 4 | department performing various procedures, mainly inserting -- |
| 5 | THE COURT:  Let's go through the elements though in |
| 6 | terms of disability. |
| 7 | Do you dispute that a back condition can constitute an |
| 8 | impairment with respect to the first step? |
| 9 | MS. GILBRIDE:  We don't dispute that, your Honor.  In |
| 10 | certain circumstances, of course, a back injury or a record of |
| 11 | a back injury could be an impairment. |
| 12 | THE COURT:  And is the focus of your argument then |
| 13 | whether it substantially limits a major life activity?  There |
| 14 | is medical evidence of a back condition; correct? |
| 15 | MS. GILBRIDE:  Plaintiff had an MRI in 2008, which |
| 16 | indicated that he had muscular -- it's a degenerative bulging |
| 17 | of the disks, essentially, which, if you look at the medical |
| 18 | information that's available to anybody online, essentially, |
| 19 | what that is is just, you know, something that happens with |
| 20 | aging.  We probably all have that condition.  And, you know, so |
| 21 | there's definitely -- he had this MRI in 2008. |
| 22 | He worked for us for eleven years with no indication |
| 23 | of any need for any kind of an accommodation or any issues with |
| 24 | respect to the duties that he was performing. |
| 25 | THE COURT:  Isn't the relevant question not the |

M3MVMAL1

1    history of the eleven years, but at the moment in time when

2    he's asked about the new position, whether he's got an

3    impairment that substantially limits major life activities?

4         MS. GILBRIDE:  Yes, your Honor.  Absolutely.  That is

5    the key time period, at that moment in time.

6         And the evidence that's before the Court that's in the

7    record is virtually nil with respect to that period of time.

8         THE COURT:  Isn't there evidence in the record that's

9    undisputed that he was not able to stand for more than 10 to 15

10   minutes?  Do you dispute that?

11        MS. GILBRIDE:  Your Honor, the only evidence there is

12   that -- there's no evidence other than his self-serving

13   statement that that was a fact.  No one observed that.  He was

14   observed and he admitted in his testimony that he walked back

15   and forth at work.  He walked from one building on 17th Street

16   to 30th Street.  So we do dispute that, your Honor.  I don't

17   think -- in fact, I don't even think that's what plaintiff is

18   claiming.

19        He's claiming that he couldn't stand for more than 15

20   to 20 minutes wearing a lead apron, which I'm not sure that

21   that qualifies -- in fact, I'm sure that it doesn't qualify as

22   a major life activity.  If he was arguing, for example, that he

23   couldn't stand, just stand, you know, for some period of time,

24   and there was some medical evidence to support that, we would

25   not dispute that that -- perhaps that could qualify as an

M3MVMAL1

1    impairment.  But then you have to go to the next step, whether

2    it substantially limits a major life activity, your Honor.  And

3    there's just -- there's no evidence in the record, other than

4    plaintiff's self-serving statements, that that is, in fact, the

5    case.

6            THE COURT:  If, in fact, there was evidence -- and

7    I'll ask the plaintiffs about the evidence.  But if, in fact,

8    there is evidence from which the jury could find that he

9    couldn't stand for extended periods of time, isn't that enough

10   for a fact-finder to determine that that would substantially

11   limit a major life activity?  Isn't standing actually a major

12   life activity?

13           MS. GILBRIDE:  Your Honor, we don't dispute that.  Of

14   course standing is a major life activity.  There's no question.

15           But plaintiff's argument is that he couldn't stand

16   with a lead apron for 15 to 20 minutes.  That's his argument.

17   He obviously could stand.  He walked back and forth to work, he

18   performed his job responsibilities.  I mean, there's no

19   question that he was able to stand.

20           Just so your Honor -- there was never a request by

21   Mr. Malzberg for any kind of an accommodation.

22           THE COURT:  That's now a different argument.

23           MS. GILBRIDE:  Well, I mean, I think it's evidence

24   also, your Honor, of his -- whether or not there was a

25   disability, of whether or not there was any evidence in the

M3MVMAL1

1    record to support his argument that he is disabled.  So he was

2    performing his job functions.  He was doing his job.

3              THE COURT:  Right.  But we're now talking about

4    actually a different job.  And the notion -- I thought there

5    was testimony in the record that the previous job didn't

6    require as much standing or exertion of effort as the new job

7    that he was asked to assume.

8              MS. GILBRIDE:  Well, plaintiff's testimony is that he

9    believed that the new job would require more standing.  But, in

10   fact, the evidence demonstrates that he never even accepted the

11   job.  So he -- you know, it's really pure speculation on his

12   part concerning whether or not he could perform the job.  And

13   he never indicated to anybody that he needed any kind of an

14   accommodation to perform the job.

15             So he had been in that position -- or he thought -- he

16   thought he was going back to the same position he had had.  He

17   had been in -- it's the VIR, the vascular interventional

18   radiology department.  He had been in that department up until

19   2005 -- sorry, 2012.  And then in 2012, he was asked to

20   transfer to another location.  And he was performing a subset

21   of what he'd been doing in the first job.

22             So when this happened in February of 2019, I think

23   plaintiff automatically assumed that he was going to be going

24   back to that same position.  In fact, there was never a meeting

25   of the minds about what the duties of that job were going to be

M3MVMAL1

1   because plaintiff immediately said, I'm not doing it.

2          THE COURT:  Well, that's actually what your witnesses

3   testified to.  What he testified to was that at the February

4   meeting he referenced his back problem, he referenced his

5   impairments.

6          MS. GILBRIDE:  He did testify to that, you're right,

7   your Honor.

8          THE COURT:  And isn't that enough to have triggered a

9   responsibility on the part of your client to say, Well, we can

10  accommodate that?

11         MS. GILBRIDE:  No, your Honor, I don't think it is.

12         THE COURT:  Why not?

13         MS. GILBRIDE:  The case law, the *Brady v. Walmart*

14  case, which essentially a plaintiff has the burden -- an

15  employee has the burden of requesting an accommodation.

16         THE COURT:  But they don't need to use magic words.

17         MS. GILBRIDE:  No, no, they don't.  But in certain

18  circumstances -- and it's the *Brady* case where there is an

19  obvious disability.  And in that case, what it was, that was a

20  carve-out of the general principle that it is the employee's

21  burden to request an accommodation.  And in that case, the

22  *Brady* case, the plaintiff had cerebral palsy.  And it was

23  perfectly obvious to all of his coworkers and his supervisor

24  that he had a disability.  And in that case, the Second Circuit

25  carved out this exception and said, Where there's an obvious

M3MVMAL1

1    disability, then it is the -- then the employer has this

2    affirmative obligation, when they observe that, to institute

3    the interactive process.

4            Without the obvious disability, your Honor, it is

5    the -- it is clearly the employee's burden to begin the

6    interactive process.

7            THE COURT:  Right.  But it's not enough to say, I've

8    got a back problem.  I'm concerned about the job that you're

9    asking me to assume.  I'm not sure that I can do it because of

10   my back problem.  Let's assume that that's the hypothetical.

11   Why wouldn't that be enough for the employer then to engage?

12   Doesn't at that point it become obvious to the employer that

13   there is an impairment that would require an accommodation?

14           MS. GILBRIDE:  I think the burden at that point is

15   on -- still on the employee to say, I need something.  I need

16   some -- I need you to change the job.  I need you to do

17   something.  That never happened here.  Mr. Malzberg simply, you

18   know, moved on.  He moved on to another job opportunity.  He

19   tried to obtain another job.  And, in fact, his very last day

20   at NYU, he went back to his old job.  So he never indicated

21   that he wanted this new function.

22           THE COURT:  That's looking at things from your

23   perspective.  But if I construe all of the facts favorably to

24   the nonmoving party, draw inferences in favor of the nonmoving

25   party, wouldn't the facts tend to demonstrate that he actually

M3MVMAL1

1    did want this job and he wanted to stay at the hospital as long

2    as they could accommodate him?

3            MS. GILBRIDE:  Your Honor, I think one fact that is

4    undisputed is that on March 27th, he met with HR, which was

5    documented the following day.  And Ms. Tavares said to

6    Mr. Malzberg, If you want this position, we can work with you.

7    Let us know.  We'll engage with you in the interactive process.

8    And Mr. Malzberg's testimony was that he simply ignored it.  He

9    didn't respond.  That was his testimony.  So he ended whatever

10   interactive process was beginning at that point.  He just

11   failed to engage in the interactive process.

12           THE COURT:  Maybe it was at that point a little bit

13   too late from your client's perspective; they had ignored for

14   weeks the issue that had been raised as early as February, if

15   not before then.

16           MS. GILBRIDE:  Well, your Honor, I mean, February 14th

17   was when the first discussion was held about this change.  And

18   within a week, Mr. Malzberg was off interviewing for another

19   position.  And it wasn't until that process ended on March 15th

20   that he then, you know, went to HR and had this conversation.

21           So it's difficult to say -- I think it's very

22   difficult to say that that was too long or too late or, you

23   know, it was the way that the process went and that was

24   Mr. Malzberg's choice.  You know, he had -- he could have

25   responded on March 28th and said, I do want this job.  Here's

M3MVMAL1

1    what I need.  I mean, he never told us what he needed to do

2    this job.  His response was always, you know, I can't do it.  I

3    can't do it.  And that's not a request for an accommodation.

4    He never requested an accommodation.

5              I think, taking a look at the *Anderson v. National*

6    *Grid* case, in which Judge Bianco looked at back -- evidence of

7    a back injury.  I think there the Court made it clear that, you

8    know, there has to be some medical evidence; you can't simply

9    have the plaintiff's testimony at summary judgment saying that

10   he has a disability.

11             THE COURT:  Isn't there actually medical evidence in

12   this case, both in the form of the medical examination that was

13   done right before the employment ended and the subsequent

14   medical testimony?

15             MS. GILBRIDE:  There was an MRI that was done in 2008,

16   and then there was an MRI that was done on March 29th of 2019.

17   None of that information was ever submitted to the employer.

18             THE COURT:  Right.  But that goes to the question of

19   notice.  That seemed to me you were arguing that he didn't have

20   an impairment.  And if he didn't -- why isn't all of that

21   evidence, medical evidence of the impairment?

22             MS. GILBRIDE:  Your Honor, I don't believe that that

23   evidence, of those two MRIs, demonstrate that there was a

24   substantial limitation on Mr. Malzberg's ability to stand or

25   sit or to do any major life activity.

M3MVMAL1

1          THE COURT:  What about the evidence that was -- that's

2     in the record from after the time period that his employment

3     was terminated?

4          MS. GILBRIDE:  I think your Honor is referring to the

5     expert report that --

6          THE COURT:  Yes.

7          MS. GILBRIDE:  Yes.  From 2021.

8          THE COURT:  Right.

9          MS. GILBRIDE:  As your Honor pointed out earlier, the

10     key element is what was -- what the person's physical condition

11     was at the time that he's alleging that we should have

12     engaged --

13          THE COURT:  But isn't the later report evidentiary

14     with respect to his condition at the relevant time period?  You

15     surely wouldn't argue — maybe you would — that a litigant in a

16     case can't have a medical report or medical expert to testify

17     about what the current condition is, and that the current

18     condition is something that's chronic, and that would have

19     existed at the relevant time period?

20          MS. GILBRIDE:  You know, in a different context, of

21     course an expert's opinion would be relevant.  But here, this

22     is an individual who -- he did not examine Mr. Malzberg at the

23     time that the accommodation was being requested.  So it's pure

24     speculation on his part what Mr. Malzberg's physical condition

25     was back in 2019.  And it certainly is not evidence that was

M3MVMAL1

1    ever submitted to the employer.  I think it's not competent

2    evidence for the purpose -- for this particular purpose.  So I

3    don't believe that that is evidence that the Court should be

4    considering in determining whether or not Mr. Malzberg

5    satisfies the statutory definition of "disability."

6           Secondly, the second argument is that Mr. Malzberg

7    never requested a reasonable accommodation.  And I think the

8    case law there is clear from the Second Circuit, most recently

9    in the *Costabile* case, that it is the employee's burden to

10   request an accommodation.  And here, there's no evidence --

11   Mr. Malzberg admitted at his deposition that he did not request

12   an accommodation.  That's an admission.  That's in the record.

13   And I think without his request for an accommodation, he

14   cannot -- he can't satisfy the elements of a failure to

15   accommodate claim, which requires that he do that, and that the

16   employer then refuse that requested accommodation.  You can't

17   refuse something if it's never requested.

18           THE COURT:  Okay.  All right.  I've got your argument.

19           I'll give you five minutes at the end to respond.

20           MS. GILBRIDE:  Okay.  Thank you.

21           THE COURT:  Ms. Saksouk, maybe we can start with where

22   in the record there is evidence with respect to the limitations

23   of your client's ability to stand.

24           MS. SAKSOUK:  Yes.  Thank you, your Honor.

25           So, your Honor, in this case we have medical evidence

M3MVMAL1

1    from 2006, 2008, 2019, and afterwards, that substantiate

2    Mr. Malzberg's claim that he cannot stand for longer than 15 to

3    20 minutes at a time without a lead vest.

4             THE COURT:  I'm sorry, without --

5             MS. SAKSOUK:  Without a lead vest.  Purely standing

6    for 15, 20 minutes at a time, he cannot do that without severe

7    pain.

8             THE COURT:  And what you're saying is in your view

9    there is evidence in the record that he can't stand for more

10   than 10 to 15 minutes, regardless of whether he's got the lead

11   apron on.

12            MS. SAKSOUK:  Yes, your Honor, 15 to 20 minutes.

13            THE COURT:  Fifteen to 20.  I'm sorry.

14            MS. SAKSOUK:  Yes.

15            THE COURT:  And can you point me to where you think

16   there is evidence that would support that.

17            MS. SAKSOUK:  Yes, your Honor.

18            Well, I think the most probative piece of evidence

19   would be the March 29th, 2019 MRI report which, importantly,

20   was interpreted in our expert's report, Dr. Silber's report.

21   The report relied in large part on Dr. Silber's interpretation

22   of those MRI findings.  He found that they were consistent with

23   somebody who experiences back pain and who cannot stand for

24   prolonged periods of time.  And, in fact, Dr. Silber

25   recommended that plaintiff avoid standing for longer than 10 to

M3MVMAL1

1    15 minutes at a time.

2              THE COURT:  Doesn't that say that he avoids standing

3    for more than 10 to 15 minutes at a time without a lead apron?

4              MS. SAKSOUK:  Correct.

5              THE COURT:  Got it.

6              So your interpretation is even without a lead apron,

7    he can't stand for more than 10 to 15 minutes.

8              MS. SAKSOUK:  Yes, that's correct, your Honor.

9              THE COURT:  Okay.

10             All right.  I didn't mean to interrupt the flow of

11   your argument.  Why don't you start wherever you had prepared

12   to start.  I would be interested in your responses to the

13   argument from your colleague at the defense bar.

14             MS. SAKSOUK:  All right.  Thank you, your Honor.

15             All right.  So, your Honor, defendants have failed to

16   establish -- defendant has failed to establish that it's

17   entitled to summary judgment in this case; and I think there

18   are three principal reasons why that is.

19             First, the evidence, as we just discussed, does

20   support that Mr. Malzberg, Larry, has an ADA-qualified

21   disability.  The defendant concedes that standing is a major

22   life activity.  We know that from the EEOC regulations as well.

23   And prior cases have found that this kind of physical challenge

24   is substantially limiting under the law.

25             And specifically, those cases that are cited in our

1    brief are *Parada v. The Industrial Bank of Venezuela,* a Second

2    Circuit case from 2014, where the court held that the inability

3    to sit for a prolonged period of time may be a disability

4    depending on the totality of the circumstances.  And *Picinich*

5    *v. UPS*, which was a Northern District case from 2004, which

6    found that the plaintiff was disabled almost entirely based on

7    a doctor's report that she couldn't stand, sit, or walk for

8    more than 30 minutes at a time, as well as evidence that the

9    limitations were expected to be permanent.

10            And, your Honor, those are essentially the facts of

11   this case.  He cannot stand for longer than 15 to 20 minutes at

12   a time.  And the fact that he has medical evidence stretching

13   back to 2006 suggests it's been over 15 years, it is a

14   long-standing problem that has gotten worse.  There's no

15   indication that it will be going away anytime soon.

16            THE COURT:  Is it a musculoskeletal problem or

17   neurological problem?

18            MS. SAKSOUK:  I believe it's a skeletal problem, a

19   musculoskeletal impairment, your Honor.

20            Also, with respect to one of the points that defendant

21   made about the fact that plaintiff was walking from place to

22   place in the hospital, the ADA doesn't require that more than

23   one major life activity be substantially limited.  And I think

24   the use of the back is different, depending on if you're

25   walking or you're standing.  I don't think it's really

M3MVMAL1

1    probative.

2              THE COURT:  Defendant argues that there needs to be

3    medical evidence from the time.  And you, in your answer to me

4    just now, relied upon your expert's interpretation of the

5    records from after the time that your client is terminated.

6              There may be a common sense notion, you know, as to

7    whether you need medical evidence from the time or not.  Is

8    there case law with respect to whether you need medical

9    evidence of an impairment in order to qualify under the ADA?

10             MS. SAKSOUK:  Yes, your Honor.  In 2015, the Second

11   Circuit in the *Rodriguez* case, which we cite in our brief, it's

12   *Rodriguez v. Village Green Realty*, the court clarified that

13   medical evidence is not necessarily required in ADA cases on

14   summary judgment.  If there's other evidence in the record,

15   that's enough.

16             And also on that point, your Honor, there is a Third

17   Circuit case from 2000 that I think is relevant here because of

18   how it relates to back pain.  The Court in *Marinelli v. City of*

19   *Erie, Pennsylvania* found that failing to present medical

20   evidence of an impairment such as a neck injury or a back

21   injury doesn't warrant judgment as a matter of law because

22   these types of impairments are easily understood by a lay jury,

23   compared to, say, hepatitis C.  There's a case that they talk

24   about and distinguish in that case where hepatitis C is a

25   little bit -- it's harder to understand; you don't really have

M3MVMAL1

| 1 | a common sense knowledge of it.  But that's not the case with

| 2 | back pain, your Honor.

| 3 |          THE COURT:  What's your response to defendant's

| 4 | argument that your client really never requested an

| 5 | accommodation; he may have mentioned that he had back pain, he

| 6 | had concerns about the new job, but then he pretty quickly

| 7 | started to look for another job.  And, you know, is what your

| 8 | client did enough to trigger an obligation on the employer?

| 9 |          MS. SAKSOUK:  Yes, your Honor, it was.

| 10 |          So while it is a general -- it's probably more common

| 11 | that plaintiffs will directly ask for a reasonable

| 12 | accommodation, but the law doesn't require that since *Brady* in

| 13 | 2008.  And in reality, the exception to that test is that where

| 14 | the disability is obvious, as in where the employer knows or

| 15 | reasonably should have known about the disability, they are on

| 16 | the hook; they are obligated to participate and initiate the

| 17 | interactive process.

| 18 |          And actually on that point, your Honor, there is a

| 19 | case that just came down yesterday in this Court, it's Judge

| 20 | Ramos.  The case is called -- it's *Krow*.  And in that case --

| 21 |          THE COURT:  Do you have a Westlaw cite?

| 22 |          MS. SAKSOUK:  Yes, I do.  I actually have copies for

| 23 | the Court, as well, if you would --

| 24 |          THE COURT:  If you want to hand it up afterwards.

| 25 |          Do you have a copy for your adversary, as well?

M3MVMAL1

1              MS. SAKSOUK:  Yes.  Thank you.

2         So in that -- oh, sorry.  The WL cite is 2022 WL

3    836916, *Krow v. Pine Bridge Investments*.

4              And in that case, your Honor, the court dealt with

5    this question of when is a disability obvious.  And in that

6    case, the plaintiff had a stroke, which his employers knew

7    about.  And then he his performance review started to decline.

8    And the court found that that made -- that that decline of the

9    performance reviews made his disability obvious.  The employer

10   should have connected the dots and known something was wrong.

11             In this case, we're not even asking -- or plaintiff

12   isn't even asking NYU to make that sort of inference.  He told

13   them specifically, I have back pain.  I cannot do this job

14   without severe back pain, which we -- it's hard to imagine him

15   being more obvious than that.

16             THE COURT:  This is, it seems to me, a little bit of

17   an odd case in a way because it's not as if your client was in

18   a position, and while in that position, requested an

19   accommodation.  He was being asked to transfer to a new

20   position.

21             And is there law with respect to when the ADA

22   obligations to make a reasonable accommodation are triggered

23   when there's a job offer, in other words, should I consider

24   this to be him to be in a position of somebody who's a

25   stranger, in essence, to NYU, who's applying for a position, or

M3MVMAL1

1     does it make a difference that he's already within the system?

2          MS. SAKSOUK:  I don't have a case directly on point,

3     your Honor.  But one distinguishing factor I'd like to point

4     out is that it's sort of disputed whether it was actually an

5     offer.  Plaintiff's position is that he was required to report

6     to IR starting on April 1st, 2019.  So I think in that way it

7     is more analogous to cases where the plaintiff is already in

8     the job and is making their need for an accommodation known.

9          Continuing on that point of notice, your Honor, this

10    is a major point of dispute between the parties.  The reason

11    it's a major dispute is because the answer may be dispositive

12    on the ultimate question of liability, because liability

13    attaches to the person who's responsible for the breakdown of

14    the interactive process.

15         And defendant's version of the story is that it wasn't

16    on notice that he had a disability until March 27th.  But this

17    is a clear factual dispute.  There's evidence in the record

18    that plaintiff talked to eight different people.  He raised

19    this concern at least 13 times in three months.

20         Most critically, on March 15th he texted and he

21    emailed his direct supervisor, Dr. Rybak; told him that he

22    can't do the job without pain; that's he's concerned about his

23    health.  And this entire time he was met with nothing but

24    silence or ultimatums.

25         Which gets to point three, your Honor, which is that

M3MVMAL1

1    NYU is responsible for sabotaging and breaking down the

2    interactive process.  Plaintiff spoke with people on the phone,

3    he emailed people, he texted people.  This is all in the

4    record.  He met with people in person.  And NYU's message from

5    the beginning was that if you don't take this job for any

6    reason, you're seen as quitting.

7            And if NYU had actually tried to respond in good

8    faith, what we would have seen was some kind of back and forth.

9    NYU, as we know it, is a sophisticated institution.  They have

10   reasonable accommodation forms that they give to employees.

11   Plaintiff never got these forms, he never knew they existed.

12   There's sort of a black hole of evidence in the HR department

13   about what happened.  Because even though they were trained to

14   take notes, many of these HR professionals did not take notes

15   when plaintiff raises concerns to them.  They did not open a

16   sales force case, they did not open a file for him, nothing was

17   produced in discovery from those meetings that he had with

18   employees from HR.

19           And in addition to that, Dr. Rybak, Dr. Sista, and

20   Mr. Lexa also, despite being familiar with the policy, NYU

21   policy, which requires them to contact employee and labor

22   relations when they become aware that an employee has a need

23   for a reasonable accommodation, none of them did that, which is

24   particularly telling because, your Honor, in defendant's

25   briefs, they claim that Malzberg disrupted or thwarted the

M3MVMAL1

1     interactive process because he did not respond to a supposed

2     offer of accommodation made by Dr. Sista on February 14.  We

3     dispute that that ever happened.  But it just goes to show how

4     disputed this is and how much the parties disagree as to the

5     facts.

6               And, your Honor, the law is clear that a party who

7     obstructs or delays the interactive process is not acting in

8     good faith.  A party that issues ultimatums, that's

9     stonewalling, fails to communicate by initiation or response,

10    is not acting in good faith and is, therefore, responsible.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M3MQmalO2

1            THE COURT:  Thank you very much, Ms. Saksouk.  Is

2      there more?  I think I've got your argument.

3            MS. SAKSOUK:  Just give me one second.

4            THE COURT:  Let me ask you, actually, Ms. Saksouk, in

5      addition to the expert's report that recommends that

6      Mr. Malzberg perform a more sedentary-type job that involves

7      periodic standing for no more than 10 to 15 minutes without an

8      apron, what other evidence do you contend supports the

9      proposition that your client is not able to stand for extended

10     periods of time or was not at the relevant time period able to

11     stand for extended periods of time?

12            MS. SAKSOUK:  Your Honor, the other evidence in the

13     record would be those MRI findings and the other medical

14     documents which are consistent with someone who experiences

15     back pain, and which our expert would surely testify to at

16     trial.

17            THE COURT:  Thank you very much.

18            MS. SAKSOUK:  Thank you, your Honor.

19            THE COURT:  Let me hear for about five minutes, no

20     more than that, from defendants.

21            MS. GILBRIDE:  I won't belabor any points, believe me.

22     Thank you, your Honor.

23            I just want to point out that in terms of the

24     Rodriguez case, which plaintiff's counsel mentioned, Second

25     Circuit case, in that case the court made clear that

M3MQmalO2

1    self-serving testimony is not sufficient to show evidence of a

2    disability.  Here, we had a plaintiff who never missed a day of

3    work.  He was performing his job.  It is highly disputed -- we

4    didn't get into these facts in the record because it's a

5    summary judgment motion, but it is disputed what our response

6    was when he went to HR.  The HR people say that he had no

7    interest in a request for an accommodation.  He just

8    stonewalled.  He was not interested in that, but those facts

9    are disputed, so we didn't get into that on the record.  But

10   what's not disputed, your Honor, is that there was a written

11   communication to plaintiff that he just did not respond to in

12   terms of, you know, requesting an accommodation.  That's not

13   disputed.

14              Thank you, your Honor.

15              THE COURT:  Okay, thank you.  Thank you both.

16   Defendant will order a copy of the transcript.

17              Ms. Saksouk, let me ask you, because this is in the

18   footnote, is this your first time arguing in federal court?

19              MS. SAKSOUK:  Yes.  Not exactly.  It's my first sort

20   of big motion, big dispositive motion.

21              THE COURT:  Well, congratulations.

22              MS. SAKSOUK:  Thank you, your Honor.

23              THE COURT:  You did a very nice job, as did all

24   counsel.

25              MS. SAKSOUK:  Appreciate it, your Honor.

M3MQmalO2

```
 1              THE COURT:  We'll adjourn.  I'll take this under
 2   advisement.
 3              (Adjourned)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```